# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO:  07 CR 683 |
| | : | |
| v. | : | **DEFERRED PROSECUTION** |
| | : | **AGREEMENT** |
| BP AMERICA INC., | : | |
| | : | |
| Defendant. | : | |

Defendant BP AMERICA INC. ("BP America" or the "Company"), a corporation

established and existing under the laws of the State of Delaware, by its undersigned attorneys,

pursuant to authority granted by its Board of Directors, and the United States Department of

Justice, Criminal Division, Fraud Section (the "Department of Justice" or the "Department")

enter into this Deferred Prosecution Agreement ("Agreement") which shall apply to BP America

and the following BP America subsidiaries: BP Corporation North America Inc., BP Products

North America Inc., BP America Production Company, BP Energy Company, and BP

International Services Company (hereinafter collectively referred to as the "BP Entities").  The

terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.     The United States will file a criminal Information that will be made public in the

United States District Court for the Northern District of Illinois charging BP America with

conspiring to commit offenses against the United States, that is, to violate the Commodity

Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343

(wire fraud), all in violation of 18 U.S.C. § 371.  In so doing, BP America knowingly waives its

right to be charged by indictment on this charge, as well as all rights to a speedy trial pursuant to

1

the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and all related applicable Local Rules of the United States District Court for the Northern District of Illinois for the period during which this Agreement is in effect.

2.      BP America hereby warrants and represents that the Board of Directors of BP America has duly authorized, in a specific resolution that is attached hereto, the execution and delivery of this Agreement by BP America, and that the person executing this Agreement has the authority to bind BP America.

3.      BP America admits, accepts and acknowledges responsibility for the acts of its current and former officers and employees of the BP Entities as set forth in the Statement of Facts attached hereto as "Attachment A." BP America further agrees the factual statements set forth in the Statement of Facts are accurate. Should the Department initiate the prosecution that is deferred by this Agreement, BP America agrees that it will neither contest the admissibility of, nor contradict, in any such proceeding, the Statement of Facts.

### Cooperation

4.      During the three (3) year term of this Agreement (and any extension thereof), BP America and the BP Entities agree to cooperate fully with the Department, the Commodity Futures Trading Commission ("CFTC"), any "registered entity" as that phrase is defined in 7 U.S.C. § 1a(29), or any "self-regulatory organization," as that term is defined in 17 C.F.R. § 1.3(ee), as directed by the Department or the CFTC, and an independent monitor (described in "Attachment B"), whenever any such entity, agency, or monitor investigates whether BP America, the BP Entities, or any of its directors, officers, employees, agents or consultants may

2

have: (1) engaged in any potential act of manipulation, attempted manipulation, cornering, or attempted cornering relating to the price of a "commodity," as commodity is defined in Section 1(a) of the CEA, in interstate commerce, or for future delivery; (2) knowingly delivered or caused to be delivered any false, misleading, or knowingly inaccurate information that could tend to affect the price of a commodity in interstate commerce; and/or (3) made any false or misleading statements made to any registered entity (collectively referred to as "Manipulative Conduct"). BP America agrees that its cooperation shall include, but is not limited to, the following:

      a.    BP America and the BP Entities shall truthfully disclose all information with respect to the activities of BP America and the BP Entities' directors, officers, employees, agents or consultants, concerning all matters relating to the current investigation of propane and any other alleged Manipulative Conduct, about which BP America and the BP Entities have any knowledge or about which the Department shall inquire. BP America and the BP Entities shall be deemed to "have any knowledge" of alleged Manipulative Conduct when information about such alleged Manipulative Conduct is known to a representative from any BP legal group, a representative of a BP compliance group, or any individual responsible for the supervision of trading managers or his or her supervisor(s). This obligation of truthful disclosure includes the obligation of BP America and the BP Entities to provide to the Department or any agency designated by the Department, upon request, any document, record, or other tangible evidence relating to the current investigation of propane or such other Manipulative Conduct about which the Department shall inquire of BP America and the BP Entities.

      i.    The Department specifically reserves the right to request that BP America and the BP Entities provide the Department with access to information, documents,

records, facilities and/or employees that may be subject to a valid claim of attorney-client privilege and/or the attorney work product doctrine.

  ii. If BP America or the BP Entities agree to provide the Department or the Monitor with access to information, documents, records, facilities and/or employees that may be subject to a claim of attorney-client privilege and/or attorney work product doctrine, the Department will agree: (a) not to assert that the provision of such materials in any way constitutes a waiver of the attorney-client privilege and/or the work product doctrine as it relates to third parties; (b) that the production of such materials provides no ground to obtain other documents, materials, or information, although any such grounds that exist apart from such production remain unaffected; and (c) to maintain the confidentiality of such materials and not to provide them to any third party, except to the extent that disclosure is required by law, otherwise authorized by this Agreement, or necessary in furtherance of the Department's discharge of its official duties and responsibilities;

  iii. Upon written notice to the Department, BP America and the BP Entities specifically reserve the right to withhold access to information, documents, records, facilities and/or employees based upon an assertion of a valid claim of attorney-client privilege or application of the attorney work product doctrine. Such notice shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as the basis of the claim.

  iv. In the event that BP America or the BP Entities withhold access to information, documents, records, facilities and/or employees, the Department may consider this

fact in determining whether BP America or the BP Entities have fully cooperated with the Department.

        v. Except as provided in this paragraph, BP America and the BP Entities shall not withhold from the Department any information, documents, records, facilities and/or employees on the basis of an attorney-client privilege or work product claim.

        b.     Upon request of the Department, with respect to any issue relevant to its current investigation of propane or such other Manipulative Conduct about which the Department shall inquire of BP America and the BP Entities, BP America and the BP Entities shall designate knowledgeable employees, agents, or attorneys to provide to the Department the information and materials described in Paragraph 4(a) above, on behalf of BP America and the BP Entities. It is further understood that BP America and the BP Entities must at all times provide complete, truthful, and accurate information.

        c.     With respect to any issue relevant to the Department's current investigation of propane or such other Manipulative Conduct about which the Department shall inquire of BP America and the BP Entities, BP America and the BP Entities shall use reasonable efforts to make available for interviews or testimony, as requested by the Department or the CFTC, current or former directors, officers, employees, agents and consultants of BP America, or any of its current or former subsidiaries, affiliates, or its parent company. This undertaking includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities, the CFTC, and any other agency designated by the Department for any civil or criminal investigative purposes. This undertaking

also includes identification of witnesses who, to the knowledge of BP America, may have material information regarding the matters under investigation.

d.    With respect to any information, testimony, document, record, or other tangible evidence provided to the Department or the CFTC pursuant to this Agreement, BP America and the BP Entities consent to any and all disclosures to other government agencies, whether agencies of the United States or a foreign government, as the Department and the CFTC shall deem appropriate.  Prior to providing any such information, the Department will seek reasonable assurances from the agency that it will abide by the terms of this Agreement and keep the information confidential except as may be necessary to discharge its official duties.

5.    In return for the full and truthful cooperation of BP America and the BP Entities, and compliance with all the terms and conditions of this Agreement, the Department agrees not to use any information related to the conduct described in the attached Statement of Facts against BP America, the BP Entities, or any of their parent or affiliated entities in any criminal or civil case, except in a prosecution for perjury or obstruction of justice occurring after the date of this Agreement; in a prosecution for making a false statement after the date of this Agreement; in a prosecution or other proceeding relating to any crime of violence; or in a prosecution or other proceeding relating to tax enforcement.  This does not preclude the Department or any government entity from using information contained in the attached Statement of Facts in a prosecution for crimes unrelated to the conduct described therein.

6.    In addition, the Department agrees that except in the event of a violation by BP America of any term of this Agreement, the Department will bring no additional charges against BP America, the BP Entities, or any of their parent or affiliated entities relating to: (a) the events

6

or transactions described in the attached Statement of Facts; (b) the events or transactions relating to West Texas Intermediate crude oil trading from 1999 to 2005 by any BP America subsidiary, including the storage of supply in Cushing, Oklahoma and at TEPPCO and trading activities as they relate to Platts assessments; and (c) the events or transactions relating to the trading activity and price reporting of ethane and ethylene in April 2003 by any BP America subsidiary. This Paragraph does not provide any protection against prosecution for any illegal activities, if any, committed in the future by BP America or the BP Entities, nor does it apply to any illegal conduct that may have occurred in the past, which are not described in the attached Statement of Facts. In addition, this Paragraph does not provide any protection against criminal prosecution of any present or former director, officer, employee, agent or consultant of BP America or the BP Entities for any violations committed by them.

### Monetary Penalty

7.      BP America agrees to pay a monetary penalty of $100,000,000 made payable to the U.S. Treasury within five (5) business days after acceptance of this Agreement by the Court. This amount is a final payment and shall not be refunded (a) if the Department moves to dismiss the Information pursuant to this Agreement, or (b) should the Department later determine that BP America has breached this Agreement and brings a prosecution against it. Further, nothing in this Agreement shall be deemed an agreement by the Department that this amount is the maximum criminal fine that may be imposed in any such prosecution, and the Department shall not be precluded in such a prosecution from arguing that the Court should impose a higher fine. The Department agrees, however, that in the event of a subsequent breach and prosecution, it will recommend to the Court that the amount paid pursuant to this Agreement should be offset

7

against whatever fine the Court shall impose as part of its judgment. BP America acknowledges that no tax deduction may be sought in connection with the payment of this $100,000,000 penalty.

8.    The parties have agreed that the fine of $100,000,000 for defendant BP America is appropriate based upon the following factors:

a.    By entering and fulfilling the obligations under this Agreement, defendant BP America has demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct and agreed to continue its cooperation with the Department; and

b.    By entering into a deferred prosecution agreement with the Department, the defendant has, among other things, agreed to engage a monitor.

### Victim Restitution

9.    The parties agree that BP America will pay a total of $53,503,000 into a fund established for victim restitution (the "Restitution Fund"), including for possible settlement of any pending claims asserted in class action lawsuits brought by direct purchasers or indirect purchasers of February 2004 TET propane. The payment of this money into the Restitution Fund shall not constitute an adjudication of any individual claim presently asserted or asserted in the future by any victim.

10.    Victims eligible to submit claims for payment from the Restitution Fund include persons and entities that meet all three of the following criteria:

a.    purchased physical barrels of propane from February 12, 2004 through March 2, 2004;

8

b.    purchased physical barrels of propane from an entity identified as a Prime Supplier by the U.S. Energy Information Administration ("EIA"); and

c.    purchased propane transported by the Texas Eastern Products Pipeline Co., LLC ("TEPPCO") system or another pipeline system in one of the following states: Alabama, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, and West Virginia.

11.    Any entity listed on the EIA Prime Supplier Exclusionary List, EIA Form-782C, in February 2004 is excluded from submitting a claim for restitution to the Restitution Fund.

12.    The exclusion of any potential victims from the class of victims eligible to be reimbursed through the Restitution Fund shall not be construed to confirm or deny potential liability for those victims.

13.    BP America agrees to retain and to compensate an individual or entity to administer the distribution of the proceeds of the Restitution Fund (hereinafter referred to as the "Third Party Administrator" or "Administrator"). The Third Party Administrator shall be selected by BP America and approved by the Department. Within 30 days of the date of execution of this Agreement, BP America will submit to the Department a proposal setting forth the identity and terms of retention and compensation of the Third Party Administrator. The Department will approve or disapprove the proposed Third Party Administrator within 15 days of its receipt of a proposal. If the Department disapproves of the proposed Third Party Administrator, BP America will, within 30 days of receipt of notice of such disapproval, submit a revised proposal, which the

9

Department will approve or disapprove within 15 days. The procedure set forth in this paragraph will continue, as necessary, until such time as the Department approves a proposed Third Party Administrator.

14.     Within six (6) months of the retention of the Third Party Administrator, the Administrator will prepare and submit to the Department a plan (the "Restitution Plan") setting forth the procedures governing the activities of the Third Party Administrator, including but not limited to (a) the procedures by which victims eligible to seek reimbursement from the Restitution Fund will be identified; and (b) the procedures by which the financial losses of such victims will be determined and restitution for such losses will be paid. In connection with the preparation of the Restitution Plan, BP America and the BP Entities shall assist and cooperate with the Third Party Administrator. Because the restitution paid pursuant to this Agreement is not ordered as part of a judgment of conviction, the provisions of 18 U.S.C. §§ 3663A *et seq.* are inapplicable. The Restitution Plan must be approved by the Department and the Court. The Department will approve or disapprove the Restitution Plan within 30 days of its receipt. If the Department disapproves the proposed plan, the Third Party Administrator will, within 30 days of receipt of notice of such disapproval, submit a revised plan, which the Department will approve or disapprove within 30 days. This process will continue, as necessary, until a plan is approved by the Department. Upon approval of the Restitution Plan by the Department, the Department and BP America will jointly submit the approved Restitution Plan to the Court for its approval. If the Court rejects the approved Restitution Plan, the procedure set forth in this paragraph will be repeated until such time as the Court approves a Restitution Plan. An extension of time may be granted by the Department upon request.

15.     Within twelve (12) months of the retention of the Third Party Administrator, the Administrator will prepare and submit to the Department a distribution plan (the "Distribution Plan")

10

setting forth the manner for distributing the restitution funds. The Distribution Plan shall outline all material issues that exist regarding the proposed distribution. The Distribution Plan must be approved by the Department and the Court. The Department will approve or disapprove the Distribution Plan within 45 days of its receipt. If the Department disapproves the proposed plan, the Third Party Administrator will, within 30 days of receipt of notice of such disapproval, submit a revised plan, which the Department will approve or disapprove within 30 days. This process will continue, as necessary, until a plan is approved by the Department. Upon the approval of the Distribution Plan, the Department and BP America will jointly submit the approved Distribution Plan to the Court for its approval. If the Court rejects the approved Distribution Plan, the procedure set forth in this paragraph will be repeated until such time as the Court approves a Distribution Plan.

16.    The Third Party Administrator shall not report to BP America or any of its direct or indirect affiliates, subsidiaries, or parent corporations.

17.    Within fourteen (14) days of appointment, the Third Party Administrator shall open an interest-bearing bank account in order to receive monies to be paid by BP America under the Agreement. All proceeds deposited shall be held in the form of cash, cash equivalents, or a similarly safe financial instrument. All interest and other income of any type earned on funds held in the account shall be available for distribution by the Third Party Administrator. Immediately after opening the account, the Third Party Administrator shall notify BP America of such opening and shall provide BP America with all bank account information necessary to enable and facilitate the funding of the bank account.

18.    BP America agrees that the $53,503,000 for the Restitution Fund shall be paid as a lump sum within five (5) business days after receiving the bank account information from the Third Party Administrator.

11

19.    None of the proceeds of the fund shall be payable as attorney's fees. All costs of administering the Restitution Fund, including all costs associated with the retention and actions of the Third Party Administrator, are to be born by BP America.

20.    Within sixty (60) calendar days after the appointment of the Third Party Administrator, BP America shall provide notice to potential victims by, at least:

    a.    Providing written notification of the existence of the Restitution Fund, subject to the review of the Department, to all direct counterparties that purchased TET propane, including contracts for physical propane and financially settled contracts, from February 12, 2004 through March 2, 2004, from BP America or any of its direct or indirect affiliates, subsidiaries, or parent corporations; and

    b.    Providing public notice of the existence of the Restitution Fund, subject to the review of the Department, in a nationally distributed newspaper.

21.    To the extent that any money in the Restitution Fund is not claimed by victims within two (2) years of the appointment of the Third Party Administrator, the remaining amount may, at the discretion of the Third Party Administrator, be transferred to a fund for other potential classes of victims affected by the conduct described in the attached Statement of Facts. If after three (3) years of the appointment of the Third Party Administrator, the remaining amount shall revert to the United States Treasury, unless an extension is granted by the Department.

## Other Payment

22.    In addition to the above, the parties further agree that BP America will pay $25,000,000 to the United States Postal Inspection Service Consumer Fraud Fund. BP America

agrees that this amount shall be paid as a lump sum within five (5) business days after acceptance of this Agreement by the Court.

### Independent Monitor

23.   Under the terms and conditions set forth in Attachment B, which is incorporated by reference herein, BP America and the BP Entities agree to oversight and monitoring by an independent monitor ("Monitor"). BP America, the CFTC, and the Department shall use mutual best efforts to identify a mutually acceptable person, who, subject to the approval of the Court, shall serve as the Monitor.

### Deferral of Prosecution

24.   In consideration of BP America's entry into this Agreement and BP America's: (a) cooperation with the Department and the CFTC in their investigations of this matter; (b) acceptance and acknowledgment of responsibility for its conduct; (c) agreement to take voluntary remedial actions, including its engagement of an outside consulting firm to evaluate BP's trading compliance programs and to adopt recommended measures; (d) engagement of an independent monitor pursuant to this Agreement; (e) agreement to continue to cooperate with the Department and the CFTC in their investigations; and (f) compliance with all of the terms of this Agreement, the Department shall recommend to the Court that prosecution of BP America on the Information be deferred for a period of three (3) years from the date of entry of this Agreement, subject to extensions as described in Paragraph 29 herein.

25.   If the Department determines, in its sole discretion, that BP America is in compliance with all of its obligations under this Agreement, including its obligation to adopt the recommendations of the Monitor, in accordance with the terms of Attachment B, at the expiration

of the period of deferral (including any extensions thereof), the Department will not continue a criminal prosecution against BP America and the BP Entities, will move to dismiss the Information, and this Agreement shall expire.

26.    BP America and the Department understand that the Agreement to defer prosecution of BP America must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason, both BP America and the Department are released from all obligations imposed upon them by this Agreement except that BP America agrees not to object to the dismissal of the Information and the filing of any superseding charging documents.

27.    Should the Department determine in its sole discretion that BP America or the BP Entities committed a willful and knowing material breach of any provision of this Agreement, the Department shall provide written notice to BP America of the alleged breach and provide BP America a two-week period within which to request a meeting to make a presentation to the Department to demonstrate that no material breach has occurred, or, to the extent applicable, that the breach is not a willful and knowing material breach or has been cured. The parties hereto expressly understand and agree that should BP America fail to request such a presentation within a two-week period, the Department in its sole discretion may presume that BP America or the BP Entities willfully and knowingly materially breached this Agreement.

28.    It is further understood that should the Department in its sole discretion determine that BP America has committed any federal crime involving Manipulative Conduct other than a misdemeanor violation, knowingly given false, incomplete or misleading information relating to the current investigation of propane or such other Manipulative Conduct about which the

14

Department shall inquire of BP America and the BP Entities, or have otherwise knowingly violated any provision of this Agreement, BP America shall, in the Department's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge, including but not limited to a prosecution based on the Information or the conduct described therein. Any such prosecution may be premised on any information provided by or on behalf of BP America or the BP Entities to the Department or the CFTC at any time. Any such prosecutions that are not time-barred by the applicable statute of limitations on the date of this Agreement may be commenced against BP America within the applicable period governing the statute of limitations. In addition, BP America agrees to toll, and exclude from any calculations of time, the running of the criminal statute of limitations for a period of three (3) years from the date of the execution of this Agreement (with two additional extensions of the tolling agreement, as necessary, to be co-extensive with the term of the independent monitor) for any crimes encompassed in the attached Statement of Facts. By this Agreement, BP America expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing and voluntary.

29.    BP America agrees that, in the event that the Department determines, in its sole discretion, that BP America has knowingly violated any provision of this Agreement, a one-year extension of the period of deferral of prosecution may be imposed by the Department, and, in the event of additional violations, such additional one-year extensions as appropriate, but in no event shall the total term of the deferral of prosecution period of this Agreement exceed five (5) years.

Any extension of the deferred prosecution period extends all terms of this Agreement for an equivalent period.

30.     It is further agreed that in the event that the Department, in its sole discretion, determines that BP America or the BP Entities have knowingly violated any provision of this Agreement: (a) all statements made by or on behalf of BP America or the BP Entities to the Department, including the attached Statement of Facts, and any testimony given by BP America or the BP Entities before a grand jury or any tribunal, at any legislative hearings, or to the CFTC, whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against BP America or the BP Entities; and (b) BP America and the BP Entities shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of BP America or the BP Entities prior or subsequent to this Agreement, or any leads therefrom, should be suppressed. The decision whether conduct or statements of any individual will be imputed to BP America or the BP Entities for the purpose of determining whether BP America or the BP Entities have knowingly violated any provision of this Agreement shall be in the sole discretion of the Department.

31.     BP America and the BP Entities acknowledge that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court should BP America or the BP Entities breach this Agreement and this matter proceed to judgment. BP America and the BP Entities further acknowledge that any such sentence is solely

within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

32.    BP America and the BP Entities agree that in the event they sell, merge, or transfer all or substantially all of their business operations or any part of the trading operations as they exist as of the date of this Agreement, whether such sale(s) is/are structured as a stock or asset sale, merger, or transfer, they shall include in any contract for sale, merger or transfer a provision binding the purchaser(s) or any successor(s) in interest thereto to the obligations described in this Agreement.

33.    BP America further agrees that during the three (3) year period of this Agreement (or any extensions thereof), the Company will refrain from entering into any contract, agreement, or reorganization that divests the U.S. Compliance and Ethics group of its authority to implement compliance rules and regulations for trading operations in North America, without prior approval from the Department.

34.    BP America and the BP Entities expressly agree that they shall not, through their present or future attorneys, directors, officers, or any other person authorized to speak for BP America or the BP Entities, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by BP America and the BP Entities set forth above or the factual statements set forth in the Statement of Facts. Any such contradictory statement shall, subject to cure rights below by BP America and the BP Entities, constitute a breach of this Agreement and BP America and the BP Entities thereafter shall be subject to prosecution as set forth in Paragraphs 28 through 30 of this Agreement. It shall be within the Department's sole discretion and decision whether any public statement by any such person contradicting a fact contained in

17

the Statement of Facts will be imputed to BP America and the BP Entities for the purpose of determining whether they have breached this Agreement. Should the Department determine that a public statement by any such person materially contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify BP America or the BP Entities. Thereafter, BP America or the BP Entities may avoid a breach of this Agreement by publicly repudiating such statement within two (2) business days after notification. Consistent with the obligations of BP America and the BP Entities as set forth above, BP America and the BP Entities shall be permitted to raise defenses and to assert affirmative claims and defenses in any other separate civil and regulatory proceedings that relate to the matters set forth in the Statement of Facts. This Paragraph is not intended to apply to any statement made by any former employee of BP America or the BP Entities in the course of any criminal, regulatory, or civil case initiated against any such individual.

35.    Should BP America or the BP Entities issue a press release in connection with this Agreement or the ongoing civil and criminal investigations of propane, BP America or the BP Entities shall provide the text of the press release to the Department twenty-four hours before its public release.

36.    It is understood that this Agreement is binding on BP America and the BP Entities and the Department but specifically does not bind any other federal, state or local law enforcement or regulatory agencies, although the Department will bring the cooperation of BP America and the BP Entities and their compliance with their other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by BP America or the BP Entities and their attorneys.

18

37. This Agreement sets forth all the terms of the Deferred Prosecution Agreement between BP America and the BP Entities and the Department. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for BP America and the BP Entities, and a duly authorized representative of BP America and the BP Entities.

38. Any notice to BP America or the BP Entities under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service or registered or certified mail, in each case addressed to Stephen R. Winters, Associate Group General Counsel, BP America Inc., 200 West Lake Park Blvd., Houston, TX 77079. Notice shall be effective upon actual receipt by BP America.

AGREED:

    FOR DEFENDANT BP AMERICA INC:

    Counsel for Defendant BP America Inc.

    FOR BP CORPORATION
    NORTH AMERICA INC.:

    Counsel for BP Corporation North America
    Inc.

    FOR BP PRODUCTS
    NORTH AMERICA INC.:

    Counsel for BP Products North America Inc.

    FOR BP AMERICA
    PRODUCTION COMPANY:

    Counsel for BP America Production
    Company

    FOR BP ENERGY COMPANY:

    Counsel for BP Energy Company

    FOR BP INTERNATIONAL
    SERVICES COMPANY:

    Counsel for BP International Services
    Company

20

FOR THE DEPARTMENT OF JUSTICE:

STEVEN A. TYRRELL
Chief, Fraud Section

By: _____
PAUL E. PELLETIER
Principal Deputy Chief, Fraud Section

By: _____
JERROB DUFFY
Trial Attorney, Fraud Section

By: _____
STACEY LUCK
Trial Attorney, Fraud Section


United States Department of Justice
Criminal Division, Fraud Section
10th & Constitution Avenue, NW
Washington, D.C. 20530
(202) 514-0819


Filed at Chicago, Illinois, on this ___ day of October, 2007.

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, BP AMERICA INC. ("BP AMERICA" or the "Company") has been engaged in discussions with the United States Department of Justice in connection with issues in relation to certain manipulative conduct arising from the trading of TET propane in 2003 and 2004; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a deferred prosecution agreement with the United States Department of Justice; and

WHEREAS counsel for the Company have advised the Board of Directors of the Company's rights, possible defenses, the Organizational Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the United States Department of Justice;

Therefore, this Board hereby RESOLVES that:

1.      The Company (i) consents to the filing in the United States District Court for the Northern District of Illinois of an Information charging BP AMERICA with conspiring to commit offenses against the United States, that is, to violate the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), all in violation of 18 U.S.C. § 371, and (ii) waives indictment on such charges and enters into a Deferred Prosecution Agreement with the United States Department of Justice.

2.      Counsel for the Company, or his delegate, are hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel, or his delegate, may approve;

3.      Counsel for the Company, or his delegate, the President or his delegate, and any Vice President are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.      All of the actions of the counsel for the Company, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the company.

Date: _Oct. 23, 2007_

_Paula J. Clayton_
Paula J. Clayton
Corporate Secretary
BP America Inc.

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP America Inc. ("BP America"). I understand the terms of this Agreement and voluntarily agree, on behalf of BP America, to each of its terms. Before signing this Agreement, I consulted with counsel for BP America. Counsel fully advised me of BP America's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP America, which has been advised of its rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP America, in any way to enter into this Agreement. I am also satisfied with counsel's representation in this matter. I certify that I am an officer of BP America and that I have been duly authorized by the Board of Directors of BP America to execute this Agreement on behalf of BP America.

Date: 10/24/07

BP AMERICA INC.

By: _____
Paul Reed
Vice President

## CERTIFICATE OF COUNSEL

I am counsel for BP America Inc. ("BP America") in the matter covered by this Agreement. In connection with such representation, I have examined relevant BP America documents and have discussed this Agreement with the Board of Directors and authorized representative of BP America. Based on my review of the foregoing materials and discussions, I am of the opinion that: BP America's representative has been duly authorized to enter into this Agreement by its Board of Directors on behalf of BP America. This Agreement has been duly and validly authorized, executed, and delivered on behalf of BP America and is a valid and binding obligation of BP America. Further, I have carefully reviewed this Agreement with the Board of Directors and General Counsel of BP America. I have fully advised them of BP America's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To my knowledge, BP America's decision to enter into this Agreement is an informed and voluntary one.

Date: 10-24-07

STEVEN R. PEIKIN
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

Counsel for BP AMERICA INC.

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP Corporation North America Inc. ("BP Corporation"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP Corporation, to each of its terms. Before signing this Agreement, I consulted with counsel for BP Corporation. Counsel fully advised me of BP Corporation's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP Corporation, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP Corporation and that I have been duly authorized by the Board of Directors of BP Corporation to execute this Agreement on behalf of BP Corporation.

Date: 10/24/07

BP CORPORATION NORTH AMERICA INC.

By: _____
Paul Reed
Vice President

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP Products North America Inc. ("BP Products"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP Products, to each of its terms. Before signing this Agreement, I consulted with counsel for BP Products. Counsel fully advised me of BP Products' rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP Products, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP Products and that I have been duly authorized by the Board of Directors of BP Products to execute this Agreement on behalf of BP Products.

Date: 10 | 24 | 07                    BP PRODUCTS NORTH AMERICA INC.


                                  By: _____
                                       Paul Reed
                                       Vice President

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP America Production Company ("BP America Production"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP America Production, to each of its terms. Before signing this Agreement, I consulted with counsel for BP America Production. Counsel fully advised me of BP America Production's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP America Production, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP America Production and that I have been duly authorized by the Board of Directors of BP America Production to execute this Agreement on behalf of BP America Production.

Date: 10 | 2 4 | 0 7

BP AMERICA PRODUCTION COMPANY

By: _____

Paul Reed
Vice President

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP International Services Company ("BP International"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP International, to each of its terms. Before signing this Agreement, I consulted with the counsel for BP International. Counsel fully advised me of BP International's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP International, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP International and that I have been duly authorized by the Board of Directors of BP International to execute this Agreement on behalf of BP International.

Date: 10/24/07

BP INTERNATIONAL SERVICES COMPANY

By: _____

James Dietz
Vice President

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP Energy Company ("BP Energy"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP Energy, to each of its terms. Before signing this Agreement, I consulted with the counsel for BP Energy. Counsel fully advised me of BP Energy's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP Energy, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP Energy and that I have been duly authorized by the Board of Directors of BP Energy to execute this Agreement on behalf of BP Energy.

Date: __10 | 26 | 07__

BP ENERGY COMPANY

By: _____

Paul Reed
Vice President

2

ATTACHMENT A

STATEMENT OF FACTS

Should this matter proceed to trial, the United States is prepared to prove beyond a reasonable doubt, by admissible evidence, the allegations set forth in the Information. This evidence will establish the following:

I.    **Introduction**

1.    From February 5, 2004, through March 12, 2004, employees of subsidiaries of BP America Inc. ("BP America") including, BP America Production Company and BP International Services Company (hereinafter collectively referred to as the "BP Entities") (BP America and the BP Entities will hereinafter be referred to collectively as "BP") conspired to manipulate the February 2004 propane market for propane transported in the TEPPCO pipeline system (hereinafter referred to as "TET" propane). As a result, the price of TET propane was artificial and inflated from February 12, 2004 through March 2, 2004.

2.    In accordance with the plan, the employees used the financial resources of BP to buy contracts for substantially all of the February 2004 TET propane supply to become the dominant owner, or "long-holder," of TET propane. The employees, at specific times thereafter, withheld supply from the market while continuing to purchase contracts to own more than the supply of TET propane in the TEPPCO system. BP's dominant ownership position, continued purchases of said propane subsequent to obtaining such a position, and withholding of supply at specific times thereafter, all distorted and made artificial the price of TET propane during February 2004. As a result of the employees' conduct, by the end of February 2004, BP acquired ownership of substantially all of the available supply of February 2004 TET propane in the United States. The employees executing the plan thus cornered the market for February 2004

TET propane, distorted and made artificial the price of February 2004 TET propane, and sold a portion of the supply at an artificial and inflated price.

II.   **Background**

   A.   **TET Propane Market**

   3.      Propane is a natural gas liquid ("NGL"). Propane is used by petrochemical industries to produce plastics and is also used as a source of energy for residential and commercial purposes. Residential and commercial demand for propane is seasonal. Typically, propane inventory levels are built up during the spring and summer. Then, during the winter heating season, propane consumption is high, resulting in lower inventory levels at the end of the heating season in February and March.

   4.      Residential and commercial consumption of propane is greatest in the Northeast and Midwest sections of the United States. The primary means by which propane is delivered to these regions is the Texas Eastern Products Pipeline Company, LLC ("TEPPCO") pipeline system, which is the only pipeline transporting propane from the TEPPCO storage facility in Mont Belvieu, Texas, to the Northeast and Midwest. Propane in the TEPPCO system is identified as TET propane. Propane in storage facilities at Mont Belvieu that is not maintained by TEPPCO or transported in the TEPPCO pipeline is referred to as "non-TET" propane.

   5.      TET propane is a commodity as defined in Title 7, United States Code, Section 1(a)(4), and TET propane that flows through the TEPPCO pipeline crosses various states. TET propane is a commodity in interstate commerce.

   6.      TET propane is predominantly traded "over-the-counter" in one of three ways: (1) direct, bilateral transactions between two parties; (2) voice broker transactions; and (3) electronic

transactions on the "Chalkboard" trading platform.[1]  In voice broker transactions, the brokers negotiate and execute deals on behalf of a buyer and seller.  In Chalkboard transactions, buyers and sellers post anonymous bids and offers on an electronic website, Chalkboard, and only learn the counterparty's identity when the transaction is completed.  Propane sales are generally traded in lots of 1,000 barrels (bbls) and each barrel is the equivalent of 42 gallons of propane.

7.      Propane prices are published by the Oil Price Information Service ("OPIS").  The prices published by OPIS are specific to the type of propane, such as TET propane, and the month or time period for which the propane is to be delivered.  Generally, a price is published for the current (or "prompt") month, the next (or "forward") month and for delivery the next day.  Propane traders trade TET propane contracts based upon these delivery distinctions.

8.      OPIS also publishes "average" prices, such as "daily average" and "monthly average," based on information collected directly from market participants.  An OPIS "daily average" price consists of the mean between the lowest and the highest reported prices on a given day.  Parties sometimes trade propane based on a "daily" or "monthly" average price as published by OPIS.  As a result, OPIS prices published for TET propane can affect the price paid by both commodity traders and end users for many categories of propane in the Midwest and Northeast, including, but not limited to, the District of Columbia and Illinois.

B.      **Corporate Organization and Structure**

9.      BP plc was a major international energy company headquartered in London, England, and organized as a private limited company under the laws of England and Wales, the shares of which were traded on the London Stock Exchange and the New York Stock Exchange.

---

[1] During all times relevant to this Statement of Facts, Chalkboard was owned by Chemconnect, Inc.

10.    BP America was a wholly owned subsidiary of BP plc. BP America is a holding company incorporated under the laws of Delaware and headquartered in Warrenville, Illinois, within the Northern District of Illinois.

11.    BP Corporation North America Inc. ("BP Corporation"), BP Products North America Inc. ("BP Products"), BP America Production Company ("BP America Production") and BP International Services Company ("BP International") were all subsidiaries of BP America.

12.    Within and across the corporate structure of BP, there were a number of groups, business units, and teams that focused on specific aspects of the companies' business. These groups and business units were not separate legal entities but rather existed within and across the various BP legal entities.

13.    The organizational group responsible on a global basis for overseeing trading activity was the Integrated Supply & Trading ("IST") group. Within IST there were a number of regional business units. The regional business unit responsible for the trading of gas and power products, including propane, in North America was North America Gas & Power ("NAGP"). During 2003 and 2004, the team within NAGP focused on the trading of natural gas liquids, including propane, was known as the NGL trading bench ("NGL Trading Bench" or "Bench").

14.    A separate regional business unit responsible for the production, transportation, and sales of natural gas liquids, including propane, in North America was the Natural Gas Liquids Business Unit ("NGLBU").

C.    **The NGL Trading Bench**

15.    During February 2004, the NGL Trading Bench was located in Houston, Texas, and employed approximately eight traders. All of the members of the NGL Trading Bench were employees of BP America Production, reporting to managers and other executives who were

4

employed by other BP America subsidiaries. The NGL Trading Bench entered into contracts to purchase and sell propane on behalf of BP Products.

16.     Once a contract was executed, a confirmation notice was sent to the counterparty, via the mails and wires of the United States, between BP's offices in Texas or Illinois and the various counterparties' offices which were located in Texas, Illinois, New York, and elsewhere.

17.     BP recorded the NGL Trading Bench traders' telephone communications. Traders had stations on the bench with separate telephone lines. The traders were aware that their conversations were recorded on those telephones.

18.     The NGL Trading Bench purchased and sold propane for use in BP Products' wholesale and petrochemical businesses, and for speculative purposes to generate a profit.

19.     BP Trader #1 was the primary trader responsible for trading TET propane from at least January 2003 to April 2005.

20.     Dennis N. Abbott was another trader on the NGL Trading Bench during the relevant time period. Abbott's primary responsibility involved the trading of heavy NGLs such as butane, and as the need arose, light NGLs, such as propane and other commodities.

21.     BP Trader #2 was a trader primarily responsible for trading ethane and other NGLs, as well as propane, during 2003 and 2004. During February 2004, BP Trader #2 assisted with the trading of TET propane and aided in the execution of the manipulation scheme.

22.     BP Trader #3 was primarily responsible for trading other categories of propane during 2003 and 2004, but also traded TET propane during the relevant time period.

23.     The direct supervisor of the traders on the NGL Trading Bench was the "bench leader" ("BP Bench Leader"). The BP Bench Leader's responsibilities included the development

and oversight of the NGL Trading Bench's trading strategies, and reporting to and seeking approval from executives who oversaw the NGL Trading Bench's trading operations.

24.     The BP Bench Leader reported to a Vice President responsible for supervising BP's trading in NGLs ("BP Executive #1"). BP Executive #1 was an employee of BP America Production.

25.     BP Executive #1 reported to the Chief Operating Officer of NAGP ("BP Executive #2"). BP Executive #2 was responsible, among other things, for the development, implementation, and execution of trading and marketing strategies for NAGP and was an employee of BP International.

26.     BP Executive #2 reported to the Chief Executive Officer or Business Unit Leader of NAGP ("BP Executive #3"). BP Executive #3 was an employee of BP International

27.     A BP Compliance Manager for NAGP ("BP Compliance Manager") sat on the NAGP trading floor and was an employee of BP America Production.

### III.   2003 TET Propane Manipulation Attempt

28.     The BP Bench Leader and members of the NGL Trading Bench conspired to manipulate the price of TET propane during February 2004 based, in part, upon information and experience gained in April and May of 2003 when members of the NGL Trading Bench attempted to manipulate the price of April 2003 TET propane. During April 2003, the NGL Trading Bench attempted to corner April 2003 TET propane by taking a large long position. Through this strategy, the NGL Trading Bench members sought to make money by purchasing substantially all of the available April TET propane supply, and sought to hold those barrels until the price increased based on the resulting lack of supply and then sell the barrels to market shorts.

29.    During a conversation on April 12, 2003, BP Trader #1, Abbott, and the BP
Bench Leader stated:

| | |
|---|---|
| Abbott: | *How does it feel taking on the whole market*, man? |
| BP Trader #1: | Whew. It's pretty big man. |
| Abbott: | Dude, you're the entire f[***]ing propane market. |

*    *    *

| | |
|---|---|
| BP Bench Leader: | Don't worry about it, it's the first two days of the month. Plenty of lead time for people to think that barrels will emerge and take a short position. |
| Abbott: | No, I mean, it's cool, *100% of the open interest in propane* probably, and uh 3% of the open interest in nat gas....I dig it, it just, sometimes its hard, *it just feels hard to take on the whole market sometimes.* . . . |

(emphasis added).

30.    Based on the April 2003 attempt to manipulate the price of TET propane,
members of the NGL Trading Bench booked a profit and learned information that they later used
during the February 2004 manipulation strategy. In particular, the NGL Trading Bench learned
what they believed to be the "dead stock" level of TET propane, or the "minimum operating
level" needed for the TEPPCO pipeline to function. The traders' perception of the dead stock
level, later coupled with knowledge of the total TEPPCO propane inventory, led the NGL
Trading Bench to believe they could estimate the total size of the available physical supply of
TET propane, thereby allowing them to estimate the total amount of physical contracts they
would have to purchase to corner February 2004 TET propane and effectuate a manipulation.

31.    On or about February 5, 2004, the BP Bench Leader and Abbott discussed the attempt to manipulate or "squeeze" the price of April 2003 TET propane and the dead stock information they gleaned from the prior attempt, stating:

<table>
<tr><td>BP Bench Leader:</td><td>The second point is, that I would imagine that the minimum operating level at the end of Feb[ruary] is higher than it is at the end of March or April because I think the wholesalers have to hold barrels. So I think the minimum level might be a little higher than we're assuming based on what we experienced in April <i>when we squeezed the April May.</i></td></tr>
<tr><td>Abbott:</td><td>Right, which was one of the reasons why it was harder to own all that April. That's why we had to take on a little bit more than we thought we had to take on, in April. And that's why I think that 2 mm, 2.1 mm barrels as that minimum in Feb., I think that's real, man, I think that is, that's the bottom at TET.</td></tr>
</table>

(emphasis added).

## IV.    2004 Propane Manipulation

32.    During February 2004, members of the NGL Trading Bench developed a plan to manipulate the price of February 2004 TET propane by becoming the dominant owner of February 2004 TET propane. As explained below, the strategy was intended to force other market participants holding short positions in TET propane at the end of February to purchase February 2004 TET propane from BP at an artificial and inflated price. Between approximately February 9, 2004, and February 27, 2004, members of the NGL Trading Bench executed the manipulation scheme by buying almost all of the available February TET supply in the TEPPCO system, withholding that supply during the month, and selling a portion of the supply later in the month, to certain counterparties holding short positions at artificial and inflated prices.

33.    Due to BP's conduct, from approximately February 12, 2004, through approximately March 2, 2004, the price of February TET propane was artificial and inflated by BP's conduct.

A.    **The Scheme**

34.    During January 2004, the BP Bench Leader identified and discussed conditions relating to the TET propane market that would render the market ripe for manipulation. On or about January 8, 2004, during a regularly scheduled call, the BP Bench Leader stated to other employees located in Texas, Illinois, and elsewhere that the TET propane market was "vulnerable to a squeeze."

35.    In addition, on or about January 13, 2004, the BP Bench Leader stated to another employee that February 2004 TET propane in the short term was "tight enough that if someone wanted to play games with it, potentially they could." The BP Bench Leader further stated that if someone wanted "to get a hold of this [TET propane] market and play some games with it" they could.

36.    On or about February 5, 2004, during a conversation with Abbott, the BP Bench Leader articulated the intent of the February 2004 TET trading strategy and the justification necessary for obtaining approval for the strategy:

> Two things I thought of. One, in terms of whether we should do this or not, in terms of talking to [BP Executive #1], what we stand to gain, is not just we'd make money out of it, but we would know from thereafter that *we can control the market at will*. If we never break the threshold, we'll never know what the answer is, you know what I mean?

(emphasis added).

37.    During January 2004 and the beginning of February 2004, the BP Bench Leader also instructed the NGL Trading Bench to amass a significant position in February TET propane,

both contracts for delivery of physical barrels as well as financial or "swap" contracts. By the estimate of BP Executive #1, entering February 2004, BP owned contracts for delivery for nearly 50% of all of the available physical February TET propane.

38.    Members of the NGL Trading Bench intended to earn a significant profit for BP by selling a portion of their February 2004 TET propane at the end of the month at prices inflated by their conduct, and then taking a small loss on the remaining barrels which would be carried into March. As such, the NGL Trading Bench recognized that they would purchase more propane than BP needed for its own business or commercial purposes, or could actively sell to counterparties during February. Furthermore, the NGL Trading Bench members could expect to profit personally by obtaining bonuses and other remuneration as a result of the anticipated profits BP would achieve through their market manipulation.

**B.    Execution of the Scheme: Buy, Withhold, and Sell**

**1.    The NGL Trading Bench's Attempt to Buy All Available Supply**

39.    Between on or about February 5, 2004 and on or about February 9, 2004, the BP Bench Leader directed the execution of the manipulation scheme by instructing BP Trader #1, Abbott, BP Trader #2, and BP Trader #3 to buy a significant amount of February 2004 TET propane without arousing the suspicion of other market participants.

40.    On the afternoon of February 9, 2004, the BP Bench Leader spoke to BP Trader #1 and Abbott to check the progress of the scheme. During the conversation, the BP Bench Leader, BP Trader #1, and Abbott stated:

| | |
|---|---|
| BP Bench Leader: | What's been going on? |
| BP Trader #1: | How much we got on? I was just looking at that, you wanna guess? 3.1 [million bbls]. |
| BP Bench Leader: | Has it been busy today? |

| BP Trader #1: | Oh yeah. Did it very quietly. 10 lots, 5 lots, 10 lots, 15 here, 5 here. The biggest lot I think was 75. |

*    *    *

| BP Bench Leader: | Did you feel good about it? |

| Abbott: | I kinda characterize it as . . . I characterize it as I was kinda surprised we were able to get 300 from the marketplace, basically, maybe 3-400 from the marketplace, without moving it that much. I mean we definitely were moving it [the price of TET propane] at the end of the day, it was definitely firming up at the end of the day . . . So it's kinda . . . it seems like something that will just kinda move fairly easily. |

41.    Later, during the same telephone call on February 9, 2004, the same traders discussed the plan to continue to purchase large quantities of TET propane:

| Abbott: | I mean tomorrow, tomorrow if we are able to buy another 4-500 [thousand] barrels tomorrow from the marketplace, I would be genuinely shocked. I mean, really shocked so . . . that's it. Then I think . . . we'll just have to play a waiting game and see, you know, how it's gonna shape up. |

| BP Bench Leader: | It, um, still remains to be seen, doesn't it? Still need to see some of these shorts come in . . . . |

42.    Finally, during the same February 9, 2004 telephone call, the traders identify the true nature of the scheme as one to "squeeze" other market participants:

| BP Bench Leader: | Half of me is saying, look, the fact that nothing's really moved in terms of the spread yet is good, because people aren't looking for ways out . . . alternative feeds, or backing out demand, so that's kind of a good thing. The down side is, of course, if it all happens at the last minute, it gets a bit messy. People start cheating, not delivering, and may start to look a little bit funny as well that the spread, you know, just erupts at the last minute. |

| BP Trader #1: | And we don't get the price out on all this paper [financial or "swap" contracts]. |
| Abbott: | Well, that's a different, thing, if we don't get a price out on all this paper. |
| BP Bench Leader: | The advantage of paper, is that we're selling at an index price there's no complaints. *If we squeeze it in the last four or five days of the month, ah, forgive my French, but ah, you know, it's going to be hard to say what's the fair price of the market at the time.* |

(emphasis added).

43.     Based on the activities of the BP Bench Leader, and BP Trader #1, Abbott, BP Trader #2, and BP Trader #3, between the morning of February 9, 2004 and the close of business of February 13, 2004, the NGL Trading Bench purchased contracts for an additional 1.4 million barrels of February 2004 TET propane. As a result, at the close of business on February 13, 2004, the position of the NGL Trading Bench exceeded 3 million barrels of physical propane, in addition to a volume equivalent to approximately 480,000 barrels in "paper" or financially settled propane contracts.

44.     As of February 13, 2004, the NGL Trading Bench estimated that BP's position then exceeded the volume of TET propane supply in the TEPPCO system. Additional waterborne imports or other sources could increase the supply, and delivery from the storage facility through the pipeline to end users could reduce supply during the month. Therefore, the NGL Trading Bench continued to monitor the TEPPCO inventory level. The traders on the NGL Trading Bench frequently discussed these inventory levels and also their estimates of the "dead stock," or minimum amount of propane needed for the pipeline to operate.

45.     On approximately February 15, 2004, factors unanticipated by the NGL Trading Bench caused the price of TET propane to decrease and the amount of available TET propane to increase. First, on February 15, 2004, the TEPPCO pipeline ruptured near Coschocton, Ohio,

12

causing a suspension in the delivery of propane until the pipeline was repaired. The rupture caused the amount of propane stored in Mont Belvieu, Texas, to accumulate and decreased the amount of propane that could be delivered from the pipeline. Second, weather forecasts around that time changed and unexpectedly indicated warmer weather in the Northeast, reducing the demand and expected demand of TET propane. Third, on February 17, 2004, BP received a published report from Commercial Services Company, Ltd. which forecast approximately 4.2 million barrels of propane destined for the United States via cargo ship in February 2004. This represented an increase in the amount of propane being imported into the United States. Combined, these factors put downward pressure on the price throughout the remainder of the month.

46.    Because the NGL Trading Bench had already purchased such a large quantity of February TET propane, by February 17, 2004, the NGL Trading Bench anticipated a significant loss of money if they began to unwind, or sell, their position at the prevailing price or if prices dropped further from the then-existing levels.    Nevertheless, the NGL Trading Bench accumulated even more TET propane.

47.    Between February 17, 2004 and February 20, 2004, the NGL Trading Bench purchased a substantial amount of additional contracts for more than 1.4 million barrels of physical February 2004 TET propane. By February 20, 2004, BP's position exceeded the TET propane in the TEPPCO system by approximately 1 million barrels.

48.    Between February 20, 2004, and February 29, 2004, the TEPPCO system propane inventory continued to increase. At various times during that period, BP's position in February TET propane also increased. During the last trading week of the month, BP's position reached approximately 5 million barrels of physical TET propane. From approximately February 17,

13

2004 through the last trading day of the month, February 27, 2004, BP's position exceeded the TEPPCO system inventory.

### 2.    Selective Withholding of Supply

49.    At certain times during late February, members of the NGL Trading Bench refused to sell physical TET propane to counterparties as part of their strategy to drive up the price. Acting at the direction of the BP Bench Leader, the traders at certain times refused to show offers or sell any of BP's TET propane, even though BP held contracts for delivery of millions of barrels, and in at least one instance a counterparty had offered "best bid."

50.    For example, on February 23, 2004, BP Trader #1 stated to a counterparty:

| | |
|---|---|
| Counterparty: | Can you use any Dynegy propane? |
| BP Trader #1: | Yea. |
| Counterparty: | Do you have any TET you can sell? |
| BP Trader #1: | Thought you were asking me about Dynegy. |
| Counterparty: | Well I am.  I got a guy who wants to sell Dynegy and buy TET. Do you have any TET you can sell? |
| BP Trader #1: | Not right now, I don't, but I'll take the Dynegy side. |

At the time BP Trader #1 refused to sell, BP's position exceeded 4 million physical barrels.

51.    Similarly, on February 26, 2004, BP Trader #2 stated to a counterparty:

| | |
|---|---|
| Counterparty: | I'm looking for 5,000 barrels of TET propane, didn't know if you guys were selling or not. |
| BP Trader #2: | No we're not right now, actually. |
| | *      *      * |
| Counterparty: | If you guys decided to come back in, I'm the best bid at five. |

14

At the time of this conversation, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane.

52.     BP did not offer or sell physical barrels of propane on February 26, 2004, but continued to purchase even more TET propane during the day.

### 3.     The NGL Trading Bench Sells at an Inflated Price

53.     At the beginning of February 27, 2004, the last trading day of the month, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane. The NGL Trading Bench began the day by buying additional barrels of February TET propane before 9:00 a.m. from the remaining counterparties who still had barrels to sell. This meant that although BP already owned contracts for more than the deliverable supply of February TET propane on the last trading day of the month, they bought more in an effort to ensure that they would be the only company in the market that could sell significant quantities of TET propane. By the end of the day, BP sold approximately 530,000 physical barrels of its accumulated February TET propane position. BP had to accept delivery of the remaining 4.4 million barrels and carry them into March at a significant loss.

54.     By mid-morning on February 27, 2004, the price for TET propane was not the result of legitimate forces of supply and demand, but was dictated by BP. Certain counterparties had no ability to bargain that day, but instead had to pay the prices set by BP:

| | |
|---|---|
| BP Trader #1: | [Company A] buys 25,000 at .89. |
| Voicebroker: | .89. Where's your next? .89 and a half? |
| BP Trader #1: | .89 and a half. |
| Voicebroker: | Alright. .89 and a half, next....are you just walking them up half step? |
| BP Trader #1: | Now. |

| | |
|---|---|
| Voicebroker: | For now you are? |
| BP Trader #1: | Yes. |
| Voicebroker: | 89 and half is next, his next offer is coming in a penny higher. |

55.    Later in the morning on February 27, 2004, BP Trader #1 stated to a voicebroker:

| | |
|---|---|
| Voicebroker: | Hey, um, do you have an offer? I got .90 bid by [Company C]. |
| BP Trader #1: | Uh, .905. |
| Voicebroker: | .905. Can you hang one second? [Talking on another line]. . . .905, he's about to hang up. |
| BP Trader #1: | No I'm not. Don't make me feel like the bad guy here. |
| Voicebroker: | Would you do 50 [thousand barrels]. |
| BP Trader #1: | 50? I'll do 50. |
| Voicebroker: | He'll do 50. [Company D]'s telling him to buy it because there's nobody else out here that has any but you. F***, *what's it gonna go to [BP Trader #1]? A buck?* |
| BP Trader #1: | Don't tell him you said that. |
| Voicebroker: | I didn't tell him that. |
| | *        *        * |
| BP Trader #1 | Everything you say is recorded on all these lines. |
| Voicebroker: | I hear you. |

56.    Further, in addition to the telephone sales, on certain occasions BP was dictating the price of sales through the use of Chalkboard. During periods when there were relatively few sellers of February 2004 TET propane in the market, members of the NGL Trading Bench posted both bids and offers on Chalkboard. At regular intervals, and usually after a single transaction in

16

the market occurred, the members of the NGL Trading Bench, often working in a coordinated fashion, would withdraw the bids and offers and increase both the bids and the offers, thereby effectively "stepping up the price."

57.    On February 27, 2004, a counterparty located in the Northern District of Illinois holding a short position in February TET propane was forced to buy from BP Products at an artificial and inflated price:

| | |
|---|---|
| Counterparty: | We just did a deal on Chalkboard, do you want to do another 5? |
| Abbott: | Another five, hold on . . . we're at .925 for 5 [thousand bbls]. |
| Counterparty: | Holy smokes! Okay. What's going on? Just people like me out there trying to find this? |
| Abbott: | Yeah. |
| Counterparty: | Well crap, I may have to, I gotta do something here. .925 is it? |
| Abbott: | Yep |
| Counterparty: | Jesus Christ, I don't have a choice do I? Not really? |
| Abbott: | Not if you need to cover. |
| Counterparty: | I need to cover, why don't we go ahead and do that. |

58.    After selling concluded on February 27, 2004, the NGL Trading Bench had not sold enough to make a profit and had to take delivery of the remaining barrels at a significant loss. In an effort to mitigate these losses, in March 2004, the bench members refused to accept "late" deliveries and required counterparties that were "caught short" in their position from February to financially settle such contracts by paying the February 27 OPIS high price, which had been artificial and inflated by BP.

17

####    4.    Fraudulent Conduct to Support Scheme Throughout the Month

59.    To execute the manipulation scheme, members of the NGL Trading Bench not only attempted to purchase all of the available February 2004 TET supply, but they also engaged in tactics to conceal their efforts, mislead counterparties, and otherwise manipulate the index price.

60.    Between February 9 and February 27, 2004, members of the NGL Trading Bench caused bids and offers to be presented to the market via Chalkboard which were designed to falsely reflect that there was more buying or selling interest in the market than actually existed. BP also engaged in conduct to affect the daily and monthly average price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price, from being reported. In the context of the market manipulation scheme, this conduct was intended to present false information to the market concerning the actual availability of TET propane, was intended to subvert the integrity of the industry benchmark average price, and was intended to defraud certain counterparties.

61.    On February 24, 2004, Abbott sold 30,000 barrels to a counterparty. They agreed that the contract price for that propane was determined based on the OPIS daily average price for each subsequent trading day in February.  The counterparty was not informed that BP was involved in posting "high floor" bids, "stacking" multiple offers and bids, "stepping up the price," posting deceptively low "wet" March offers, or withholding supply from the market during the three-day contract term.  BP's conduct had the affect of manipulating the OPIS average price for each pricing day of that contract, and defrauded the counterparty who purchased TET propane based on the OPIS benchmark.

18

62.   In certain transactions in which the NGL Trading Bench sold February 2004 TET propane using voice brokers, commission payments were made by counterparties using checks transmitted via the U.S. mail. In transactions in which the NGL Trading Bench sold February 2004 TET propane based on the OPIS index price, payments were wired by the counterparties from various states, including Texas and New York, to BP's account at Bank One, in Chicago, Illinois.

**C.     Market Reaction and Industry Reports**

63.   Members of the NGL Trading Bench knew that counterparties and market observers were making allegations that someone was attempting a short squeeze, and that some suspected BP. BP Trader #1, Abbott, BP Trader #2, and BP Trader #3 were each confronted by market participants with allegations that BP was involved in a "short squeeze."

64.   On February 23, 2004, OPIS published a newsletter that included the following:

> The gas liquids market is largely focused on the antics of Mt. Belvieu propane. Prices have held a strong tone as traders gossip about *the possibility that a short squeeze is being put in play in the TET market.* The short squeeze could be complicating the efforts of some to price inbound cargos of propane, traders add. Indeed, TET propane "anys" traded from 72-75.375cts/gal through the morning. Non-TET barrels were worked from 67-69.375cts/gal. In contrast, the Conway propane market has been quiet with confirmed deals holding a 61.25-61.75cts/gal range. Bushton barrels are thought to be trading at a 1-2cts/gal discount to Conway.

(emphasis added).

65.   On February 24, 2004, OPIS published a newsletter that included the following:

> In spot trading . . . the talk in the propane markets is that one or more firms may be involved in a short squeeze in the TET propane market. Traders speculate that those firms own a hefty proportion of the inventories in TET storage and they are making sellers pay up for the right to cover. "Somebody's got to be getting killed," said one trader. "I hope nobody that owes me money." Traders marveled at the fact that TET propane opened at 74 cts/gal and ended the session at 88.25 cts/gal[.]

19

D.    **BP Management's Failure to Address the Conduct**

66.    During and after the execution of the manipulation scheme, members of the NGL Trading Bench provided certain information to various BP executives and the BP Compliance Manager. Although the conduct violated BP's written policy, the BP Executives and Compliance Manager failed to report this conduct to authorities, take affirmative steps to ensure such trading strategies did not recur, and chose not to discipline any of the traders, managers, or the compliance official involved until the CFTC initiated an investigation. At no time during February 2004 did anyone at BP bring the scheme to the attention of the legal department.

67.    Initially, between February 5 and 9, 2004, the BP Bench Leader provided BP Executive #1 with certain information about the proposed strategy.

68.    On or about February 19, 2004, the BP Bench Leader met with BP Executive #1, BP Executive #2, and the BP Compliance Manager. At the time of the meeting, the TEPPCO pipeline had ruptured, the NGL Trading Bench had exceeded its position limit size imposed by BP policy, BP had accumulated contracts for over 4.5 million barrels of February TET propane, and the total available supply of propane in the TEPPCO storage facility was approximately 3.5 million barrels. After the February 19, 2004 meeting, the NGL Trading Bench continued to accumulate February TET propane.

69.    After the February strategy had concluded and the NGL Trading Bench anticipated that the loss associated with the strategy would be approximately $10 million, BP management instituted a business review of the trading strategy.

70.    In preparation for the business review, the BP Bench Leader and BP Executive #1 caused a PowerPoint presentation entitled "Lessons Learned" to be drafted. A purpose of the "Lessons Learned" PowerPoint presentation was to determine why BP lost money and how to

make such a strategy profitable. One slide in the presentation compared BP's position in physical TET propane during February to the available supplies in the TEPPCO system, and clearly indicated that BP's position exceeded the available supply of propane by as early as February 11, 2004. The slide also indicated that BP continued to accumulate more propane after its position significantly exceeded the total TEPPCO inventory. Certain slides from the "Lessons Learned" PowerPoint were presented, again, on or about March 26, 2004, and at high level management meetings on April 15 and July 28, 2004.

71.    Further, by at least May 5, 2004, BP Executive #3 and the BP Compliance Manager became aware of the tape recorded conversation of February 9, 2004 conversation in which the BP Bench Leader used the word "squeeze" to describe the February trading activity to BP Trader #1 and Abbott.

72.    The conduct of the NGL Trading Bench was not self-reported to the authorities, nor was timely discipline imposed on any of the traders, managers, or the compliance official involved. In fact, BP initially informed members of the NGL Trading Bench that they would receive monetary bonuses at the end of the year. BP Executive #2 also informed the NGL Trading Bench in early March 2004, despite the $10 million loss, that no trader would lose his or her job. Only after a regulatory inquiry commenced in 2005 was disciplinary action taken against certain individuals and other traders learned they would not receive their anticipated end of the year bonuses.

V.    **Conclusion**

73.    Based on the facts set forth above, BP admits that through the actions of its employees, BP conspired to corner the market and manipulate the price of February 2004 TET propane contrary to Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), and engage in

21

transactions that violated 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), all in violation of 18 U.S.C. § 371.