**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
NORTHERN DIVISION**

| | |
|---|---|
| AMERIGAS PROPANE, L.P. and FERRELLGAS L.P., ) ) ) ) Plaintiffs, ) ) v. ) ) BP AMERICA, INC., BP CORPORATION ) NORTH AMERICA INC., BP INTERNATIONAL ) SERVICES COMPANY, BP PRODUCTS ) NORTH AMERICA INC., BP ENERGY, ) and BP AMERICA PRODUCTION COMPANY, ) ) Defendants. ) ) | Case No.: 1:08-cv-00981<br><br>The Honorable James B. Zagel |

**THE BP DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR RULE 12(b)(6) MOTION TO DISMISS**

        Richard C. Godfrey, P.C.
        David J. Zott, P.C.
        Andrew A. Kassof
        Katheleen Ehrhart
        Kathryn F. Taylor
        KIRKLAND & ELLIS LLP
        200 East Randolph Drive
        Chicago, Illinois  60601-6636
        Telephone:   (312) 861-2000
        Facsimile:   (312) 861-2200

        *Attorneys for Defendant BP Products North
        America, Inc.*

Date:   May 30, 2008

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

THE COMPLAINT'S FACTUAL ALLEGATIONS..................................................................2

ARGUMENT..................................................................................................................................4

I.  PLAINTIFFS FAIL TO STATE A MONOPOLIZATION CLAIM BECAUSE BPPNA NEVER HAD MONOPOLY POWER. .............................................................4

    A.  Plaintiffs Fail To Allege That BPPNA Caused A Lasting Structural Change In The TET Propane Market..........................................................................4

    B.  Plaintiffs Cannot Allege That BPPNA Possessed Durable Market Power..............7

    C.  Without Significant Barriers To Entry, BPPNA Could Not And Did Not Achieve Any Monopoly Power. ..............................................................................8

II. WITHOUT ANY DANGEROUS PROBABILITY OF MONOPOLIZATION, PLAINTIFFS ALSO CANNOT STATE A CLAIM FOR ATTEMPTED MONOPOLIZATION.........................................................................................................9

III. BECAUSE PLAINTIFFS CAN SEEK A REMEDY UNDER THE CEA, THEIR ANTITRUST CLAIMS SHOULD BE DISMISSED. .........................................11

IV. PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED..............13

CONCLUSION.............................................................................................................................13

K&E 12784365.

**TABLE OF AUTHORITIES**

**Cases**

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
    881 F.2d 1396 (7th Cir. 1989) .................................................................................................... 5

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
    141 F.3d 947 (9th Cir. 1998) ....................................................................................................... 8

*Am. Academic Suppliers, Inc. v. Beckley-Cardey, Inc.*,
    922 F.2d 1317 (7th Cir. 1991) .................................................................................................... 9

*Apex Oil Co. v. DiMauro*,
    713 F. Supp. 587 (S.D.N.Y. 1989) ................................................................................. 4, 5, 6, 7

*Ashkanazy v. I. Rokeach & Sons, Inc.*,
    757 F. Supp. 1527 (N.D. Ill. 1991) ............................................................................................. 7

*Axiom Advisers & Consultants, Inc. v. School Innovations & Advocacy Inc.*,
    No. 2:05 CV 02395, 2006 WL 1049997 (E.D. Cal. Mar. 20, 2006) ......................................... 10

*Barr Labs., Inc. v. Abbott Labs.*,
    978 F.2d 98 (3d Cir. 1992) ....................................................................................................... 10

*Baseball At Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC*,
    113 F. Supp. 2d 1164 (S.D. Ohio 1999) .................................................................................... 5

*Berkey Photo Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir.1979) ........................................................................................................ 5

*Borough of Landsdale v. Phila. Elec. Co.*,
    692 F.2d 307 (3d Cir. 1982) ....................................................................................................... 8

*C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc.*,
    884 F.2d 209 (5th Cir. 1989) ...................................................................................................... 9

*CFTC v. BP Products North America, Inc.*,
    No. 06-cv-3503 (N.D. Ill. June 28, 2006) ............................................................................... 1, 2

*Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*,
    885 F.2d 683 (10th Cir. 1989) ........................................................................................... 4, 7, 8

*D. Ginsberg & Sons, Inc. v. Popkin*,
    285 U.S. 204 (1932) ................................................................................................................. 11

*Deauville Corp. v. Federated Dep't Stores, Inc.*,
    756 F.2d 1183 ............................................................................................................................ 7

*Dial A Car, Inc. v. Transportation, Inc.*,
    82 F.3d 484 (D.C. Cir. 1996) .................................................................................. 10

*Endsley v. City of Chicago,*
    230 F.3d 276 (7th Cir. 2000) ..................................................................................... 4

*Garot Anderson Mktg, Inc. v. Blue Cross & Blue Shield United of Wis.*,
    772 F. Supp. 1054 (N.D. Ill. 1990) ............................................................................ 5

*Hoarel Sign Co. v. Dominion Equity Corp.*,
    910 S.W.2d 140 (Tex. Ct. App. 1995) ..................................................................... 13

*In re TransOcean Tender Offer Sec. Litig.*,
    427 F. Supp. 1208 (N.D. Ill. 1977) .......................................................................... 12

*Indiana Grocery, Inc. v. Super Valu Stores Inc.*,
    864 F.2d 1409 (7th Cir. 1989) .......................................................................... 4, 9, 10

*Indiana Telecom Corp., Inc. v. Indiana Bell Tel. Co., Inc.*,
    No. 97-1532-C, 2001 WL 1168169 (S.D. Ind. Sept. 25, 2001) ................................ 9

*Institutional Foods Packing, Inc. v. Creative Prods., Inc.*,
    No. 89 C 4499, 1992 WL 111133 (N.D. Ill. May 12, 1992) .................................... 9

*Jame Fine Chems., Inc. v. Hi-Tech Pharm. Co., Inc.*,
    No. 00 C 3545, 2007 WL 927976 (D. N.J. Mar. 27, 2007) ...................................... 8

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1981) ..................................................................................... 9

*Lerma v. Univision Commc'ns, Inc.*,
    52 F. Supp.2d 1011 (E.D. Wis. 1999) ....................................................................... 5

*Lindell v. Huibregtse*,
    No. 05-4627, 2006 WL 3077484 (7th Cir. Oct. 31, 2006) ........................................ 7

*Matter of Hartman Bros. Const. Corp.*,
    835 F.2d 1215 (7th Cir. 1987) ................................................................................. 11

*Metro Mobile CTS, Inc. v. NewVector Comm'ns*,
    661 F. Supp. 1504 (D.Ariz. 1987) ............................................................................. 8

*Nesby v. Country Mut. Ins. Co.*,
    805 N.E.2d 241 (Ill. Ct. App. 2004) ........................................................................ 13

*Nsight, Inc. v. Peoplesoft, Inc.*,
    No. 04 C 3836, 2005 WL 3299164 (N.D. Ind. Aug. 5, 2005) ......................... 4, 8, 10

*Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*,
　179 F.3d 523 (7th Cir. 1999) .................................................................................................. 7

*Oxford Global Resource, Inc. v. Weekly-Sessnum*,
　2004 WL 2599898 (N.D. Tex. Nov. 12, 2004).................................................................... 11

*Republic Tobacco, L.P. v. North Atlantic Trading Co.*,
　1999 WL 261712 (N.D. Ill. April 9, 1999)................................................................... 9, 11

*Ricci v. Chicago Mercantile Exch.*,
　447 F.2d 713 (7th Cir. 1971) ............................................................................................... 12

*S.S.W., Inc. v. Air Transp. Ass'n of Am.*,
　191 F.2d 658 (D.C.Cir.1951) .............................................................................................. 11

*Santana Prods., Inc. v. Sylvester & Assocs., Ltd.*,
　121 F. Supp.2d 729, 736-37 (E.D.N.Y. 1999)...................................................................... 5

*SCFC ILC, Inc. v. Visa USA, Inc.*,
　36 F.3d 958 (10th Cir. 1994) ................................................................................................. 5

*Schaefer v. First Nat'l Bank of Lincolnwood*,
　326 F. Supp. 1186 (N.D. Ill. 1970) ................................................................... 2, 11, 12, 13

*Season Comfort Corp. v. Ben A. Borenstein Co.*,
　655 N.E.2d 1065 (Ill. App. Ct. 1995) ................................................................................. 13

*Smith v. Groover*,
　468 F.Supp. 105 (N.D. Ill. 1979) ................................................................................. 12, 13

*Spectrum Sports, Inc. v. McQuillan*,
　506 U.S. 447 (1993).............................................................................................................. 9

*Stonebridge Life Ins. Co. v. Pitts*,
　236 S.W.3d 201 (Tex. 2007)............................................................................................... 13

*Taylor Pub. Co. v. Jostens, Inc.*,
　216 F.3d 465 (5th Cir. 2000) ........................................................................................... 2, 8

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
　687 F. Supp. 832 (S.D.N.Y. 1988)....................................................................................... 5

*Terminal Warehouse Co. v. Penn. R. Co.*,
　297 U.S. 500 (1936)............................................................................................................ 11

*Texas Carpenters Health Ben. Fund v. Philip Morris, Inc.*,
　21 F. Supp. 2d 664 (E.D. Tex. 1998).................................................................................. 13

*Tri-Tronics Co., Inc. v. MacGregor & Co., Inc.*,
    No. 90 C 0630 WL 114738 (N.D. Ill. July 25, 1990) ........................................................ 11

*U.S. Navigation Co. v. Cunard S.S. Co.*,
    284 U.S. 474 (1932) ........................................................................................................... 11

*United States v. BP Products North America, Inc.*,
    No. 07-CR-683 (N.D. Ill. Oct. 30, 2007) ............................................................................ 2

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ....................................................................................................... 1, 4

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
    810 F.2d 243 (D.C. Cir. 1987) ...................................................................................... 7, 8

**Statutes**

7 U.S.C. § 25(a)(1)(A)-(D) ....................................................................................................... 13

7 U.S.C. § 25(a)(1)(D) .............................................................................................................. 12

**Other Authorities**

1 ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007) ........................... 7

**1** Antitrust Law Developments (6th ed. 2007) ...................................................................... 10

3 Phillip Areeda: Herbert Hovenkamp, Antitrust Law ................................................................ 11

66 AM. JUR. 2D *Restitution and Implied Contracts* (2008) .......................................................... 13

Antitrust Law Developments, 234 .............................................................................................. 8

*Monopoly, Manipulation, and the Regulation of the Futures Markets*, 59 J Bus. (1986) ............ 10

*Price Manipulation in the Commodity Futures Markets: A Reexamination of the
    Justifications for Simultaneous Causes of Action Under the CEA and the Sherman
    Act*, 34 UCLA L. Rev. 1305 (1987) ............................................................................... 12

## INTRODUCTION

Defendants BP America, Inc. and BP Products North America, Inc. ("BPPNA") have admitted to a short-lived, ill-conceived manipulation of the propane trading market during February 2004 in violation of the Commodity Exchange Act ("CEA").[1] BP America and affiliated entities[2] have paid a stiff price for their traders' behavior – $303,000,000 – including civil and criminal penalties and a $53,503,000 restitution fund to compensate any parties harmed by the manipulation. (Deferred Prosecution Agreement ("DPA") (Am. Compl. Ex. E) ¶¶ 7, 9, 22; Consent Order for Permanent Inj. ("Consent Order") ¶ 87(a), Docket No. 81, *CFTC v. BP Products North America, Inc.*, No. 06-cv-3503 (N.D. Ill. June 28, 2006).)

Plaintiffs AmeriGas Propane, L.P. and Ferrellgas L.P. filed their Amended Complaint seeking damages under the CEA. But the Amended Complaint does not stop there. Rather, it tries to transform BPPNA's brief market manipulation into an antitrust case. Beyond the CEA claim, the plaintiffs assert three claims: monopolization under the Sherman Act (Count I); attempted monopolization under the Sherman Act (Count II); and unjust enrichment (Count III). Each fails to state a claim.

*First*, plaintiffs base their monopolization claims on an allegation that BPPNA cornered and manipulated the February 2004 market for TET propane (propane transported in the TEPPCO pipeline system). (Am. Compl. ¶¶ 77-78; Statement of Facts ("SOF") (Attach. A to Am. Compl. Ex. E) ¶ 1.) But plaintiffs cannot establish the *sine qua non* of an antitrust monopolization claim: monopoly power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). As the Amended Complaint concedes, BPPNA's trading conduct caused no structural change to the TET propane market, did not last for any sufficient duration, and did not prevent entry into the market. Monopoly power requires all three factors. Plaintiffs' own allegations make clear they cannot establish even one.

---

[1] Nothing herein is intended to contradict in any way the statements agreed to by BP America, Inc. in the October 25, 2007 Deferred Prosecution Agreement, and the statements in the Deferred Prosecution Agreement or the CFTC Consent Order govern over any statements made herein.

[2] Each of the BP entities named in the Amended Complaint join in the Motion to Dismiss - BP America, Inc., BP Corporation North America, Inc., BP International Services Company, BP Products North America, Inc., BP Energy and BP America Production Company (collectively the "BP Defendants").

*Second*, attempted monopolization requires a dangerous probability of achieving monopoly power. *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000). Based on the plaintiffs' own allegations, BPPNA had no probability, much less a "dangerous probability," of achieving any monopoly power.

*Third*, the CEA is the statute governing the alleged conduct at issue. When Congress provides a specific statutory remedy, such as the CEA, it controls over a general remedy, such as the antitrust laws. *Schaefer v. First Nat'l Bank of Lincolnwood*, 326 F. Supp. 1186, 1191 (N.D. Ill. 1970); *aff'd,* 509 F.2d 1287 (7th Cir. 1975). Thus, even if plaintiffs' additional claims were otherwise valid – and they are not – they should be dismissed.

*Finally*, plaintiffs' unjust enrichment claim fails because they have alleged an adequate remedy at law. Having alleged an adequate legal remedy – their CEA claim – the plaintiffs cannot bring an equitable unjust enrichment claim.

## THE COMPLAINT'S FACTUAL ALLEGATIONS

On June 28, 2006, the Commodity Futures Trading Commission ("CFTC") filed a civil action against BPPNA for injunctive relief and money damages for violations of the CEA. The CFTC alleged that BPPNA manipulated the price of TET physical propane during February 2004. (CFTC Compl. ¶ 1, Docket No. 1, *CFTC v. BP Products North America, Inc.*, No. 06-cv-3503 (N.D. Ill. June 28, 2006).) The United States Department of Justice also separately began investigating BPPNA's actions regarding February 2004 TET propane.

After the CFTC filed its complaint, direct and indirect propane purchasers filed copycat lawsuits across the country. On October 25, 2007, BP America, Inc. entered into a deferred prosecution agreement with the United States government, and BPPNA entered into a consent order settling the CFTC action. (DPA; Consent Order.) They agreed to the appointment of an independent monitor to oversee and ensure compliance with those agreements and to monitor "compliance controls as they pertain to the applicable anti-manipulation and reporting provisions of the Commodity Exchange Act" and CFTC regulations. (DPA ¶ 23, Attachment B to DPA, Docket No. 7 in *United States v. BP Products North America, Inc.*, No. 07-CR-683 (N.D. Ill. Oct. 30, 2007).) Under the agreements, the BP entities agreed to pay a criminal penalty of $100,000,000, a $25,000,000 million contribution to the U.S. Postal Inspection Service Consumer Fraud Fund, a civil monetary penalty of $125,000,000, and $53,503,000 into a

2

restitution fund to compensate those harmed by BPPNA's activities. (DPA. ¶¶ 7-9, 22; Consent Order ¶ 87(a).)

As part of the agreements, BP America, Inc. and BPPNA admitted that in February 2004 certain BPPNA traders manipulated the February 2004 propane market for "TET propane" — that is, propane transported in the TEPPCO pipeline system. (SOF ¶ 1.) Specifically, BPPNA agreed that it purchased more TET propane for February 2004 delivery than it needed in an attempt to create an artificially high price for TET propane, and thereby force counterparties to pay inflated prices to cover their delivery obligations at the end of February. (SOF ¶ 2, 32, 38.) BPPNA's plan failed miserably. (SOF ¶¶ 58, 69, 72.) While some counterparties covered their needs at the inflated price, others never covered or just waited to purchase their TET propane until March, after market prices collapsed. (SOF ¶ 72.)

Four years after the conduct at issue, and four months after BPPNA entered into settlement agreements with the government, the plaintiffs filed their Complaint. They describe BPPNA's plan as an attempt to (i) acquire a substantial long position in TET propane during January and early February 2004, (ii) force a "short run" increase in price, (iii) liquidate its inventory at those higher prices by the end of February, and (iv) roll the remaining TET propane into March and sell it at a loss. (Am. Compl. ¶¶ 77, 84, 85, 112, 148; SOF ¶¶ 32, 53.)

BPPNA's plan flopped. As the plaintiffs allege, inventories of TET propane steadily increased throughout February 2004. (*See e.g.* Am. Compl. ¶¶ 107, 122, 136; SOF ¶¶ 45, 48.) Imports streamed to the TEPPCO system to meet the increased demand created by BPPNA's conduct. (SOF ¶ 45.) An unexpected rupture in the TEPPCO pipeline and shifts in weather caused fluctuation in demand. (*See* Am. Compl. ¶ 103; SOF ¶ 45.) While the average price for TET propane increased somewhat during the month, the largest spike lasted only three days, from February 23 through February 25. (Am. Compl. ¶¶ 113-117.) By the next day, the average price had plummeted by over six cents-per-gallon. (*Id.* ¶ 118.) And on "March 1, 2004, the price of TET propane fell precipitously" to almost 25 cents-per-gallon below the February 27 published price. (*Id.* ¶ 133.) The price continued to fall into March. (*Id.*) Ultimately, BPPNA could sell only 530,000 barrels in February and had to roll the remaining 4.4 million barrels into March at a significant loss. (SOF ¶ 53.) The plan devised by BPPNA's traders cost the company $10 million. (*Id.* ¶ 72.)

3

# ARGUMENT

A handful of BPPNA employees concocted a plan to manipulate the TET propane market in February 2004. The fleeting impact on the TET propane market was thoroughly investigated by the government and fully remedied. Plaintiffs' complaint wrongly tries to transform a straightforward case of market manipulation into an antitrust violation. The plaintiffs' own allegations, however, disprove any antitrust theory as a matter of law.

## I. PLAINTIFFS FAIL TO STATE A MONOPOLIZATION CLAIM BECAUSE BPPNA NEVER HAD MONOPOLY POWER.

BPPNA has admitted to a 36-day price manipulation of the TET propane market from February 5, 2004 to March 12, 2004. (Am. Compl. ¶ 150, SOF ¶ 1.) Plaintiffs claim this admitted activity constitutes a monopolization claim under Section 2 of the Sherman Act. A monopolization claim requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Grinnell Corp.*, 384 U.S. at 570-71; *see also Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

Monopoly power is the power to exclude competition or to control prices in a defined market. *Indiana Grocery, Inc. v. Super Valu Stores Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989). To be actionable, monopoly power must be durable. That is, a plaintiff must show that the alleged monopolist caused a long-term structural alteration to the market, maintained the monopoly for a sufficient period of time, and prevented others from entering the market. *See e.g. Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 600 (S.D.N.Y. 1989) (requiring a structural alteration to the relevant market of more than "fleeting duration"); *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 695 (10th Cir. 1989) (merely acquiring the short-term ability to control prices will not sustain a claim under § 2); *Nsight, Inc. v. Peoplesoft, Inc.*, No. 04 C 3836, 2005 WL 3299164, at *1 (N.D. Ind. Aug. 5, 2005) (dismissing § 2 claims where plaintiffs failed to allege sufficient barriers to entry). Plaintiffs not only fail to allege any of these essential elements; their allegations disprove any monopolization claim as a matter of law.

### A. Plaintiffs Fail To Allege That BPPNA Caused A Lasting Structural Change In The TET Propane Market.

Section 2 of the Sherman Act "is aimed primarily not at improper conduct," but instead conduct that creates "a pernicious market structure in which the concentration of power saps the

4

salubrious influence of competition." *Apex Oil Co.*, 713 F. Supp. at 600; *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 838 (S.D.N.Y. 1988) (dismissing monopoly claim) (quoting *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272 (2d Cir. 1979); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 n.10 (10th Cir. 1994) (difference between § 1 and § 2 is that the former does not require an alteration of market structure). Section 2 claims require an alteration of the market structure. *E.g.*, *Apex Oil*, 713 F. Supp. at 600; *Baseball At Trotwood, LLC v. Dayton Prof'l Baseball Club, LLC*, 113 F. Supp. 2d 1164, 1174 (S.D. Ohio 1999) (dismissing plaintiff's antitrust claims where "there [was] no allegation that the actions of the [d]efendants altered the market structure"); *Santana Prods., Inc. v. Sylvester & Assocs., Ltd.*, 121 F. Supp.2d 729, 736-37 (E.D.N.Y. 1999) (same). The Seventh Circuit follows this "structural analysis" for monopolization claims. *See e.g. A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1403 (7th Cir. 1989) (monopolization was impossible due to the relevant market structure); *see also Garot Anderson Mktg, Inc. v. Blue Cross & Blue Shield United of Wis.*, 772 F. Supp. 1054, 1059 (N.D. Ill. 1990); *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp.2d 1011, 1025 (E.D. Wis. 1999).

   Plaintiffs do not – and cannot – allege that BPPNA structurally altered the TET propane market. They accordingly cannot show the "monopoly power" required to state a Section 2 claim. To the contrary, the plaintiffs' allegations establish the opposite: the nature of the propane market made any structural alteration by BPPNA impossible. By design, the BPPNA traders' plan was to create and capitalize on a short term spike in TET propane prices.

   *First*, the Amended Complaint recognizes that BPPNA's traders could only create a short term price spike in February 2004, and that – even if their plan worked – they would be forced to sell accumulated inventory at a loss in March:

> Members of the NGL Trading Bench intended to earn a significant profit for BP by selling a portion of their February 2004 TET propane at the end of the month at prices inflated by their conduct, and then taking a small loss on the remaining barrels which would be carried into March.

(Am. Compl. ¶ 85.)

   The Amended Complaint details the numerous sources of supply available to defeat any would-be monopolist. (*See e.g.* Am. Compl. ¶39 (eight major producers), ¶ 45 (eighteen refineries), ¶¶ 46-47 (imports), ¶ 136 (non-TET propane).) Indeed, the predicate of the

5

complaint is that this supply – while available to prevent any long-term change in the market structure – could not enter the market "in a timely manner" to deter a short run market run up. (*See e.g. id.* ¶¶ 146-148.) In plaintiff's words "[t]he short duration of the corner, directed to February 2004 propane, precluded the market from providing any meaningful substitute source of supply." (*Id.* ¶ 148.)

*Second*, the Amended Complaint describes how, coinciding with BPPNA's increased position, the TET propane inventories continued to build through the month of February:

- "By February 16, 2004, the total TEPPCO system inventory had increased to over 3.3 million barrels." (*Id.* ¶ 103; *see* SOF ¶ 45.)

- "The total TEPPCO system propane inventory steadily increased from just over 3.4 million barrels on February 17 to just over 3.6 million barrels on February 20, 2004." (Am. Compl. ¶ 107.)

- "Between February 20, 2004, and February 29, 2004, the TEPPCO system propane inventory continued to increase." (SOF ¶ 48.)

- On February 26, 2004, "[t]he total TEPPCO system inventory. . . increased to just over 4.3 million barrels of propane." (Am. Compl. ¶ 122.)

*Third*, plaintiffs allege that imported propane was steaming to the U.S. Gulf Coast in February to meet the increased demand. (SOF ¶ 45.)

*Finally*, the complaint recites numerous other market factors beyond BPPNA's control that further impeded its ability to cause even a short term price spike. These included a pipeline rupture (Am. Compl. ¶ 103), and weather forecast changes, which had the affect of "reducing the demand and expected demand of TET propane." (SOF ¶ 45.) As a result, just days after the short-lived spike in TET propane pricing, "the price of TET propane fell precipitously." (Am. Compl. ¶ 133.) Far from any long-term structural change to the market, BPPNA's plan caused only a passing blip, and it was able to sell only a fraction of the inflated TET propane that it predicted. All-in-all it sold around 530,000 barrels in February, rolling 4.4 million barrels into March at a $10 million loss. (SOF ¶¶ 53, 58, 69, 72.)

The plaintiffs' allegations are virtually indistinguishable from the monopolization claim rejected in *Apex Oil*. In *Apex Oil*, Apex sold oil futures contracts to defendants for February 1982 delivery. *Apex Oil*, 713 F. Supp. at 593. At the end of the trading month, Apex could not fulfill its delivery requirement and had to purchase oil on the wet market to cover its obligations at a considerable cost. *Id.* Apex sued, alleging that defendants' conspiracy to monopolize the

6

relevant market caused an artificially high price for oil to be delivered in February 1982. *Id.* The *Apex* court rejected plaintiffs' monopolization claim as a matter of law. Apex had not established that "the markets for futures and cash products would be structurally altered. Both markets had dozens of participants. Both were vigorously competitive." *Id.* at 600. Plaintiffs' Amended Complaint is no different. They cannot allege that BPPNA eliminated rivals or competitors or structurally altered the TET propane market in any way. Just as in *Apex Oil*, BPPNA "arguably planned to put [buyers] in a delivery bind for no more than a few business days from which they might extract premium prices." *Id*. That is not monopoly power as a matter of law.

### B. Plaintiffs Cannot Allege That BPPNA Possessed Durable Market Power.

Plaintiffs' monopolization allegations fail for another, independent reason: They cannot allege that BPPNA ever possessed durable market power. There is no monopoly power absent "a sufficiently long period of monopoly pricing." *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F. Supp. 1527, 1538 (N.D. Ill. 1991). Ephemeral power to charge monopolistic prices is not enough to sustain a monopolization claim. *Colo. Interstate Gas*, 885 F.2d at 695-696; *see also Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 252 (D.C. Cir. 1987) (same); *Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1190 (finding no monopoly power based on defendant's "short-term control over price"); 1 ABA Section of Antitrust Law, Antitrust Law Developments, 226 (6th ed. 2007).

BPPNA has admitted to manipulating the TET propane market for only 36 days, from February 5, 2004 to March 12, 2004. (SOF ¶ 1.) Plaintiffs' allegations (and those incorporated by attachment of the Deferred Prosecution Agreement and Statement of Facts) confirm the fleeting nature of that manipulation.[3] (*See* Am. Compl. ¶¶ 77-78, 146-148, 150; SOF ¶¶ 32, 56, 61, 64.) BPPNA never obtained any sustained ability to control supply and demand and, therefore, could not dictate the price of TET propane for any significant period. (*See* Am. Compl. ¶¶ 84, 103, 107, 114; SOF ¶¶ 45, 48.) As noted, BPPNA's plan itself was premised on

---

[3] "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529 (7th Cir. 1999) ("A plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment") (quotations and citations omitted); *Lindell v. Huibregtse*, No. 05-46217, 2006 WL 3077484 at *3 (7th Cir. Oct. 31, 2006).

its inability to acquire any sustained market power. BPPNA hoped to profit from a short-term spike in TET prices. But if even if all went perfectly, BPPNA recognized that the market would quickly adjust to the price spike, and thus BPPNA would have to sell some of its accumulated propane at a *loss* in March. (Am. Compl. ¶¶ 85, 89.) Ultimately, BPPNA overestimated its ability to cause and capitalize on even a short term price spike. As plaintiffs allege, the average price for TET propane dropped "precipitously" just days after only a brief spike (*id.* ¶ 133), forcing it to sell 4.4 million barrels at a $10 million loss. (SOF ¶ 53, 58, 69, 72.)

At most, plaintiffs' allegations show merely a "temporary" ability to increase TET propane prices, not "significant and more-than temporary harmful effects on competition." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 482 (5th Cir. 2000) (quotations and citations omitted); *see also Colo. Interstate Gas*, 885 F.2d at 695-96 (temporary ability to charge monopolistic prices insufficient for monopoly claim). Monopoly power of far longer duration has been held insufficient as a matter of law to establish a claim for monopolization. *See Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (a "temporary decline" in competition lasting four to ten months did not constitute a monopoly); *Jame Fine Chems., Inc. v. Hi-Tech Pharm. Co., Inc.*, No. 00 C 3545, 2007 WL 927976, at *5 (D. N.J. Mar. 27, 2007) (alleged monopoly between five and nine months "is not a sufficiently substantial foreclosure of the relevant market"); *Williamsburg*, 810 F.2d at 252 (no monopoly power where alleged control of the market lasted twelve months); *Borough of Landsdale v. Phila. Elec. Co.*, 692 F.2d 307, 313 (3d Cir. 1982) (finding fourteen to sixteen months insufficient to show monopoly power); *Metro Mobile CTS, Inc. v. NewVector Commc'ns*, 661 F. Supp. 1504, 1523-24 (D.Ariz. 1987), *aff'd* 892 F.2d 62 (9th Cir. 1989) ("temporary anticompetitive conduct" lasting seventeen months too short to find monopoly power).

    **C.    Without Significant Barriers To Entry, BPPNA Could Not And Did Not Achieve Any Monopoly Power.**

Plaintiffs' complaint also fails to allege any barriers to entry. This likewise dooms their monopolization claim. "[W]here entry is easy, courts rarely find monopoly power . . . because the threat of entry should prevent the defendant from raising prices to monopoly levels or the fact of such entry should make any exercise of monopoly power short-lived." Antitrust Law Developments, 234 (internal quotations omitted); *see also Nsight,* 2005 WL 3299164, at *1 (dismissing § 2 claims where plaintiffs failed to allege sufficient barriers to entry); *see also*

8

*Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, No. 89 C 4499, 1992 WL 111133, at *2 (N.D. Ill. May 12, 1992) (dismissing monopoly claim where plaintiff "failed to allege a plausible economic theory which would result in [defendant] precluding new entrants into the manufacturing market"); *Republic Tobacco, L.P. v. North Atlantic Trading Co.*, 1999 WL 261712, at *11 (N.D. Ill. April 9, 1999) (dismissing plaintiff's § 2 claim after finding only conclusory allegations of "significant barriers to entry"). The Seventh Circuit has "long held that low barriers to competition demonstrate the absence of monopoly power." *Indiana Telecom Corp., Inc. v. Indiana Bell Tel. Co., Inc.*, No. 97-1532-C, 2001 WL 1168169, at *11 (S.D. Ind. Sept. 25, 2001) (citing *Am. Academic Suppliers, Inc. v. Beckley-Cardey, Inc.*, 922 F.2d 1317, 1320-21 (7th Cir. 1991) (no monopoly power where defendant faced a "'horde of existing competitors'").)

Far from alleging any significant barriers to entry, plaintiffs' complaint recognizes that there were none, and that propane producers began moving propane to the TET market as soon as the price increased. This included 4.2 million imported barrels steaming to the U.S. (SOF ¶ 45), and "additional supplies of propane [that] were directed away from the non-TET caverns at Mont Belvieu and into the TET caverns." (Am. Compl. ¶ 136.) The presence and entry of new sellers in the market belies any notion that BPPNA obtained monopoly power under the antitrust laws.

II.  **WITHOUT ANY DANGEROUS PROBABILITY OF MONOPOLIZATION, PLAINTIFFS ALSO CANNOT STATE A CLAIM FOR ATTEMPTED MONOPOLIZATION.**

Plaintiffs' attempted monopolization claim fails for the same reasons as their monopolization claim. An attempted monopolization claim under Section 2 of the Sherman Act requires (1) that the defendant engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Indiana Grocery*, 864 F.2d at 1414. Because the structure of the TET propane market prevented any monopolization, there was no "dangerous probability" of monopolization.

Without the "capacity to commit the offense" of monopolization, BPPNA had no possibility, let alone a dangerous probability of monopolizing the TET propane market. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981); *see also C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc.*, 884 F.2d 209, 211 (5th Cir. 1989) (finding defendant

9

incapable of "control[ling] prices for any meaningful period, because other competitors easily [could] enter the market"); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112, 114 (3d Cir. 1992) (finding no dangerous probability of monopolization when defendant had two major competitors and other new firms entered the market, preventing defendant "from raising prices for any lengthy period of time"); *Nsight*, 2005 WL 3299164, at *1 (dismissing plaintiff's attempted monopoly claim based only on conclusory allegations of market share and barriers to entry); 1 Antitrust Law Developments (6th ed. 2007), 316 ("[E]ven a defendant with a relatively high market share may not have a dangerous probability of successfully monopolizing the market if there are no substantial entry barriers").

Courts have consistently rejected attempted monopolization claims where plaintiff's allegations fail to show that a defendant controlled the available supply to the market. In *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 487 (D.C. Cir. 1996), the D.C. Circuit affirmed the district court's dismissal of an attempted monopoly claim where:

> [plaintiff's] own complaint acknowledge[d] that there [were] multiple [] service providers in competition with [defendants], and there [was] no reasonable basis for believing that all other competitors…[would] be driven out of business. . .

*Id*. Unless it can be shown that "existing competitors lack the capacity to increase their output" in response to a defendant's anticompetitive conduct, there is no "dangerous probability of achieving monopoly power." *Axiom Advisers & Consultants, Inc. v. School Innovations & Advocacy Inc.*, No. 2:05 CV 02395, 2006 WL 1049997, at *6 (E.D. Cal. Mar. 20, 2006); *see also, Indiana Grocery*, 814 F.2d at 1414 (no attempted monopoly where an attempt by defendant "to curtail the total amount of [supply] . . . could [be] easily offset . . . by importing more . . . from . . . other suppliers"); Frank H. Easterbrook, *Monopoly, Manipulation, and the Regulation of the Futures Markets*, 59 J Bus. S103, S109 (1986) ("As soon as [traders] learn of the existence of a manipulative strategy, they close their positions. . . . Entry and exit are so easy that monopoly cannot thrive [in the futures market].").

Plaintiffs have not alleged any of the structural indicia necessary for an attempted monopolization claim. To the contrary, their complaint recognizes that (i) inventories of TET propane increased throughout February (Am. Compl. ¶¶ 103, 107, 114, 122; SOF ¶¶ 45, 48), (ii) additional sellers were entering the market (Am. Compl. ¶ 136), (iii) propane imports were moving into the market, thereby precluding any possibility of achieving durable market power

(SOF ¶ 45), and (iv) BPPNA would necessarily have to sell most of its accumulated supply of propane at a loss in March, when prices collapsed (*see* Am. Compl. ¶¶ 85, 89, 133; SOF ¶ 53). *See Republic Tobacco*, 1999 WL 261712, at *11 (dismissing attempted monopoly claim where plaintiff did not allege market characteristics such as "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand") (citations and quotations omitted). At most, the plaintiffs' allegations show merely a "temporary harmful" price manipulation, not a "dangerous probability" that BPPNA could achieve any monopoly power. *Oxford Global Resource, Inc. v. Weekly-Cessnun*, 2004 WL 2599898, at *2 (N.D. Tex. Nov. 12, 2004) (citing *Taylor Publ'g Co.*, 216 F.3d at 474-478, 482 and quoting 3 Phillip Areeda: Herbert Hovenkamp, Antitrust Law P651 at 482). In sum, plaintiffs have no attempted monopolization claim.

### III. BECAUSE PLAINTIFFS CAN SEEK A REMEDY UNDER THE CEA, THEIR ANTITRUST CLAIMS SHOULD BE DISMISSED.

Even apart from the legal infirmities in the plaintiffs' antitrust claims, they would have to be dismissed. Where a specific statutory regime exists providing a plaintiff damages "there may be no recovery of treble damages under the antitrust laws." *Schaefer v. First Nat'l Bank of Lincolnwood*, 326 F. Supp. 1186, 1191 (N.D. Ill. 1970), *aff'd*, 509 F.2d 1287 (7th Cir. 1975) (quoting *S.S.W., Inc. v. Air Transp. Ass'n of Am.*, 191 F.2d 658, 663 (D.C.Cir.1951); *see also Matter of Hartman Bros. Const. Corp.*, 835 F.2d 1215, 1217 (7th Cir. 1987) ("[s]pecific terms prevail over the general in the same or another statute which otherwise might be controlling") (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)); *see also Tri-Tronics Co., Inc. v. MacGregor & Co., Inc.*, No. 90 C 0630, 1990 WL 114738, at *2 (N.D. Ill. July 25, 1990); *Terminal Warehouse Co. v. Penn. R. Co.*, 297 U.S. 500, 514-15 (1936) (finding plaintiff could not collect treble damages under antitrust statutes where it was eligible for relief under the Interstate Commerce Act); *U.S. Navigation Co. v. Cunard S.S. Co.*, 284 U.S. 474, 485 (1932) (finding that the remedy offered by the 1916 Shipping Act superceded that of the antitrust statutes). Because the CEA provides a remedy directed to the specific conduct at issue, the plaintiffs cannot pursue treble damages under the antitrust laws based on that same conduct.

In *Schaefer*, plaintiffs brought suit under the securities laws and the Sherman Act after defendants allegedly manipulated stock prices. 326 F. Supp. at 1188. The court found the

securities laws provided a specific remedy for price manipulation, and thus dismissed the antitrust claims:

> The settled rule of statutory construction is that, where there is a special statutory provision affording a remedy for particular specific cases and where there is also a general provision which is comprehensive enough to include what is embraced in the former, the special provision will prevail over the general provision, and the latter will be held to apply only to such cases as are not within the former.

*Id.* at 1190 (quoting *United States v. Chase*, 135 U.S. 255 (1890)). To hold otherwise would allow the Sherman Act to "evade[] and effectively nullif[y]" the "damage restrictions contained in the carefully drawn prohibitions against market manipulation" that Congress had created. *Id.* at 1192.

The Seventh Circuit affirmed, finding that "[b]y electing to make their claim for relief under the securities acts, the plaintiffs have rendered their antitrust claims superfluous." *Schaefer*, 509 F.2d at 1300; *see also In re TransOcean Tender Offer Sec. Litig.*, 427 F. Supp. 1208, 1210 (N.D. Ill. 1977) (dismissing antitrust claims because "the securities laws protect plaintiffs against the acts [of market manipulation] and when, as here, plaintiffs have elected to pursue said claims under these laws, the antitrust claims are superfluous at best"). Similarly, in *Smith v. Groover*, 468 F.Supp. 105, 116 (N.D. Ill. 1979), the Court dismissed plaintiffs' antitrust claims as "superfluous," holding the CEA provided the "specialized remedy" for their claims. (Citing *Schaefer*, 509 F.2d at 1300); *see also Ricci v. Chicago Mercantile Exch.*, 447 F.2d 713, 719-720 (7th Cir. 1971), *aff'd* 409 U.S. 289 (1973) (noting "a potential repugnance between a decision of the Commodity Exchange Commission and the award of treble damages in an antitrust action.").[4]

The CEA provides the specific statutory remedy for the price manipulation claims that the plaintiffs allege under 7 U.S.C. § 25(a)(1)(D). Allowing plaintiffs to also seek treble

---

[4] The legislative history of the CEA lends further support to the caselaw. "Congress specifically rejected proposed amendments to create treble damages liability for violations of the CEA." John Kern, *Price Manipulation in the Commodity Futures Markets: A Reexamination of the Justifications for Simultaneous Causes of Action Under the CEA and the Sherman Act*, 34 UCLA L. Rev. 1305, 1311 (1987) (citing S. 2578 93d Cong., 1st Sess. § 20 (1973) and S. 2837, 93d Cong., 1st Sess. § 505 (1973)).

12

damages under the Sherman Act would be "superfluous". *Smith*, 468 F. Supp. at 116 (citing *Schaefer*, 509 F.2d at 1300).

### IV. PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

No claim can lie for unjust enrichment when there is an adequate remedy at law. *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. Ct. App. 2004); *Season Comfort Corp. v. Ben A. Borenstein Co.*, 655 N.E.2d 1065, 1071 (Ill. App. Ct. 1995); 66 AM. JUR. 2D *Restitution and Implied Contracts* § 30 (2008).[5]  The plaintiffs have alleged an adequate legal remedy under the CEA in Count IV of their Amended Complaint.  The CEA provides private remedies for anyone damaged from a violation of the statute.  7 U.S.C. § 25(a)(1)(A)-(D).  The plaintiffs' CEA claim precludes their equitable claim for unjust enrichment as a matter of law.

### CONCLUSION

BPPNA requests that the Court dismiss the plaintiffs' monopoly, attempted monopoly, and unjust enrichment claims — Counts I, II and III of the Amended Complaint.

Date:  May 30, 2008

Respectfully submitted,

/s/ Kathryn F. Taylor
Richard C. Godfrey, P.C.
David J. Zott, P.C.
Andrew A. Kassof
Katheleen A. Ehrhart
Kathryn F. Taylor
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601-6636
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

***Attorneys for the BP Defendants***

---

[5]  Texas law on this point is the same.  *See Texas Carpenters Health Ben. Fund v. Philip Morris, Inc.*, 21 F. Supp. 2d 664, 678 (E.D. Tex. 1998) (dismissing account of "Restitution to Prevent Unjust Enrichment" under Texas law; holding that in order to recover under that equitable theory, plaintiff must have no adequate remedy at law) (citing *Hoarel Sign Co. v. Dominion Equity Corp.*, 910 S.W.2d 140, 143 (Tex. Ct. App. 1995)); *see also Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 203 n.1 (Tex. 2007).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing **THE BP DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RULE 12(B)(6) MOTION TO DISMISS** was filed electronically pursuant to the CM/ECF procedures on May 30, 2008 and will, therefore, be served electronically upon the parties in the action, and served via U.S. mail, first class, postage prepaid, upon.:

>Peter G. Skiko
>Daniel G. Wills
>Brendon P. Friesen
>Swanson, Martin & Bell LLP
>330 N. Wabash, Suite 3300
>Chicago, IL  60611
>Telephone:    (312) 321-9100
>Facsimile:    (312) 576-0016

and that copies were served this same date by U.S. mail only upon the following:

>Henry Chajet
>John Austin
>DeMaurice Smith
>Patton Boggs LLP
>2550 M. Street NW
>Washington, DC 20037
>Telephone:    (202) 457-6000
>Facsimile:    (202) 457-6315

              /s/ Kathryn F. Taylor