**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

———————————————————————

AMERIGAS PROPANE, L.P. and )
FERRELLGAS L.P., )
)
       Plaintiffs, )
)
       v. )    Case No. 1:08-cv-00981
)
BP AMERICA, INC., BP CORPORATION )    Judge James B. Zagel
NORTH AMERICA INC., BP INTERNATIONAL )
SERVICES COMPANY, BP PRODUCTS )
NORTH AMERICA INC., BP ENERGY, )
and BP AMERICA PRODUCTION COMPANY, )
)
       Defendants. )
———————————————————————

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS**

Peter G. Skiko
Daniel G. Wills
SWANSON, MARTIN & BELL, LLP
330 North Wabash
Suite 3300
Chicago, IL  60611
Telephone: 312-321-9100
Fax: 312-576-0016
pskiko@smbtrials.com

*Attorneys for Plaintiffs*
*AmeriGas Propane L.P. and*
*FerrellGas L.P.*

Henry Chajet
John W. Schryber
DeMaurice F. Smith
John D. Austin, Jr.
PATTON BOGGS LLP
2550 M Street NW
Washington D.C. 20037
Telephone: 202-457-6000
Fax: 202-457-6315
hchajet@pattonboggs.com

*Attorneys for Plaintiffs*
*AmeriGas Propane L.P. and*
*FerrellGas L.P.*

Date: July 31, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………....i
INTRODUCTION………………………………………………………………………...1
FACTUAL BACKGROUND……………………………………………………………..3
STANDARD OF REVIEW……………………………………………………………….4
ARGUMENT……………………………………………………………………………...5
I.     Plaintiffs State A Proper Claim for Monopolization Because BP
       Possessed and Exercised Monopoly Power…………………………………….5
       A.     Direct Evidence That BP Actually Controlled Prices and Excluded
              Competition Demonstrates BP's Monopoly Power……………………….6
       B.     Both Market Share and Significant Barriers to Entry Also
              Establish BP's Monopoly Power…………………………………………8
       C.     Longstanding Precedent Supports Plaintiffs' Claims…………………….10
              1.     The Seventh Circuit Has Long Recognized Claims for
                     Monopolization of Month-Long Commodities Markets…………11
              2.     BP's Proposed New Elements of "Lasting Structural
                     Change" and "Durable Market Power" Have No Basis in
                     Law and Do Nothing to Undermine Plaintiffs' Claims………….13
II.    Plaintiffs State a Proper Claim for Attempted Monopolization…………………16
III.   The CEA Does Not Preclude Plaintiffs' Antitrust Claims………………………19
       A.     The CEA Does Not Explicitly or Implicitly Void Plaintiffs'
              Antitrust Claims………………………………………………….............19
              1.     The Seventh Circuit Has Held that the CEA Did Not
                     Implicitly Repeal the Antitrust Laws…………………………......20
              2.     Congress Plainly Did Not Intend for the CEA to Preclude
                     Antitrust Remedies………………………………………………20
              3.     Unlike the Securities Laws, the Commodities and Antitrust
                     Laws Have Long Co-Existed……………………………………22
       B.     Plaintiffs May Plead CEA and Antitrust Claims In the Alternative……..23
IV.    BP's Equitable Defense Does Not Apply To Plaintiffs' Action at Law………...24
CONCLUSION…………………………………………………………………………..25

# TABLE OF AUTHORITIES

                                                                        **Page(s)**

CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
    881 F.2d 1396 (7th Cir. 1989)                                          14

*Am. Agric. Movement Inc. v. Bd. of Trade of Chicago*,
    977 F.2d 1147 (7th Cir. 1992) ("*Soybeans I*")               20, 21, 22, 23

*Apex Oil Co. v. DiMauro*,
    713 F. Supp. 587 (S.D.N.Y. 1989)                                    14, 15

*Ashkanazy v. I. Rokeach & Sons, Inc.*,
   757 F. Supp. 1527 (N.D. Ill. 1991)     15

*Autry v. Northwest Premium Servs., Inc.*,
   144 F.3d 1037 (7th Cir. 1998)     4

*Bd. of Highway Comm'rs v. Bloomington*,
   97 N.E. 280 (Ill. 1911)     24

*Biswell Stores Inc. v. Indian Nations Commc'ns of Cushing Inc.*,
   98 F.3d 1349 (10th Cir. 1996)     15

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)     6

*Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.*,
   135 F.3d 526 (7th Cir. 1998)     24

*Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*,
   613 F.2d 727 (9th Cir. 1979)     17

*CFTC v. Amaranth Advisors, L.L.C.*,
   No. 08 Civ. 6682, 2008 WL 2123323 (S.D.N.Y. May 21, 2008)     13

*Cleveland v. Rotman*,
   297 F.3d 569 (7th Cir. 2002)     5

*Defiance Hosp. v. Fauster-Cameron, Inc.*,
   344 F.Supp.2d. 1097 (N.D. Ohio 2004)     18

*Dickerson Realtors, Inc. v. Frewert*,
   307 N.E.2d 445 (Ill. App. 1974)     24

*Eastman Kodak Co. v. Image Tech. Servs. Inc.*,
   504 U.S. 451 (1992)     12

*Endsley v. Chicago*,
   230 F.3d 276 (7th Cir. 2000)     5

*Fishman v. Estate of Wirtz*,
   807 F.2d 520 (7th Cir. 1986)     12

*Fishman v. Wirtz*,
   No. 74 C 2814, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981).     6

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)     6

*Graves v. Man Group USA, Inc.*,
    479 F. Supp. 2d 850 (N.D. Ill. 2007)                                                          4

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
    895 F.2d 1417 (9th Cir. 1990)                                                                17

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
    627 F.2d 919 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1981)                             8

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989)                                                             6, 16

*Inst. Foods Packaging, Inc. v. Creative Prods., Inc.*,
    No. 90 C 4499, 1992 WL 111133 (N.D. Ill. May 12, 1992)                                       10

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*,
    452 F.2d 579 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066 (1972)                           18

*Lektro-Vend Corp. v. Vendo Co.*,
    660 F.2d 255 (7th Cir. 1981)                                                                 16

*MCI Commc'n. Corp. v. Am. Tel. and Tel. Co.*,
    708 F.2d 1081 (7th Cir. 1983)                                                                 8

*Minpeco, S.A. v. Hunt*,
    718 F. Supp. 168 (S.D.N.Y. 1989) (illegal manipulation of silver market three
    times – in months of December 1979, February 1980, and March 1980)                      12, 16

*Morton v. Mancari*,
    417 U.S. 535 (1974)                                                                      21, 23

*Nat'l Gerimedical Hosp. & Gerontology Ctr. V. Blue Cross*,
    452 U.S. 378 (1981)                                                                          20

*Northeastern Tel. Co. v. Am. Tel. and Tel. Co.*,
    651 F.2d 76 (2d. Cir. 1981), *cert. denied*, 455 U.S. 943 (1982)                             17

*nSight, Inc. v. PeopleSoft, Inc.*,
    No. C-04-3836, 2005 WL 3299164 (N.D. Cal. Aug. 5, 2005)                                      10

*Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*,
    908 F.2d 1363 (7th Cir. 1990)                                                                23

*Oxford Global Res., Inc. v. Weekley-Cessnun*,
    No. Civ. A 3:04-cv-0030-N, 2004 WL 2599898 (N.D. Tex. Nov. 12, 2004)                         18

*Partipilo v. Hallman*,
    510 N.E.2d 8 (Ill. App. 1987)                                                                24

*Peto v. Howell*,
    101 F.2d 353 (7th Cir. 1938)                                          11, 12, 15

*Pollock v. Citrus Ass'n of N.Y. Cotton Exch., Inc.*,
    512 F. Supp. 711 (S.D.N.Y. 1981)                                      12, 21, 23

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
    173 F.3d 995 (6th Cir. 1991)                                                  6

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)                                                 18

*Sanner v. Bd. of Trade of Chicago*,
    62 F.3d 918 (7th Cir. 1995) ("*Soybeans II*")                                20

*SCFC ILC, Inc. v. Visa USA, Inc*,
    36 F.3d 958, 966 n.10 (10th Cir. 1994)                                       13

*Schaefer v. First Nat'l Bank of Lincolnwood*,
    326 F. Supp. 1186 (N.D. Ill. 1970), *aff'd in part and rev'd in part*, 509 F.2d
    1287 (7th Cir. 1975)                                                      22, 23

*Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*,
    No. 05 C 3004, 2006, WL 952032 (N.D. Ill. April 12, 2006)                    24

*SEC v. Santos*,
    355 F. Supp. 2d 918 (N.D. Ill. 2003)                                          5

*Smith v. Groover*,
    468 F. Supp. 105 (N.D. Ill. 1979)                                            23

*Strobl v. N.Y. Mercantile Exch.*,
    582 F. Supp. 770 (S.D.N.Y. 1984)                                 11, 21, 22, 23

*Strobl v. N.Y. Mercantile Exch.*,
    768 F.2d 22 (2d Cir. 1985)                                       20, 21, 22, 23

*Taylor Publishing Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000)                                                 15

*Telectronics Prop., Ltd. v. Medtronic, Inc.*,
    687 F. Supp. 832 (S.D.N.Y. 1988)                                             14

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998)                                                   18

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000)                                                  6

*U.S. v. Lov-It Creamery, Inc.*,
  895 F.2d 410 (7th Cir. 1990)                                          22

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)                                                    5

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
  678 F.2d 742 (7th Cir. 1982)                                          9

*Wis. Winnebago Bus. Comm. v. Koberstein*,
  762 F.2d 613 (7th Cir. 1985)                                         22

**STATUTES**

7 U.S.C. 25(a) (2007)                                                   22

15 U.S.C. § 78bb(a) (2007)                                             22

**RULES**

Federal Rule of Civil Procedure 8(a)(3)                               23

Federal Rule of Civil Procedure 8(e)(2)                               23

Federal Rule of Civil Procedure 12(b)(6)                         5, 18, 26

**OTHER AUTHORITIES**

Alan Schacter, *The Availability of Antitrust Treble Damages for Commodities
  Market Manipulation*, 54 Fordham L. Rev. 853, 859 (1986)            21

*Price Manipulation in the Commodities Futures Market: A
  Reexamination of the Justifications for Simultaneous Causes of Action Under
  the CEA and the Sherman Act*, 34 UCLA L. Rev. 1305, 1307 (1987)    21, 22

## INTRODUCTION

In early 2003, Defendants ("BP") set in motion a brazen scheme to build an ongoing monopoly in the market for "TET" propane.[1]  For nearly a year, BP plotted, tested, and executed its market takeover, including a "test run" in April 2003 to refine its scheme, followed by its massive squeeze of the February 2004 TET propane market.

BP's sophisticated plot was simple in concept: buy up an overwhelming portion of the February 2004 TET propane supply and refuse to sell it to the market, driving up prices severely, and then sell at supra-competitive prices.  The plan worked because buyers were desperate.  Holders of "short" futures positions <u>had no choice</u> but to buy propane by month's end.  BP took control of 88% of inventories, and prices rose from 61 cents per gallon ("cpg") to 94 cpg.  Everyone buying TET propane at these inflated prices, including Plaintiffs, severely overpaid because of BP's manipulation.

Years later, with civil and criminal charges looming in October 2007, BP admitted its illegal conduct.  One BP trader pled guilty to conspiracy to manipulate February 2004 TET propane prices, and BP paid $303 million to avoid government prosecution for its manipulation.  Government investigators unmasked BP's scheme in detail, even revealing phone call recordings of BP traders plotting and executing to "control the market at will."  Plaintiffs' Amended Complaint ("Compl.") ¶ 75.  The "payoff isn't just [for] this year," they boasted, but rather "for as long as we carry on trading."  *Id.* ¶ 76.

BP's willful monopolization of TET propane violated the Sherman Act and the Commodities Exchange Act ("CEA"), and unjustly enriched BP at Plaintiffs' expense.

---

[1]  "TET" is propane transported in the Texas Eastern Products Pipeline Co., or "TEPPCO," pipeline system.

Unable to dispute its admissions, BP's Motion to Dismiss and Memorandum (the "Motion") does not even challenge Plaintiffs' CEA claim. Instead, it attacks Plaintiffs' antitrust claims by mischaracterizing BP's admissions and even calling them insufficient. It concocts fanciful legal arguments to impose unprecedented tests on Plaintiffs' monopolization claims. It claims the CEA is a shield against liability for BP's market squeeze and unjust enrichment. None of these arguments have any basis in fact or in law.

First, Plaintiffs' Amended Complaint includes extensive allegations that BP actually controlled the price of propane and excluded competition, allegations which alone are sufficient to state a monopolization claim. In addition, allegations of BP's overwhelming 88% market share, and the very real barriers to entry that made its scheme possible, further establish BP's monopoly power. Unable to dispute these facts, BP instead asks this Court to apply two new legal standards, which BP invents through selective citations to case law. BP's "lasting structural change" and "durable market power" standards do not exist and cannot bar Plaintiffs' claims.

Second, Plaintiffs' attempted monopolization claim is valid for the same reasons. The admitted direct evidence of BP's actual control of prices (*i.e.*, monopoly power) is enough to show BP's dangerous probability of achieving such power. BP's astonishing market share and barriers to entry made its monopoly power not only probable, but real.

Third, contrary to BP's assertions, the CEA does not undermine Plaintiffs' right to pursue antitrust remedies. The Seventh Circuit has expressly held that the CEA does not preempt antitrust claims for anticompetitive activity in commodities markets. In addition, Plaintiffs are entitled to plead in the alternative.

Finally, BP's equitable argument against Plaintiffs' unjust enrichment claim, seeking dismissal because of alleged adequate remedies at law, cannot succeed because Plaintiffs' unjust enrichment claim is a claim in "law" and thus BP's defense does not apply.

## FACTUAL BACKGROUND

Beginning in April 2003, BP traders explicitly conspired to manipulate the TET propane market by buying overwhelming amounts of "long" futures contracts and physical propane and creating an artificial lack of supply. Compl. ¶¶ 71-73. They also distorted the industry benchmark Oil Price Information Service ("OPIS") TET index by withholding and falsely reporting information about trades to affect the index price. *Id*. ¶ 62. They spoke of their deliberate effort to (a) buy an overwhelming position in propane inventories and futures, (b) withhold inventory until the price increased significantly due to lack of supply, and (c) sell at the artificially inflated prices to parties that had no choice but to buy to "cover" short positions. *Id*. BP made sure that its victims would be trapped and surprised and "aren't going to feel concerned until it's time." *Id*. ¶ 94.

BP tested its ability to manipulate the market in April and May 2003 by identifying the total available propane inventory, and determining how much they needed to buy to execute their manipulation scheme. *Id*. ¶¶ 73-76. BP then selected February 2004 as the ideal time to proceed with its first market squeeze. *Id*. BP first bought significant long positions for February TET propane in January and February of 2004 and then bought an overwhelming amount of physical inventory, all while refusing to sell any on the market. *Id*. ¶¶ 77-124. During the operative period, BP owned or controlled more than 88% of all available February 2004 TET propane inventory. *Id*. ¶ 122. By the end of the month, BP obtained and held positions in February 2004 TET propane that far

exceeded the entire TEPPCO system propane inventory. *Id*. ¶¶ 123-24.

These last days and hours of the month were critical because those with short positions needed to cover their positions by the end of the month, either by buying propane or contracts. *Id*. ¶¶ 125-29. Precisely at that point, when BP controlled and had severely limited supply, and when these parties had no choice but to buy, BP carefully and deliberately began selling propane at prices it dictated. *Id*. It drove prices as high as 94 cpg from a low of 61 cpg earlier in the month. *Id*. ¶¶ 101, 130.

BP planned to repeat this strategy in the future. After their February 2004 market squeeze, BP traders boasted, "we would know from thereafter that we could control the market at will." *Id*. ¶ 75. They added that "the payoff isn't just this year. It's saying for as long as we carry on trading." *Id*. ¶ 76. But, their initial squeeze focused directly on the February 2004 TET propane market such that on the first day of March 2004, once BP's squeeze had concluded, the price of propane quickly fell back to 61.75 cpg. *Id*. ¶ 133. Even then, many buyers, including some who still struggled to meet their February commitments, continued paying inflated prices through March, either to meet long-term supply contracts or because BP required payment of the February price. *Id*. ¶ 134-35.

As a result of BP's illegal scheme, Plaintiffs, who bought propane at TET market prices, severely overpaid and lost substantial money. *Id*. ¶ 160. They now seek damages under the Sherman Act and the CEA, as well as restitution.

## STANDARD OF REVIEW

"A motion to dismiss tests the sufficiency of a complaint, not the merits of a case." *Graves v. Man Group USA, Inc.*, 479 F. Supp. 2d 850, 853 (N.D. Ill. 2007) (citing *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998)). Under the Seventh Circuit's liberal approach to evaluating a Rule 12(b)(6) motion to dismiss,

courts accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., SEC v. Santos*, 355 F. Supp. 2d 918, 919 (N.D. Ill. 2003); *Cleveland v. Rotman*, 297 F.3d 569, 571 (7th Cir. 2002). There is no heightened pleading standard for antitrust claims. *See, e.g., Endsley v. Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). Indeed, "frequently, questions of whether the defendant possessed the requisite market power to establish a monopoly are addressed in a motion for summary judgment or trial," rather than a motion to dismiss. *Id.*

## ARGUMENT

### I.    Plaintiffs State A Proper Claim for Monopolization Because BP Possessed and Exercised Monopoly Power.

The Supreme Court has long held that Plaintiffs need only allege two elements to state a valid monopolization claim under the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571 (1966). Having admitted its monopoly scheme, BP does not deny its willful acts to acquire monopoly power. Instead, it focuses on the first factor, arguing the Amended Complaint does not allege BP had market power.

As discussed below, Plaintiffs need only show <u>either</u> direct <u>or</u> circumstantial evidence of such power. Plaintiffs demonstrate both. Plaintiffs have alleged direct evidence that BP deliberately and effectively manipulated TET propane prices. They also allege compelling circumstantial evidence of BP's stunning market share and the market's formidable barriers to entry. Finally, longstanding precedent holds that the Sherman Act extends to just the type of commodities market squeeze that BP admitted.

### A.    Direct Evidence That BP Actually Controlled Prices and Excluded Competition Demonstrates BP's Monopoly Power.

Plaintiffs may establish BP's monopoly power either (1) "through direct evidence of anticompetitive effects," or (2) through circumstantial evidence, such as market share and barriers to entry. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (emphasis added). "Monopoly power has long been defined in the courts as the power to exclude competition or to control price." *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) (emphasis added). As a result, Plaintiffs can establish BP's monopoly power by showing BP's "exercise of actual control over prices." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1991) (citations omitted); *see also Fishman v. Wirtz*, No. 74 C 2814, 1981 WL 2153, at * 48 (N.D. Ill. Oct. 28, 1981).

Plaintiffs' allegations that BP actually controlled prices and excluded competition in the propane market are sufficient to establish BP's monopoly power and thus, Plaintiffs' monopolization claim. *See Re/Max*, 173 F.3d at 1018 ("an antitrust plaintiff is not required to rely on [such] indirect evidence . . . when there is direct evidence that the defendant has actually set prices or excluded competition."); *see also*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("'proof of actual detrimental effects'. . . can obviate the need for an inquiry into market power") (citation omitted). Indeed, "market share and barriers to entry are merely surrogates for determining the existence of monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007); *see also Toys "R" Us*, 221 F.3d at 937 (Market share and barriers to entry are "only a way of estimating market power, which is the ultimate consideration.").

There can be no question that Plaintiffs' Amended Complaint provides direct

evidence of monopoly power.  As Plaintiffs allege, BP has admitted to manipulating the TET propane market, achieving overwhelming dominance of supply, and actually controlling and raising prices all the way up to 94 cpg from a low of 61 cpg.  Compl. ¶¶ 71-134.  By the end of February 2004, after buying up most of the propane supply and contracts and then refusing to sell them to anyone, BP began carefully releasing its holdings while dictating the price to the market in each transaction.  *Id*. ¶¶ 118-25.  BP's conduct prevented any meaningful competition; it owned and withheld so much of the market that it was the only company that could sell significant quantities of propane.  *Id*.

In tape-recorded conversations with brokers seeking propane, BP quickly and incrementally "stepped up" the market price.  As the BP traders charged half a penny per barrel more for each additional sale, they admitted they were "just walking them up a half step."  *Id*. ¶ 126.  A desperate broker confirmed to BP that buyers would have to accept BP's terms "because there's nobody else out here that has any [propane] but you."  *Id*. ¶ 127.  On hearing BP's outrageous price demands, a counterparty exclaimed, "Jesus Christ, I don't have a choice do I? Not really?"  Confident that its squeeze was working, BP replied, "Not if you need to cover."  The buyer accepted.  *Id*. ¶ 129.  BP intended to repeat this scheme "at will . . . as long as we carry on trading."  *Id*. ¶¶ 75-76.

These are just a few examples of Plaintiffs' extensive allegations, which BP admitted and the Court assumes as true for a motion to dismiss, showing BP's actual control over prices and exclusion of competition.  Such direct evidence of BP's monopoly power is all that is required to properly allege this element, the only element of Plaintiffs' monopolization claim which BP disputes.  On this basis alone, BP's Motion must be denied.

**B.      Both Market Share and Significant Barriers to Entry Also Establish BP's Monopoly Power.**

Although this direct evidence of BP's actual control of prices is sufficient to state a claim, Plaintiffs' Amended Complaint also provides significant circumstantial evidence of BP's monopolistic market share and the barriers to entry that made BP's scheme possible. BP acquired a market share of 88% of TET propane inventories and amassed a position larger than the entire deliverable supply in February 2004. *Id*. ¶¶ 122-24. "Where [the] data reveals a market share of more than seventy to eighty percent, the courts have inferred the existence of monopoly power." *MCI Commc'n. Corp. v. Am. Tel. and Tel. Co*., 708 F.2d 1081, 1107 (7th Cir. 1983). On a motion to dismiss, allegations of much smaller market shares state a valid claim. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 925 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1981) (finding 65% market share allegation sufficient to deny motion to dismiss).

Barriers to entry also establish BP's market power. Competitors simply were unable to bring any meaningful additional supply into the February 2004 TET propane market to thwart BP's monopoly. Compl. ¶ 144. Plaintiffs allege that (1) other pipeline systems could not have transported propane to the TET market in time; (2) refineries could only produce very small amounts of propane and were minor suppliers; and (3) overseas imports took several weeks to arrive – too late to foil BP's end-of-month price hikes and monopolization. *Id*. ¶¶ 146-47. Moreover, all of these suppliers sold their propane under long-term contracts, which tied the price to the Mont Belvieu OPIS TET index price at the time of delivery. BP's manipulation of that index price meant that any new supplies in the market would have sold at the same inflated rates. *Id*. ¶¶ 145-47.

BP built its scheme around these barriers. It intentionally waited to raise prices to

ensure that buyers "aren't going to feel concerned until it's time." *Id.* ¶ 94. Raising prices more than three weeks before the end of monthly trading might have given other suppliers enough lead time to bring more propane to market. *Id.* ¶ 147. As a result, BP purposefully inflated prices only after it was too late for any meaningful substitute supplies to arrive. *Id.* ¶¶ 125, 148; *see also Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir. 1982) (defining market power as "the power to raise prices significantly above the competitive level without losing all of one's business.").

In the face of these allegations, which the Court assumes are true, BP distorts these facts and the law. BP suggests that additional supplies <u>eventually</u> may have arrived in the propane market generally, but it ignores Plaintiffs' allegations that such supplies could not have arrived in time to affect the <u>February 2004 TET propane market</u> that is the subject of Plaintiffs' Amended Complaint. Motion at 8-11. Only by mis-defining the relevant market can BP hope to escape the allegations of major barriers that existed for anyone seeking to materially increase supply in the February 2004 TET propane market.

BP emphasizes that propane inventories increased in February, but it fails to note that BP's purchases increased, too, until BP's position far exceeded the deliverable supply, "to ensure that they would be the only company in the market that could sell significant quantities of TET propane." Compl. ¶¶ 122-24. Finally, BP says external factors undermined its scheme, but it omits that BP took account of such factors and even bought more propane to compensate. *See, e.g., id.* ¶ 94 (monitoring weather closely); *id.* ¶¶ 103-04 (buying extra after pipeline rupture increased supply).

BP relies on misleading citations to inapplicable law, going so far as to cite cases in which claims were invalid due to insufficient or merely "conclusory" allegations

of barriers to entry and market share. *See, e.g., nSight, Inc. v. PeopleSoft, Inc.*, No. C-04-3836, 2005 WL 3299164, at *1 (N.D. Cal. Aug. 5, 2005) (California case holding that complaint did "not include <u>any</u> allegations suggesting that companies wishing to enter the relevant market are unable to do so as a result of barriers to entry") (emphasis added); *Inst. Foods Packaging, Inc. v. Creative Prods., Inc.*, No. 90 C 4499, 1992 WL 111133, at *2 (N.D. Ill. May 12, 1992) ("plaintiff has <u>pled no facts</u> which would support the conclusion that Creative could exert power in that market to raise prices or exclude competitors . . . plaintiff must assert more than mere conclusory allegations of market share") (emphasis added). Plaintiffs' 52-page Amended Complaint, with allegations of specific conversations, trades, and market activity, provides far more detail than those in the cases above, easily providing the support to defeat BP's Motion.

### C. Longstanding Precedent Supports Plaintiffs' Claims.

Stuck with its own admissions that it actually and willfully controlled the price of propane and monopolized the February 2004 TET propane market, BP's only defense is to suggest that its manipulation was somehow legal. Entirely contrary to law, BP claims that because it chose to monopolize a market with a one-month futures contract period, its manipulation did not last long enough to violate the antitrust laws. To mount this defense, BP cites to entirely inapposite cases. It even coins new tests it thinks should apply to antitrust plaintiffs, including requirements of "lasting structural change" and "durable market power." Motion at 4-8. The cases BP cites do not come close to supporting these new requirements, however, and longstanding precedent confirms that Plaintiffs have stated a valid monopolization claim.

1.    **The Seventh Circuit Has Long Recognized Claims for Monopolization of Month-Long Commodities Markets.**

Plaintiffs' claims are neither unique nor unprecedented.  Under longstanding Seventh Circuit precedent, the Sherman Act forbids cornering supplies and raising prices in commodities and futures markets, even if the market only lasts a month.  BP argues that its admitted, year-long monopoly scheme, which it intended to repeat "at will," did not last long enough to violate the law.  But, as BP conveniently neglects to mention, ever since 1938 the Seventh Circuit has held that the Sherman Act

> forbids monopolies of "any part" of interstate commerce. "Any part" of commerce may cover commerce in a vast district, or that in a small district, that occurring over a long period of time or over a short period of time, but it is not to be conceived that a monopoly of all that part of interstate commerce in the city of Chicago for one day is any less a violation of the law than a monopoly over the same product and the same market for thirty days or for a year. It is the act of monopoly over a product in any part of interstate commerce that is forbidden. . . . If "any part" has both a geographical and a distributive significance, it is equally true that it may have a significance of limitation in time.

*Peto v. Howell*, 101 F.2d 353, 356-58 (7th Cir. 1938).  With very similar facts, the *Peto* Court found a Section 2 violation when a defendant cornered the supply in the Chicago market for July 1931 corn, amassing over 90% market share.  *Id.* at 356.  "[W]hen the end of the month arrived, some of the persons who had agreed to deliver to him corn found no available supply from which they could procure the commodity to deliver to him, for the simple reason that defendant then had a monopoly of the visible commercial supply of corn in the Chicago market."  *Id.* at 356-57.  Such conduct violates the Act.  *Id.*

Other cases affirm that manipulating a distinct, month-long commodities market violates the Sherman Act.  *See Strobl v. N.Y. Mercantile Exch.*, 582 F. Supp. 770 (S.D.N.Y. 1984) (potato processors illegally conspired to manipulate price of May 1976

potatoes by accumulating 98% of short positions and driving prices artificially low); *Pollock v. Citrus Ass'n of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 718-19 (S.D.N.Y. 1981) (finding monopoly where traders bought up long positions in November 1977 orange juice futures, and "[d]uring the final hours of trading in November Contracts, when persons in a short position, such as the plaintiffs, were seeking to liquidate their position through the purchase of offsetting long positions, the defendants allegedly withheld their long positions, thereby driving up the price of November Contracts"); *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168 (S.D.N.Y. 1989) (illegal manipulation of silver market three times – in months of December 1979, February 1980, and March 1980).

As these cases demonstrate, the February 2004 TET propane market is properly defined as its own, distinct product market. "Shorts" were obliged to deliver propane no later than the last day of February; only February propane would suffice. They could not wait one day more because March propane was a different commodity and no substitute. Compl. ¶¶ 86, 94, 104; *cf. Fishman v. Estate of Wirtz*, 807 F.2d 520, 539 (7th Cir. 1986) (firm may not impose discriminatory terms when a facility "cannot reasonably be duplicated and to which access is necessary if one wishes to compete"). A product market is defined by the actual "choices available to [consumers]" and whether other products are "interchangeable" with the product in question. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 481–482 (1992). Because February and March propane were not interchangeable, BP could exploit the end of February trading to defraud shorts and drive up the price for direct purchasers. *Peto* does not allow BP to use

the same time limit to escape liability.[2]

> **2.    BP's Proposed New Elements of "Lasting Structural Change" and "Durable Market Power" Have No Basis in Law and Do Nothing to Undermine Plaintiffs' Claims.**

Rather than address or even acknowledge this directly relevant precedent, BP invents two new legal standards – "lasting structural change" and "durable market power" – and argues that they should apply to Plaintiffs' claims.  Motion at 4-8.  To support these new tests, BP selectively pieces together language from assorted cases nationwide; misleadingly quotes irrelevant language relating to Section 1 and conspiracy to monopolize claims; and relies on pure dicta.  Accepting Plaintiffs' allegations as true, none of the law BP cites provides grounds to dismiss Plaintiffs' claims.

First, there is no "lasting structural change" test (to use BP's formulation) for Section 2 claims.  Citing to dicta, BP claims that Plaintiffs have not alleged a supposed requirement of "alteration of the market structure." *Id.* at 5.  Yet, the cases cited merely suggest the unremarkable proposition that Section 2 aims to prevent non-competitive markets dominated by monopolists, nothing more.  For example, *SCFC ILC, Inc. v. Visa USA, Inc.*, a Section 1 case cited by BP, mentions in a footnote that monopolization involves a "pernicious market structure," defined as a market in "which the concentration of power saps the salubrious influence of competition" – *i.e.*, a non-competitive market. 36 F.3d 958, 966 n.10 (10th Cir. 1994).  Such language is not only misrepresented by BP

---

[2] Suddenly spiking market prices at the very close of trading on a monthly market is often known as "marking the close," and violates not only the antitrust laws, but also the CEA and possibly securities laws.  *See, e.g.*, *CFTC v. Amaranth Advisors, L.L.C.*, No. 08 Civ. 6682, 2008 WL 2123323, at *1-4  (S.D.N.Y. May 21, 2008) (in CEA case, defendants "attempted to manipulate the price of natural gas futures contracts by deliberately waiting to sell a substantial number of those contracts in the final minutes before the close of trading," selling 75% of their contracts in the final minute of trading).

but also is dicta.  *See, e.g., Telectronics Prop., Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 838 (S.D.N.Y. 1988).

Likewise, in an attempt to create Seventh Circuit support for its new "lasting structural change" test, BP cites to a discussion in *A.A. Poultry Farms* that is not relevant outside of predatory pricing cases.  *See A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401 (7th Cir. 1989).  Under *A.A. Poultry*, a plaintiff alleging predatory pricing, which Plaintiffs here do not, must show not only low, predatory prices that eliminate competition, but also that the market structure remained non-competitive long enough for the monopolist to later charge higher, monopoly prices to recoup its losses from the predatory period.  *Id*.  The court said consumers may even benefit if the monopoly ends after the low prices but before the monopoly prices set in.  *Id*.

Of course, this logic does not apply outside of predatory conduct.  Where the monopolist has not engaged in predatory, artificially low pricing in order to dominate the market, a "recoupment period" is irrelevant.  Indeed, in BP's scheme, its opportunity to profit peaked in the final hours of February propane trading, as shorts needed to cover their obligations.  As March began, this urgency instantly dissipated and prices returned to normal.  No matter how quickly the market ends, consumers cannot benefit from a scheme like BP's, where there were no artificially low prices, only artificially high ones.

Equally misrepresented in BP's Motion is "fleeting duration" dicta from the Southern District of New York's *Apex* case, which differs significantly in both law and fact from the present case.  *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989).  BP's citations to *Apex* actually refer to a conspiracy to monopolize claim that suffered from a lack of facts demonstrating a defendant's specific intent to monopolize, which is

not an issue here.  *Id.* at 600-01 ("Apex has cited no case in which activity of such fleeting duration has supported a finding of a specific intent to monopolize . . . . there is no triable issue of fact as to . . .  specific intent to monopolize."); *compare Biswell Stores Inc. v. Indian Nations Commc'ns of Cushing Inc.*, 98 F.3d 1349, *3 n.3 (10th Cir. 1996) ("[O]nly general intent, not specific intent, is an element of monopolization. . . ."). Moreover, Apex lost on summary judgment because it had not provided any evidence of such intent or obviously anticompetitive conduct.  Neither showing is in question in Plaintiffs' Amended Complaint.[3]  *Supra*, at 1-4.

BP relies on similarly irrelevant case law to support its second proposed test of "durable market power."  Here, too, BP argues that its admitted market manipulation did not last long enough to violate the antitrust laws.  Once again, BP cites to irrelevant and inapposite caselaw arising out of predatory conduct cases.  *See, e.g., Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F. Supp. 1527, 1538 (N.D. Ill. 1991) (explaining that "[t]o be successful, a predatory pricing scheme must secure for the predator monopoly power to allow recoupment of losses during a sufficiently long period of monopoly pricing."); *Taylor Publishing Co. v. Jostens, Inc.,* 216 F.3d 465, 482 (5th Cir. 2000) (predatory conduct case that failed to show defendant caused the alleged injuries).

BP's entire argument fails because it once again hinges on a misstatement of the relevant market, as discussed *supra* at 12.  As *Peto* and the other cited cases make clear, the relevant market here was February 2004 TET propane.  BP focused on completely

---

[3] The plaintiff, Apex, held short futures positions in heating oil and thus had an obligation to sell to long position holders.  Market rules allowed the "longs" to determine the date and place of delivery.  When the longs all set earlier delivery dates than Apex wanted, it charged them with conspiracy to monopolize.  But, other than their common insistence on an earlier delivery date, Apex presented no evidence that their delivery preference was based on an intent to monopolize.

monopolizing that market, buying inventories and contracts specific to February propane and betting on the spread (which it created) between February and March prices.  Compl. ¶¶ 77-78.  In the Seventh Circuit and elsewhere, such monopolization of a month-long commodities market violates Section 2.[4]

## II.    Plaintiffs State a Proper Claim for Attempted Monopolization.

Plaintiffs' allegations, including BP's admissions that it attempted to and actually did manipulate the TET propane market, also fully support Plaintiffs' claim of attempted monopolization.  To state a valid attempted monopolization claim, Plaintiffs only need to show "(1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and . . . (3) a dangerous probability that the attempt to monopolize will be successful."  *Ind. Grocery,* 864 F.2d at 1413; *see also Lektro-Vend Corp. v. Vendo Co*., 660 F.2d 255, 270 (7th Cir. 1981).

BP's Motion does not even dispute that BP's misconduct satisfies the first two elements, nor could it.  As Plaintiffs allege in detail, BP already has admitted that it specifically intended to, and did, control TET propane prices through anti-competitive conduct.  *Supra*, at 1-4.[5]  BP's only defense is to claim that there was no "dangerous

---

[4] It is also noteworthy that BP's claim that its manipulation spanned only 36 days long distorts the Complaint's allegations.  BP worked on its scheme for almost a year.  It also intended to repeat it "at will" and for "as long as we carry on trading," Compl. at ¶ 76, just as the defendants in *Minpeco* did.

[5] For instance, in the Deferred Prosecution Agreement Statement of Facts, BP admitted that it

> also engaged in conduct to affect the daily and monthly price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price, from being reported. In the context of the market manipulation scheme, this

probability" that it would achieve monopoly power. Yet, BP's monopoly power not only was a probability but became a reality, as demonstrated by direct evidence of BP's actual control of prices, as well as circumstantial evidence of its staggering 88% market share and significant barriers to entry protecting its scheme. *Supra*, at 6-10.

The clearest possible proof that BP probably could control prices and exclude competition is that <u>it actually did so</u>. Courts infer a dangerous probability from such direct proof of monopoly power. *See Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727 (9th Cir. 1979) ("'dangerous probability of success' may be satisfied either by direct proof of market power, or by inference from the proven specific intent itself . . . [specific intent] is not an 'essential' element of an attempt claim."); *see also Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417, *4 (9th Cir. 1990) (unpublished) ("direct proof of market power" or "specific intent to control prices or destroy competition and predatory conduct" can satisfy this element); *Northeastern Tel. Co. v. Am. Tel. and Tel. Co.*, 651 F.2d 76, 85 (2d. Cir. 1981), *cert. denied*, 455 U.S. 943 (1982) (unlawful conduct plus monopoly power can show dangerous probability). Here, such direct evidence is extensive. *See supra*, at 6-7.

In addition, BP's stunning 88% market share and substantial barriers to entry also demonstrate its dangerous probability of gaining monopoly power. Attempt claims

---

> <u>conduct was intended to</u> present false information to the market concerning the actual availability of TET propane, was intended to subvert the integrity of the industry benchmark average price, and was intended to defraud certain counterparties.

Compl. ¶ 62 (emphasis added). Discussing their anti-competitive intent, BP traders said, "[W]hat we stand to gain is not just we'd make money out of it, but we would know from thereafter that <u>we could control the market at will</u> . . . . You know, the payoff isn't just this year. It's saying for as long as we carry on trading." *Id*. ¶ 75 – 76 (emphasis added). *See also id*. ¶¶ 1, 31, 78, 85-86, 100, 153, 163, 165, 169, and 178.

require an even lesser showing of market power and market share. *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F.Supp.2d. 1097, 1116-17 (N.D. Ohio 2004); *see also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 100 (2d Cir. 1998); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (requiring "a lower quantum" of market share in attempt cases). Indeed, courts generally infer requisite market power from a market share of over 50%. *Defiance Hosp.*, 344 F. Supp. 2d at 1116; *see also Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066 (1972) (finding dangerous probability of monopolization with one-third market share). BP's 88% market share easily meets this standard.

In the face of this evidence, and the Rule 12(b)(6) standard that assumes it is true and interprets it in the light most favorable to Plaintiffs, BP once again selectively mischaracterizes facts in its favor. BP says its plot was unworkable since BP "would necessarily have to sell most of its accumulated supply of propane in March, when prices collapsed." Motion at 11. Of course, Plaintiffs allege otherwise, quoting BP documents that said "that only a small portion of inventory would be rolled into March resulting in a minimal loss against a substantial gain." Compl. ¶ 89.

Further, as with the monopolization claim, BP suggests that the market was somehow competitive, that the monopoly was only "temporary," that there were no barriers to entry, and that it somehow did not control the market supply or price.[6] As

---

[6] Other than distorting the facts, BP makes these arguments by citing to snippets of assorted, irrelevant cases. For example, so desperate was BP for any citation at all using the word "temporary" in order to call Plaintiffs' allegations "merely a 'temporary harmful' price manipulation," Motion at 11, that BP cites an unpublished Texas case that was not even discussing either price manipulation or the "temporary" nature of a monopoly. *See Oxford Global Res., Inc. v. Weekley-Cessnun*, No. Civ. A 3:04-cv-0030-N, 2004 WL 2599898, at *2 (N.D. Tex. Nov. 12, 2004) (in sentence BP quotes regarding

discussed at length above, the allegations presented in Plaintiffs' Amended Complaint belie all of these charges. BP fully monopolized the market for February 2004 TET propane, it actually and willfully raised the price of propane, and there was nothing that any existing or potential competitor could do to stop it. Moreover, BP planned to do it again and again, "as long as we carry on trading," all in violation of Section 2.

## III.    The CEA Does Not Preclude Plaintiffs' Antitrust Claims.

BP argues that Plaintiffs' Sherman Act claims are barred because BP's misconduct is also actionable under the CEA. Federal law simply does not support this assertion, whether BP is arguing that the Sherman Act does not apply to activity that also violates the CEA, or that Plaintiffs cannot plead both claims in the alternative.

### A.    The CEA Does Not Explicitly or Implicitly Void Plaintiffs' Antitrust Claims.

The crux of BP's argument is that the Sherman Act does not apply to activity that also violates the CEA. Motion at 11. BP does not claim, however, that the CEA *expressly* repealed the Sherman Act's applicability in commodities markets or granted implicit antitrust immunity in such cases. Rather, BP relies on a canon of statutory interpretation – "the specific trumps the general" – to extrapolate that Congress *implicitly* repealed the Sherman Act by providing a remedy for price manipulation under the CEA. Motion at 11-13. This argument fails for at least three reasons. First, the Seventh Circuit has held that the CEA did <u>not</u> implicitly repeal the antitrust laws. Second, Congress expressed no intent to eliminate antitrust claims for anti-competitive activity that also violates the CEA. Third, a Securities Exchange Act case relied on by BP is inapposite

---

"temporary" monopolies, court actually was holding that antitrust violations harm competition, not competitors: "preliminary showing of significant and more-than-temporary harmful effects on *competition* (and not merely on a competitor or customer)") (italics in original).

because, unlike the securities laws, the commodities laws have long co-existed with antitrust laws.

>    1.    **The Seventh Circuit Has Held that the CEA Did Not Implicitly Repeal the Antitrust Laws.**

On this precise issue, the Seventh Circuit has held that the CEA does not implicitly repeal the Sherman Act. *See Am. Agric. Movement Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147 (7th Cir. 1992) ("*Soybeans I*"). As in the present case, the *Soybeans I* plaintiffs brought both CEA and Sherman Act claims. *Id.* at 1150. The Seventh Circuit explained, "[i]mplied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the anti-trust laws and the regulatory system." *Id.* (quoting *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross*, 452 U.S. 378, 388 (1981)). The Circuit Court found no such clear repugnancy between the CEA and the Sherman Act and held that Congress' inclusion of anti-price manipulation provisions in the CEA did not indicate its intent to foreswear "the paradigm of competition" in this field. *Id.* at 1161; *see also Sanner v. Bd. of Trade of Chicago*, 62 F.3d 918, 921 (7th Cir. 1995) ("*Soybeans II*") (noting that the *Soybeans I* court "held the CEA did not repeal the antitrust claims by implication.").

>    2.    **Congress Plainly Did Not Intend for the CEA to Preclude Antitrust Remedies.**

Omitting any discussion of this contrary and controlling Seventh Circuit law, BP instead relies on a canon of statutory construction – "the specific trumps the general" – to argue that the CEA precludes antitrust remedies. But, a rule of statutory construction does not apply where, as here, there is clear congressional intent to preserve antitrust claims for CEA violations. *See Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 30 (2d Cir. 1985) (rejecting "specific trumps the general" rule of construction in light of

"compelling" legislative evidence that CEA left the antitrust laws intact); *see also Soybeans I*, 977 F.2d at 1158 ("As with all matters of statutory construction, the intent of Congress governs, but in order to find implied immunity that intent must be clear.").

Federal courts and commentators have repeatedly and consistently determined from the CEA's legislative history that Congress intended to leave the antitrust laws intact. *See, e.g. Strobl*, 168 F.2d at 28-29 (legislative history "reveals that Congress desired the continued application of the antitrust laws to those anti-competitive practices that also violate the Commodity Exchange Act"); *Pollock*, 512 F. Supp. at 716 – 17 ("legislative history makes clear that the provision was enacted, in part, to preserve federal antitrust jurisdiction over trading practices that constitute restraints of trade."); Alan Schacter, *The Availability of Antitrust Treble Damages for Commodities Market Manipulation*, 54 Fordham L. Rev. 853, 859 (1986) ("Congress manifested its intent that the CEA antimanipulation provision leave the antitrust laws intact with respect to private defendants").[7]  As such, the Court should reject BP's formalistic reasoning in light of Congress' clear intent to allow antitrust claims for activity that also violates the CEA. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (rejecting "formalistic reasoning" that ignores both history and purpose of legislation to find implied repeal).

_____

[7] BP's brief legislative history argument consists of a citation to a law review article explaining that Congress chose not to create treble damages liability for violations of the CEA. Motion at 12 n.4.  The Second Circuit in *Strobl* specifically rejected this argument: "Congress might well have decided that treble damages under the antitrust laws were sufficient and that there was no need, therefore, to add such a remedy to the Commodity Exchange Act." 768 F.2d at 82.  Notably, the same law review article cited by BP later acknowledges that "the approach adopted in *Strobl* appears to be the prevailing view," that Congress intended to leave the antitrust laws intact.  John Kern, *Price Manipulation in the Commodities Futures Market: A Reexamination of the Justifications for Simultaneous Causes of Action Under the CEA and the Sherman Act*, 34 UCLA L. Rev. 1305, 1307 n.8 (1987).

3.    **Unlike the Securities Laws, the Commodities and Antitrust Laws Have Long Co-Existed.**

To support its argument that the CEA precludes Plaintiffs' antitrust claims, BP relies heavily on a Securities Exchange Act ("SEA") case, *Schaefer v. First Nat'l Bank of Lincolnwood*, 326 F. Supp. 1186 (N.D. Ill. 1970), *aff'd in part and rev'd in part*, 509 F.2d 1287 (7th Cir. 1975).  Even if *Schaefer* had not been superseded by *Soybeans I*, *Schaefer* is inapposite because its holding is based on a finding that the provisions of the Securities Exchange Act were incompatible with the CEA.  *Id.* at 1192 ("a number of inconsistencies would result if plaintiffs were permitted to pursue both a Sherman Act and Securities Act cause of action").  Unlike the irreconcilable securities and antitrust laws in *Schaefer*, "the *commodities* and antitrust laws have long co-existed."  *See Strobl*, 768 F.2d at 30 (emphasis in original).

Unlike the CEA, the securities laws specifically limit damages recoverable under its own provisions <u>and</u> under other statutes. *Compare* 15 U.S.C. § 78bb(a) (2007) (SEA limiting damages under the SEA <u>and</u> other statutes) *with* 7 U.S.C. 25(a) (2007) (no CEA restriction on availability of damages under other statutes); *see also Strobl*, 768 F.2d at 30 (commodities and antitrust laws do not conflict).  Indeed, the *Schaefer* court found that the Securities Exchange Act's limitation on damages reflected a specific intent to preserve "only single damage remedies." 326 F. Supp. at 1192.  The court relied on the "specific trumps the general" canon to resolve a conflict between the securities and antitrust laws.  *Id.*   This canon is inapplicable here, however, where there is no intent in the CEA to preserve only single damage remedies.  *See Strobl*, 768 F.2d at 29-30; *see also U.S. v. Lov-It Creamery, Inc.*, 895 F.2d 410, 412 (7th Cir. 1990) ("[M]axims are conflict-resolvers. . . ."); *Wis. Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613, 618

(7th Cir. 1985) ("'In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.'") (quoting *Morton*, 417 U.S. at 550).

As the Seventh Circuit held in *Soybeans I*, the CEA did not create an irreconcilable conflict between the CEA and the antitrust laws, or otherwise render superfluous antitrust remedies for anticompetitive activity that also violates the CEA. *Soybeans I*, 977 F.2d at 1150, 1155, 1161. To the extent BP relies on *Schaefer* or *Smith v. Groover*, 468 F. Supp. 105 (N.D. Ill. 1979) to argue that the "specific over general" principle should trump Congress' clear intent to leave intact the antitrust laws, such an argument must fail. *See Strobl*, 768 at 30 (refusing to adopt the rationale of *Schaefer* or *Smith*).

### B.    Plaintiffs May Plead CEA and Antitrust Claims In the Alternative.

In the absence of contrary legislative intent, the Federal Rules of Civil Procedure 8(a)(3) and 8(e)(2) expressly abolished the election of remedies rule, and thus permit Plaintiffs plead both CEA and antitrust claims. *See Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1371 (7th Cir. 1990) ("Common law pleading was superseded long ago" by Federal Rules that "expressly abolish election of remedies"); *see also Strobl*, 768 F.2d at 30 (CEA and Sherman Act claims "may be stated alternatively or hypothetically."); *Pollock*, 512 F.Supp. at 716 – 17 ("in the absence of contrary legislative intent in enacting the specific regulatory statute, the application of an election of remedy rule would be repugnant to Fed.R.Civ.P. 8(a)(3) and 8(e)(2) which specifically provide for pleading in the alternative"). Plaintiffs may plead both claims and overcome BP's motion to dismiss.

**IV.    BP's Equitable Defense Does Not Apply To Plaintiffs' Action at Law.**

Finally, in an attempt to dismiss Plaintiffs' unjust enrichment claim, BP asserts the equitable defense of "adequate legal remedy." Motion at 13. This argument fails because Plaintiffs' unjust enrichment claim is a legal action, rather than an equitable one, and equitable defenses do not apply. *See Partipilo v. Hallman*, 510 N.E.2d 8, 11 (Ill. App. 1987); *Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*, No. 05 C 3004, 2006, WL 952032, at *4 (N.D. Ill. April 12, 2006).

Under Illinois law, Plaintiffs' claim for unjust enrichment is a legal claim. *Partipilo*, 510 N.E.2d at 809-10 ("unjust enrichment . . . is an action at law") (citing *Dickerson Realtors, Inc. v. Frewert*, 307 N.E.2d 445, 448 (Ill. App. 1974) and *Bd. of Highway Comm'rs v. Bloomington*, 97 N.E. 280, 284-85 (Ill. 1911)). With this claim, Plaintiffs seek restitution of overpayments BP received as a result of its unlawful acts. Compl. ¶¶ 172-73. Although Plaintiffs also seek the establishment of a constructive trust to facilitate payments, the underlying principles of Plaintiffs' unjust enrichment claim lie in restitution, which is an action at law. *See Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.*, 135 F.3d 526, 527-28 (7th Cir. 1998) ("we do not find persuasive indications that the Supreme Court of Illinois thinks of restitution as an action in equity rather than at law."); *see also GlaxoSmithKline*, 2006 WL 952032 at * 4 (unjust enrichment claim for restitution is action at law).

Since this claim is based in law, BP's equitable defense of "adequate remedy at law" is unavailable. *See GlaxoSmithKline*, 2006 WL 952032 at *4 (adequate remedy at law is an equitable defense); *Partipilo*, 510 N.E.2d at 11 (adequate remedy at law is not a defense for a legal remedy). Without any other shield from Plaintiffs' unjust enrichment claim, BP's motion to dismiss should be denied.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny BP's

motion to dismiss Counts I, II, and III of the Amended Complaint.


Dated:  July 31, 2008




Respectfully submitted,


s/ Peter G. Skiko_____
Peter G. Skiko
Daniel G. Wills
Brendon P. Friesen
**SWANSON, MARTIN & BELL, LLP**
330 North Wabash
Suite 3300
Chicago, IL  60611
Telephone: 312-321-9100
Fax: 312-576-0016
pskiko@smbtrials.com

Henry Chajet
John W. Schryber
DeMaurice F. Smith
John D. Austin, Jr.
**PATTON BOGGS LLP**
2550 M Street NW
Washington D.C. 20037
Telephone: 202-457-6000
Fax: 202-457-6315
hchajet@pattonboggs.com

COUNSEL FOR PLAINTIFFS