## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

———————————————————————

|  |  |  |
|---|---|---|
| AMERIGAS PROPANE, L.P., | ) | |
| FERRELLGAS L.P., TITAN ENERGY | ) | |
| PARTNERS (as successor-in-interest to | ) | |
| CornerStone Propane Partners, LP), and | ) | |
| HERITAGE OPERATING, LP, | ) | Case No. 1:08-cv-00981 |
| | ) | |
| Plaintiffs, | ) | The Honorable James B. Zagel |
| | ) | |
| v. | ) | |
| | ) | |
| BP AMERICA, INC., BP CORPORATION | ) | |
| NORTH AMERICA INC., BP INTERNATIONAL | ) | |
| SERVICES COMPANY, BP PRODUCTS | ) | |
| NORTH AMERICA INC., BP ENERGY, | ) | |
| and BP AMERICA PRODUCTION COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————

## SECOND AMENDED COMPLAINT

### I.     INTRODUCTION

1.      As fully alleged below, BP America, Inc., by and through its subsidiaries and

employees (collectively "Defendants" or "BP"), engaged in acts and practices that constitute

violations of the federal antitrust laws, including Sections 2 and 3 of the Sherman Act, 15 U.S.C.

§§ 2 and 3, the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1, *et. seq.*, the Illinois

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, *et seq.*,  and the

common law. Through deception, fraud, and wrongful conduct, BP attempted to monopolize, and

did monopolize, the supply of propane stored in TEPPCO's Mont Belvieu, Texas caverns and

shipped through the TEPPCO pipeline system ("TET propane"). This pipeline system was the

dominant source of propane supply in the TEPPCO Pipeline Service Area, encompassing

portions of the mid-West and the Northeastern United States. As BP has admitted in the Deferred

Prosecution Agreement entered into with the Department of Justice ("DPA"), BP undertook to

monopolize, and did monopolize, the supply of TET propane for delivery in February 2004. As

their prior conduct, recorded phone conversations, internal documentation and admissions in the

DPA make clear, Defendants intended to test, perfect, and apply their strategies for implementing

such propane corners "at will" again in the future.

2.　　Plaintiffs bring this action to recover for damages they suffered during the

relevant period as the result of BP's illegal conduct.

## II.　　JURISDICTION AND VENUE

3.　　Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15 and 26, to recover treble damages and obtain injunctive relief as well as reasonable

attorneys' fees and costs with respect to injuries arising from Defendants' violations of the

federal antitrust laws, including Sections 2 and 3 of the Sherman Act, 15 U.S.C. §§ 2 and 3, and

under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, to recover actual damages

resulting from injuries arising from violations of that Act.　In addition, Plaintiffs bring

supplemental state law claims under Illinois common law and under the Illinois Consumer Fraud

and Deceptive Business Practices Act, 815 ILCS §§ 505/2 and 505/10a.　For these claims,

Plaintiffs seek actual and punitive damages, as well as reasonable attorneys' fees, expenses, and

costs, with respect to injuries arising from Defendants' violations of law, fraud, deception, and

wrongful conduct detailed herein.

4.　　The Court has federal question subject matter jurisdiction over this matter

pursuant to 28 U.S.C. §§ 1331, 1337(a), Section 7 of the Sherman Act, and Sections 4 and 16 of

the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 22 of the Commodity Exchange Act, 7

U.S.C. § 25(c). The Court has supplemental jurisdiction over the state law claims pursuant to 28

U.S.C. § 1367.

5.      Jurisdiction and venue are proper in this district pursuant to 15 U.S.C. §§ 2, 7, 15, 22 and 26, 28 U.S.C. § 1391(b)(2), and 7 U.S.C. § 25(c), in that Defendants are found, reside, or transact business in this District, or because part of the events or omissions giving rise to the claims occurred in this District.

## III.    PARTIES

### A.      Plaintiffs

6.      AmeriGas Propane L.P., a principal operating subsidiary of AmeriGas Partners, L.P. ("AmeriGas"), is a Delaware limited partnership with its principal place of business in Valley Forge, Pennsylvania.  AmeriGas is the nation's largest propane company, serving over 1.3 million residential, commercial, industrial, agricultural, and motor fuel propane customers in nearly 50 states.

7.      During the relevant period, AmeriGas purchased propane directly from producers at prices that were artificially inflated as the result of Defendants' wrongful, deceptive, fraudulent, and illegal conduct, monopoly, and corner detailed herein.

8.      Ferrellgas, L.P. ("Ferrellgas") is a Delaware limited partnership with its principal place of business in Overland Park, Kansas.  Ferrellgas, together with its consolidated subsidiaries, is the operating partnership of Ferrellgas Partners, L.P., a Delaware limited partnership.  Ferrellgas is the second largest marketer of propane in the United States and the largest provider of propane by portable tank exchange.

9.      During the relevant period, Ferrellgas purchased propane directly from producers at prices that were artificially inflated as the result of Defendants' wrongful, deceptive, fraudulent, and illegal conduct, monopoly, and corner detailed herein.

10.     Titan Energy Partners, LP ("Titan") is a Delaware partnership, with its principal place of business in Kentucky.  Titan (formerly named "New Cornerstone Propane Partners, LP") is the successor-in-interest to Cornerstone Propane Partners, LP ("Cornerstone"), which, during the relevant period, purchased propane directly from producers at prices that were artificially inflated as the result of Defendants' wrongful, deceptive, fraudulent, and illegal conduct, monopoly, and corner detailed herein.  All Cornerstone assets, including the claims presented in this complaint, were transferred to Titan during Cornerstone's reorganization in bankruptcy in November 2004.

11.     Heritage Operating, LP ("Heritage") is a Delaware partnership, with its principal place of business in Kentucky.  During the relevant period, Heritage purchased propane directly from producers at prices that were artificially inflated as the result of Defendants' wrongful, deceptive, fraudulent, and illegal conduct, monopoly, and corner detailed herein.

12.     During the relevant period, Plaintiffs also purchased and/or sold propane futures contracts.  Defendants' wrongful, deceptive, fraudulent, and illegal conduct, monopoly, and corner detailed herein artificially inflated the prices of futures contracts Plaintiffs purchased, required Plaintiffs who sold futures contracts to close out their obligations at artificially inflated prices, and/or inflated prices of "out" propane purchased based on Mont Belvieu OPIS TET inflated prices.

**B.     Defendants**

13.     Defendant BP America, Inc. ("BP America") was a wholly owned subsidiary of BP plc. BP America was a holding company incorporated under the laws of the State of Delaware and headquartered in Warrenville, Illinois, within the Northern District of Illinois.

14.     Defendant BP Corporation North America Inc. ("BP Corporation") was a subsidiary of BP America at all times relevant herein.

15.     Defendant BP International Services Company ("BP International") was a subsidiary of BP America at all times relevant herein.

16.     Defendant BP Products North America Inc. ("BP Products"), a subsidiary of BP America at all times relevant herein, maintained its principal place of business in Warrenville, Illinois. BP Products is one of the largest producers of natural gas liquids, including propane, in North America.

17.     Defendant BP Energy ("BP Energy") was a subsidiary of BP America at all times relevant herein.

18.     Defendant BP America Production Company ("BP Production") was a subsidiary of BP America at all times relevant herein.

19.     Within and across the corporate structure of BP, there were a number of groups, business units, and teams that focused on specific aspects of the companies' business. These groups and business units were not separate legal entities but rather existed within and across the various BP legal entities.

20.     Defendant BP America, Defendant BP Corporation, Defendant BP International, Defendant BP Products, Defendant BP Energy, Defendant BP Production, and the groups, business units and teams described herein, are collectively referred to herein as "BP" or "Defendants."

## IV.     THE NGL TRADING BENCH AND SUPERVISORY EXECUTIVES

21.     The organizational group within BP responsible on a global basis for overseeing BP's trading activity was the Integrated Supply & Trading ("IST") group. Within IST there were a number of regional business units. The regional business unit responsible for the trading of gas and power products, including propane, in North America was North America Gas & Power

("NAGP"). During 2003 and 2004, the team within NAGP focused on the trading of natural gas liquids, including propane, was known as the NGL trading bench ("NGL Trading Bench" or the "Bench").

22.    A separate regional business unit responsible for the production, transportation, and sales of natural gas liquids, including propane, in North America was the Natural Gas Liquids Business Unit ("NGLBU").

23.    During February 2004, the NGL Trading Bench was located in Houston, Texas, and employed approximately eight traders. All of the members of the NGL Trading Bench were employees of BP America Production, reporting to managers and other executives who were employed by other BP America subsidiaries. The NGL Trading Bench entered into contracts to purchase and sell propane on behalf of BP Products.

24.    The NGL Trading Bench purchased and sold propane for use in BP Products' wholesale and petrochemical businesses, and for speculative purposes to generate a profit.

25.    Donald Cameron Byers ("Byers") was the Chief Operating Officer of NAGP in both April 2003 and February 2004, and was later named the President and Chief Executive Officer of NAGP. Byers was responsible, among other things, for the development, implementation, and execution of trading and marketing strategies for NAGP and was an employee of BP International.

26.    Martin Marz ("Marz") was the Compliance Manager for NAGP during the relevant period. Marz sat on the NAGP trading floor and was an employee of another BP America subsidiary, BP America Production.

27.    Timothy Bullock ("Bullock") reported to the Chief Executive Officer or Business Unit Leader of NAGP. Bullock was an employee of BP International.

28.    James Summers ("Summers") was the Vice President of Natural Gas Liquids ("NGLs") & Chemicals Trading for BP in February 2004, and reported directly to Byers.

29.    Mark Radley ("Radley") was the NGL Trading Bench Leader for BP in both April 2003 and February 2004. Radley's responsibilities included the development and oversight of the NGL Trading Bench's trading strategies, and reporting to and seeking approval from executives who oversaw the NGL Trading Bench's trading operations.

30.    Dennis Abbott ("Abbott") was the "second-in-command" of NGL's trading in February 2004, and acted as the Trading Bench Leader in Radley's absence. Under the direction of, *inter alia,* Radley, Abbott actively participated in the execution of the monopoly and corner of TET propane detailed herein. In June 2006, Abbott pled guilty to conspiracy to manipulate the price of February 2004 TET propane, in violation of 7 U.S.C. § 13(a)(2) and 18 U.S.C. § 371. Abbott faces up to five years in prison and a fine of up to $250,000. He is presently cooperating with federal investigators.

31.    Cody Claborn ("Claborn") was the primary propane trader at BP from at least January 2003 to April 2005.

32.    The DPA states that an individual identified as BP Trader #2 assisted with the trading of TET propane and aided in the execution of the manipulation scheme in February 2004. The DPA describes BP Trader #2 as a  trader primarily responsible for trading ethane and other NGLs, as well as propane, during 2003 and 2004.  On information and belief, Plaintiffs believe that BP Trader #2 was Carrie Kienenberger.

33.    The DPA also states that an individual identified as BP Trader #3 was primarily responsible for trading other categories of propane during 2003 and 2004, but also traded TET propane during the relevant time period.  On information and belief, Plaintiffs believe BP Trader

#3 was Timothy Moby.

## V.      INTERSTATE TRADE AND COMMERCE

34.      At all times relevant herein, Defendants attempted to monopolize and corner the

market for April 2003 TET propane, and attempted to and did monopolize and corner the market

for February 2004 TET propane, with the purpose and intent of artificially inflating the price, and

with the knowledge that their actions would artificially inflate the price for propane deliverable

in April 2003 and February 2004, purchased pursuant to contracts and purchase agreements,

purchased over-the-counter, and purchased at prices influenced by OPIS TET and OPIS non-

TET pricing. TET propane is shipped and delivered within states and across state lines, and thus

Defendants engaged in wrongful conduct that involved United States commerce among many

states.

## VI.      SUBSTANTIVE ALLEGATIONS

### A.      The Manufacture and Distribution of Propane

32.      Propane is a by-product (referred to in the industry as a "co-product") either from

the refining of petroleum or from the fractionation of natural gas produced from natural gas

fields or wells. Fractionation is the process of separating certain gases such as propane, butane

and ethane from natural gas.

33.      As detailed below, the principal means of storing and transporting substantial

quantities of propane around the country is through established storage and pipeline systems.

These pipeline systems originate at underground storage caverns, called "hubs," where large

quantities of propane are collected from refineries, fractionation facilities, imports and gas

fields. Existing pipeline systems within the United States feed separate geographic regions of the

country.

34.      In addition to pipeline systems, propane in any specific geographic region is

available from two other sources: (1) propane produced and sold directly from refineries and

fractionation facilities located within the region, and (2) imported propane transported by rail,

truck, barge, or ship to private storage facilities in the region.

35.     Propane has two principal uses: (1) as fuel for commercial and residential heating

and in agriculture, particularly in the mid-Western and Northeastern United States, and (2) in the

production of plastics by the petrochemical industry. Commercial (including agricultural) and

residential use represent approximately sixty percent of propane consumed. Petrochemical

industry consumption represents the remaining approximately forty percent. The demand for

commercial and residential propane for heating is highly seasonal, peaking in winter.

Petrochemical demand is more stable year-round.

**B.      The Nation's Propane Pipeline Storage and Delivery Systems**

36.     During the relevant period, two major propane storage and distribution hubs

operated in the United States east of the Rocky Mountains -- Mont Belvieu, Texas and Conway,

Kansas. Major propane producers, including BP, had significant crude oil refining operations in

or near Mont Belvieu, Texas, that fed propane into these storage caverns. In addition, BP had

large natural gas and fractionation operations in the Gulf of Mexico area that also fed propane

into the Mont Belvieu caverns.

37.     TEPPCO Storage Partners LP and Duke Energy Field Services[1] co-owned several

of the caverns located in Mont Belvieu during the relevant period. Propane stored in these

caverns was referred to and traded in the industry as "TET propane."[2] As detailed below, TET

propane was shipped from Mont Belvieu through the Texas Eastern Products Pipeline Co. LLC

("TEPPCO") pipeline system.

38.     In addition to propane stored in the TET cavern (and delivered through the

---

[1] Duke Energy Field Services is a joint venture between Duke Energy Corporation and Philips Petroleum Company.
[2] The original owner of this cavern was the Texas Eastern Transmission Corp., or "TET."

TEPPCO pipeline), producers stored propane in other caverns at Mont Belvieu, which was then

transported through other pipeline systems. These systems included, principally, the Enterprise

pipeline system, which ran from Mont Belvieu down along the Texas Gulf Coast and into the

Mid-West, and the Dixie pipeline system, which ran through Louisiana, Mississippi, Georgia,

and up into North Carolina. The propane stored in these caverns was referred to and traded in

the industry as "non-TET propane." The Mid-America Pipeline Company ("MAPCO") pipeline

system transports propane from the Conway, Kansas storage caverns through central portions of

the country. Each of these pipeline systems services distinct geographic areas of the country.

### C.    Market Participants for Propane

39.     Various market participants were involved in the propane industry during the

relevant period. Producers, including BP, produced propane either in natural gas fractionation

facilities or oil refineries as a by-product of their refining operations. During the relevant period

there were at least eight major producers of propane. BP was one of the largest. Producers sold

propane to various other market participants, including Wholesalers and Marketers. Wholesalers

purchased propane for resale to Marketers. Marketers were companies that bought propane

either directly from producers or from Wholesalers for sale and delivery directly to commercial

and residential consumers.

40.     Then, as now, pipeline companies did not take title to the propane. They charged

government-set tariffs for transporting the propane. Brokers were companies that facilitated

over-the-counter purchase and sale transactions between other market participants. Brokers also

did not take title to the propane. Traders were companies that bought and sold propane in over-

the-counter transactions. Traders did take title to the propane they purchased.

### D.    The TEPPCO Pipeline Service Area

41.     During the relevant period, the TEPPCO pipeline serviced an area that included

all or portions of the following nineteen states: Arkansas, Delaware, Illinois, Indiana, Kentucky, Missouri, New Jersey, New York, Southern Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine. These nineteen states and/or portions of these states, as well as the District of Columbia, are collectively referred to herein as the "TEPPCO Pipeline Service Area." The TEPPCO pipeline either ran through these states, ran through states contiguous to them, or was a major source of propane supply into these states and the District of Columbia.

42.    The TET propane transported through the TEPPCO pipeline was the dominant source of supply in the TEPPCO Pipeline Service Area. Throughout the TEPPCO Pipeline Service Area, Mont Belvieu OPIS TET pricing was the benchmark price or index at which propane was sold.

**E.    The Supply and Delivery of Propane into the TEPPCO Pipeline Service Area**

43.    There were three sources of propane into the TEPPCO Pipeline Service Area.

**(i)    Propane from the TEPPCO Pipeline**

44.    Market participants purchased and took delivery of TET propane at terminals – off-loading points along the TEPPCO pipeline.

**(ii)    Refinery Production**

45.    Producers also sold propane produced in refineries located in the TEPPCO Pipeline Service Area.[3] Market participants contracted directly with these producers, and took delivery of propane at the producers' refineries. During the relevant period, eighteen refineries, located in Arkansas, Delaware, Kentucky, New Jersey, Pennsylvania, Tennessee, Virginia, and West Virginia, operated within the TEPPCO Pipeline Service Area. These refineries were responsible for approximately thirteen percent of the propane sold in the TEPPCO Pipeline

---

[3] Only *de minimus* natural gas factionation occurred in the TEPPCO Pipeline Service Area during the relevant period.

Service Area.

(iii)    **Propane Imports**

46.    Imported propane was also transported into the TEPPCO Pipeline Service Area by producers, Wholesalers and other market participants. Imported propane entered by rail, truck, barge or ship from Canada and other foreign sources, including Europe, Africa, and South America. Points of entry in the TEPPCO Pipeline Service Area for this imported propane were Virginia, New York, Rhode Island, New Hampshire, and Maine. During the relevant period, BP was a major Producer of propane from its natural gas fractionation facilities in Canada. BP sold propane it stored at the Sarnia, Ontario, facilities for import into the TEPPCO Pipeline Service Area and the State of Michigan. This propane was transported from Sarnia into the TEPPCO Pipeline Service Area by rail and truck through points of entry in upstate New York and Vermont, and by rail, truck, and barge into Michigan.

47.    Imports were responsible for approximately thirty-one percent of the propane sold in the TEPPCO Pipeline Service Area overall, but only approximately twelve percent of the propane sold in the TEPPCO Pipeline Service Area excluding the six New England States. Imports from Sarnia constituted approximately forty percent of all imports into the TEPPCO Pipeline Service Area.

48.    Regardless of the source of supply, whether from Canada, South America, Europe or Africa, importers of propane bound for the TEPPCO Pipeline Service Area and into the State of Michigan bought and paid prices for such propane based on Mont Belvieu OPIS TET pricing. For example, foreign producers, including BP, sold propane directly to Wholesalers, Marketers or other market participants based on Mont Belvieu OPIS TET pricing.

F.    **Over-The-Counter Transactions for TET Propane**

49.    During the relevant period, TET propane traded on an over-the-counter basis.

Over-the-counter trades were transactions between two parties for a specified volume of TET propane, typically of a minimum of 1,000 barrels. In any given month, market participants bought and sold propane for delivery in either the current month or future (or "out") months. Various market participants, including producers, Wholesalers, Traders, and commercial buyers like petrochemical companies, entered into trades for TET propane ("TET trades"). The parties to these transactions negotiated the price, arriving at a specified dollar value for the transaction.

50.     During the relevant period, various available services -- including "Chalkboard" -- allowed buyers and sellers to post bids and offers for TET propane. Although these bids and offers were posted on an anonymous basis, once the parties closed a deal, the parties' identities were then disclosed to one another to permit them to finalize delivery and payment terms.

51.     Counterparties also traded during the relevant period directly with each other. As with Chalkboard transactions, the terms of these directly negotiated transactions were also reflected in written negotiated contracts.

52.     Over-the-counter transactions were also arranged through Brokers. As noted above, Brokers did not take title to traded propane; rather, they served instead to match supply and demand in the market. Brokers acted similarly to Chalkboard by maintaining anonymity (at their principal's request). However, as with Chalkboard, the parties had to negotiate directly with each other to finalize delivery and payment terms.

53.     Like any other market, the pricing of TET propane in over-the-counter trading during the relevant period was determined by supply and demand. Participants in the TET market subscribed to various services to acquire a constant flow of information regarding available bids and offers over the course of the day. Defendants' manipulative accumulation of TET propane tightened the supply of TET propane and artificially raised Mont Belvieu OPIS TET prices to

supra-competitive levels. As set forth below, when participants in the market sought to settle

their over-the-counter transactions, either financially or through covering by purchasing propane

in the market, they were damaged as the result, *inter alia*, of having to pay these supra-

competitive prices.

54.     In addition, NYMEX futures trading in 2003 for April 2003 propane was affected

by Defendants' accumulation of a long position in April 2003 propane, driving up prices paid by

Plaintiffs.

55.     Likewise, January 2004 New York Mercantile Exchange (NYMEX) futures

trading for February 2004 propane specified delivery to the TEPPCO system. Nearby futures

prices *(e.g.,* prices for the next month out, namely futures trading in January for February

propane) were affected by Defendants' accumulation of their long position in February TET

propane during the month of January. This illegal conduct drove up the nearby futures price in

the NYMEX futures market, resulting in damages to NYMEX participants who had to settle their

positions by paying the resulting inflated prices.

**G.      Other Propane Transactions Based on Mont Belvieu OPIS TET Benchmark
          Pricing**

56.     Even beyond the TEPPCO Pipeline Service Area, Mont Belvieu OPIS TET

pricing was used as the benchmark price or index at which propane, regardless of the source of

supply, was bought and sold.

57.     Importers of propane bought and paid prices for such propane based on Mont

Belvieu OPIS TET pricing even though that propane was not bound for the TEPPCO Pipeline

Service Area.

**H.      The OPIS Price Reporting System and Mont Belvieu OPIS TET
          Benchmark Pricing**

58.     The primary means for tracking and reporting propane over-the-counter

transactions in the United States is the Oil Price Information Service, or OPIS. OPIS describes itself as the world's most comprehensive database and source of wholesale petroleum pricing and news information. On a daily basis, OPIS monitors more than 70,000 rack prices for multiple petroleum-based products, including heating oil, gasoline, diesel and propane. Market participants for propane subscribe to OPIS, or otherwise have access to OPIS daily pricing information.

59.     During the relevant period, OPIS separately tracked pricing information for propane over-the-counter transactions of at least 10,000 barrels[4] occurring for, *inter alia,* propane sold out of the Conway, Mont Belvieu TET and Mont Belvieu non- TET hubs. These transactions were either voluntarily reported to OPIS by one of the counterparties to the transaction, or were identified by OPIS representatives when canvassing the market over the course of a day.

60.     At the end of each day during the relevant period, OPIS reported the high, low and average price (the mid-point between the high and low price) from among all confirmed over-the-counter transactions for 10,000 barrels or more entered into that day for, *inter alia,* Conway, TET and non-TET propane. For each of these hubs, OPIS separately reported the high, low and average daily prices on three types of over-the-counter transactions: (1) "out," reflecting trading in the next month's propane; (2) "prompt," reflecting trading in the current month's propane with delivery due within the next 72 hours; and (3) "any," reflecting trading in the current month's propane with delivery due at any time during the month, but typically occurring at or near the end of the month. The average OPIS "prompt" price reported daily for TET propane transactions was referred to in the industry as "Mont Belvieu OPIS TET."

61.     During the relevant period, OPIS was widely recognized as providing the most

---

[4] There are forty-two gallons to a barrel of propane.

reliable and transparent pricing information available for propane transactions. OPIS was one of the leading reporting publications in the petroleum-based products industry. OPIS reports on its webpage that more than 100 billion gallons of fuel annually are pegged to OPIS benchmark prices. OPIS has been the industry benchmark for propane pricing since at least 1986. Prior to that time, there was no reliable public disclosure of propane transaction prices. The determination of prices charged to purchasers of propane was largely opaque and left to the discretion of producers. Absent a public and respected pricing benchmark, there was no objective and publicly reported cross-check against which a customer could assess the reasonableness of a quoted price. By creating an open and transparent reporting system, OPIS brought uniformity and standardization to propane pricing.

62.     OPIS daily reporting of prompt, any, and out transaction prices for TET propane represented the most respected and comprehensive system for reporting open, transparent, and arm's-length daily transactional prices for the dominant source of propane supply for the TEPPCO Pipeline Service Area. As such, Mont Belvieu OPIS TET pricing was uniformly understood to be and accepted as the benchmark or index price for propane produced or delivered in the TEPPCO Pipeline Service Area. Mont Belvieu OPIS TET pricing not only set the price of TET propane sold from the TEPPCO pipeline; prices for propane sold from local refineries, storage facilities, and imported propane were based on it, as well.

63.     Defendants have admitted in the DPA that OPIS TET pricing was the industry pricing benchmark. For example, in ¶ 60 of the DPA Statement of Facts, BP admitted that:

> BP also engaged in conduct to affect the daily and monthly price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price, from being reported. In the context of the market manipulation scheme, this conduct was intended to present false information to the market concerning the actual availability of TET propane, *was intended to subvert the integrity of the industry benchmark average price,* and was intended to defraud certain counterparties.

(Emphasis added); *see also,* DPA Statement of Facts, ¶¶ 8, 59, 61.

**I.     Supply Contracts and Purchase Agreements**

64.     Many market participants secured necessary supplies of propane for the winter heating season through long-term supply contracts, often negotiated during the preceding spring. Wholesalers and Marketers, for example, contracted with producers and other Wholesalers for set amounts of propane, deliverable in designated amounts on a monthly basis at specified locations. Under the terms of supply contracts, the price the buyer paid was not pre-set at the time the contract was entered into, but rather was determined at the time of delivery based on contractual pricing formulas expressly tied to Mont Belvieu OPIS TET pricing.

65.     In addition to purchases made pursuant to supply contracts, market participants also purchased propane as needed on any given day. The price term for these "purchase agreements" was determined at the time of delivery. The prices paid in these transactions were based on Mont Belvieu OPIS TET.

66.     During the relevant period, market participants entered into supply contracts and purchase agreements directly with producers for TET propane, as well as for propane produced at refining facilities, or imported or shipped to private storage facilities, located inside and outside the TEPPCO Pipeline Service Area.

**J.     Pricing Methods for Supply Contracts and Purchase Agreements**

67.     During the relevant period, market participants principally used one of two pricing methodologies for propane sold in the TEPPCO Pipeline Service Area under long-term supply contracts or pursuant to purchase agreements. These methods applied whether the propane was sold off the TEPPCO pipeline, from local refineries or imported to storage facilities. As detailed above, because Mont Belvieu OPIS TET was the industry benchmark price in the TEPPCO

Pipeline Service Area, propane sold there was priced by express reference in the contract or purchase agreement to Mont Belvieu OPIS TET pricing -- for example, to the daily reported Mont Belvieu OPIS TET price in effect the day of delivery, the average of the preceding five or ten business day Mont Belvieu OPIS TET prices, or using some other formula based on Mont Belvieu OPIS TET pricing. Propane was also sold based on a daily set "rack" or "posted" price, which was also based on the daily reported Mont Belvieu OPIS TET pricing.

68.     Sales prices for propane sold off of the TEPPCO pipeline also included transportation charges in the form of government-set fixed tariffs, set for each terminal point, and non-negotiable line loss charges, calculated to reflect propane lost from the pipeline during transportation. In addition, state and federal environmental fees were also added to all propane sold. The only discretionary pricing component was the "seller's margin" -- which reflected whatever markup the seller chose to add. All other costs were pre-set and controlled.

### K.     Petrochemical Industry Purchases

69.     As noted above, the petrochemical industry consumes propane on a year-round basis. Pursuant to a process called thermal cracking, feedstock such as propane is "cracked" into, among other end products, ethylene, which is then used to produce plastics. Because of the substantial quantities of propane consumed by the petrochemical industry, the majority of ethylene crackers are located along existing pipeline routes or near ports. In the eastern portion of the United States, the majority of these facilities are located along the Gulf Coast or around the Enterprise pipeline system.

70.     Petrochemical companies in the southeastern part of the United States price overseas propane imported from, for example, Africa and Europe, at Mont Belvieu OPIS TET pricing or a blend of Mont Belvieu OPIS TET and non-TET pricing. In addition, during the

relevant period, petrochemical companies bought propane directly from BP and other producers at prices tied to Mont Belvieu OPIS TET pricing.

71.     As set forth in detail below, through their monopolization and corner, Defendants drove up the prices of propane to supra-competitive levels throughout the TEPPCO Pipeline Service Area and beyond. Direct purchasers were injured.

## VII.    DEFENDANTS' EXECUTION OF THEIR PROPANE MONOPOLY AND CORNER

### A.    Defendants' Trial Run of the Propane Monopolization and Corner in April 2003

72.     Radley, the NGL Bench Leader, and members of the NGL Trading Bench conspired to manipulate the price of TET propane during February 2004 based, in part, on information and experience gained in April and May 2003 when members of the NGL Trading Bench attempted to manipulate the price of April 2003 TET propane. During April 2003, the NGL Trading Bench attempted to corner April 2003 TET propane by taking a large long position while simultaneously attempting to corner the supply of April 2003 TET propane inventory. Through this strategy, the NGL Trading Bench members sought to make money by holding back on their April 2003 TET propane inventory until the price increased based on the resulting lack of supply, and then selling to market participants who were short, and had to come to BP to cover their positions in April 2003 TET propane.

73.     In pursuit of this strategy, going into April 2003, BP had established a significant long position in April 2003 TET propane. On April 2, 2003, in a tape-recorded conversation[5] (a transcript of which is provided at Exhibit A hereto), Abbott called Claborn. Radley joined the

---

[5] Consistent with industry practice, during the relevant period, BP recorded the Trading Bench member's telephone conversations. Trading Bench personnel were fully aware that their conversations were being recorded. A true and accurate copy of all recordings cited herein (as made publicly available by the U.S. Commodities Futures Trading Commission ("CFTC")) were provided as exhibits to the CFTC Complaint, filed in the United States District Court for the Northern District of Illinois on June 28, 2006 (the "CFTC Complaint").

conversation, which included the following statements:

> Abbott:  How does it feel taking on the whole market, man?
>
> Claborn:  Whew, It's pretty big man.
>
> Abbott:  Dude, you're the entire [expletive deleted] propane market.
>
> * * *
>
> Radley:  Don't worry about it, it's the first two days of the month. Plenty of lead time for people to think that barrels will emerge and take a short position.
>
> * * *
>
> Abbott:  No, I mean, it's cool, 100% of the open interest in propane probably, and uh 3% of the open interest in nat gas.  I dig it, it just, sometimes it's hard, it just feels hard to take on the whole market sometimes.
>
> * * *
>
> Radley: Here's my one fear, and it's a significant fear. Everybody waits until the last [expletive deleted] day to cover, and then we get wound up in a [expletive deleted] bunch of legal disputes. That's my fear.
>
> Abbott: Yeah.
>
> Radley: That's my fear. People don't cover, don't cover, then the last day they either default or come to us to get them out of it and then we have to try and basically set a price that seems fair . . . .

74.     Based on the April 2003 attempt to manipulate the price of TET propane,

members of the NGL Trading Bench booked a profit and learned information they later used

during the February 2004 manipulation strategy. In particular, the NGL Trading Bench learned

what they believed to be the "dead stock" level of TET propane, or the "minimum operating

level" needed for the TEPPCO pipeline to function. The traders' perception of the dead stock

level, later coupled with knowledge of the total TEPPCO propane inventory, led the NGL

Trading Bench to believe they could estimate the total size of the available inventory of TET

propane, thereby allowing them to estimate the total amount of propane they would have to

purchase to corner February 2004 TET propane and effectuate a manipulation in February 2004

and "at will" in the future.

> ### B. Defendants Effectuated the February 2004 Propane Corner as Part of Their Long-Term Goal to Be Able to Effect a Corner "At Will" in the Future

75.     Defendants believed that the month of February would be more susceptible to a

successful propane market corner than April had been. On or about February 5, 2004, Radley

and Abbott discussed the attempt to manipulate or "squeeze" the price of April 2003 TET

propane and the dead stock information they gleaned from the prior attempt, saying:

> <u>Radley</u>: The second point is that ... I would imagine the minimum operating level at the end of Feb is higher than it is at the end of March or April because I think wholesalers -
>
> <u>Abbott</u>: Have to have something on hand.
>
> <u>Radley</u>: Have to hold barrels.
>
> <u>Abbott</u>: In order to pump the first day.
>
> <u>Radley</u>: Do you know what I mean?
>
> <u>Abbott</u>: That's right.
>
> <u>Radley</u>: So I think the minimum level might be a little higher than we're assuming based on what we experienced in April [2003]. *When we squeezed the April/May.*
>
> <u>Abbott</u>: Right, right. Right, which was one of the reasons why it was harder to own all that April. It was harder. That's why we had to take on a little bit more than we thought we had to take on in April. . . . And that's why I think that 2 million, 2.1 million barrels as that min in Feb., I think that's real, man, I think that is the -- *that's the bottom at TET.*

(emphasis added); *see* transcript of February 5, 2004 conversation, attached as Exhibit B hereto

and DPA Statement of Facts, attached as Exhibit E hereto, at ¶ 31.

76.     Recorded conversations and internal documentation from BP make it clear that BP

planned to implement additional TET propane corners in the future. For example, during a

February 5, 2004 conversation with Abbott, Radley articulated the intent of the February 2004

TET trading strategy and the justification necessary to obtain approval for the strategy:

> Two things I thought of. . . One, in terms of whether we should do this or not in terms of talking to Jim [Summers] is that what we stand to gain *is not just we'd make money out of it, but we would know from thereafter that we could control the market at will.* If we never break the threshold, we'll never know what the answer is, do you know what I mean?

(emphasis added).

77.     Later in the same conversation, Radley and Abbott reiterated the same point:

> <u>Abbott</u>: Okay. That's something to think about. I like that idea. I like - well, that's one way to pitch it, anyway, that there's value in knowledge.
>
> <u>Radley</u>: Yeah, even if it' s just for ourselves in terms of do - you know, needing the extra push to go for it if we're a little uncertain. *You know, the payoff isn't just this year. It's saying for as long as we carry on trading.*
>
> <u>Abbott</u>: Yeah, and that's ... kind of what my attitude is.

(emphasis added).

## C.     Defendants' Trading Strategies in Executing Their February 2004 TET Propane Corner

78.     As detailed in both recorded conversations and in an internal assessment undertaken by BP following the February 2004 manipulation to ensure the increased efficacy of future corners, Defendants combined a strategy of buying up TET propane with at least three related trading strategies in executing their February 2004 TET propane corner. They employed the first strategy in January 2004 (referred to herein as "Strategy #1"), when they bought February "out" contracts, contracts for delivery of February TET propane.  Using this strategy, Defendants ended the month of January with a substantial long position in February TET propane. A long position arises when a company incurs an obligation to buy and receive propane.

79.     In February, Defendants employed two additional strategies. They increased their long position by buying February TET propane "any" contracts, namely contracts for February TET propane deliverable in February (referred to herein as "Strategy #2"). In addition, based on their inside knowledge that, as the result of their monopoly and corner in February 2004 TET

propane, they would artificially widen the spread (or price differential) between the February

OPIS TET "any" price and the March OPIS TET "out" price over the course of February,

Defendants also went long on the February/March spread (referred to herein as "Strategy #3"). In

other words, Defendants went long (or bought) February TET and went short (or sold) March

TET, intending to profit from the increased price spread their corner would create over the course

of the month.

### D.     January Purchases of February TET Propane

80.     In pursuit of Strategy # 1, during January 2004, BP built a sizable "long" position

in February 2004 TET propane. By building this position, Defendants got a jump start on

amassing control of February 2004 TET propane before February even began.

81.     During January 2004, Radley identified and discussed conditions relating to the

TET propane market that would render the market ripe for manipulation. On or about January 8,

2004, during a regularly scheduled call, the BP Bench Leader stated to other employees located

in Texas, Illinois, and elsewhere that the TET propane market was "vulnerable to a squeeze."

82.     On January 13, 2004, in a conversation with another BP employee, Radley stated

that the propane market was "tight enough that if someone wanted to play games with it,

potentially they could."

83.     From Wednesday, January 7 until Friday, January 30, Defendants steadily

increased their long position in February TET propane. Defendants' January purchases of

February "out" propane coincided with the dates of the two recorded conversations quoted

above. On January 8, Defendants had just completed a significant one-day purchase, roughly

doubling the size of BP's February TET long position from January 7. On January 13,

Defendants began a second push to increase their long position in February TET propane, which

continued until the end of the month.

84.     Over the course of January, Defendants approximately tripled BP's position in February 2004 TET propane. During January 2004 and the beginning of February 2004, Radley instructed the NGL Trading Bench to amass a significant position in February TET propane. By the estimate of Summers, entering February 2004, BP owned contracts for delivery for nearly 50% of all of the available February TET propane. In addition to contracts for delivery of physical barrels, the NGL Trading Bench also entered into financial or "swap" contracts that would increase in value if February 2004 TET propane prices rose.

85.     As the result of this conduct, beginning on January 7, 2004, Defendants, by their conduct in furtherance of their manipulation scheme, artificially inflated, *inter alia,* the daily "out" prices reported by OPIS for Mont Belvieu February 2004 TET propane, injuring, among others, market participants who purchased February 2004 NYMEX futures contracts in January 2004, entities who sold February 2004 NYMEX futures contracts prior to January 2004 and were obligated to buy them back at artificially inflated prices to close their futures positions, and entities who bought February "out" propane in January based on Mont Belvieu OPIS TET inflated prices.

86.     Similarly, NYMEX futures trading in 2003 for April 2003 propane was affected by Defendants' accumulation of a long position in April 2003 propane, driving up prices paid by Plaintiffs.

**E.     Defendants' Manipulative Conduct Accelerated in February**

87.     Members of the NGL Trading Bench intended to earn a significant profit for BP by selling a portion of their February 2004 TET propane at the end of the month at prices inflated by their conduct, and then taking a small loss on the remaining barrels which would be carried into March. As such, the NGL Trading Bench recognized that they would purchase more propane than BP needed for its own business or commercial purposes, or could actively sell to

counterparties during February. Furthermore, the NGL Trading Bench members could expect to profit personally by obtaining bonuses and other remuneration as a result of the anticipated profits BP would achieve through their market manipulation.

>    **(i)    Defendants' Propane Trading during the First Two Weeks of February**

88.    Beginning on the first trading day in February (Monday, February 2), Defendants actively began to implement trading Strategy #2, namely, the aggressive purchase of February TET "any" propane. The strategy was intended to force other market participants holding short positions in TET propane at the end of February to purchase February 2004 propane from BP at an artificial and inflated price.

89.    Between on or about February 5, 2004 and on or about February 9, 2004, the NGL Bench Leader directed the execution of the manipulation scheme by instructing Claborn, BP Trader #2 and BP Trader #3 to buy a significant amount of February 2004 TET propane without arousing the suspicion of other market participants.

90.    By the end of the first week in February (Friday, February 6), Defendants had more than doubled the size of their February TET propane position, to approximately 2.75 million barrels.

91.    An internal BP document (as quoted in the CFTC Complaint) described Defendants' employment of trading Strategy #3, namely going long the February /March spread:

> In February, 2004 the NGL's trading bench entered into a strategy to create a long February - March spread .... The bench planned on holding a large portion of existing TET Mont Belvieu propane inventory. It was believed that the resulting lack of supply at TET would drive up prices, further widening the spread. The bench would then liquidate its inventory at higher prompt prices before the end of the February. It was expected that only a small portion of inventory would be rolled into March resulting in a minimal loss against a substantial gain.

92.    Senior BP management were fully informed of, and authorized the execution of

the propane monopoly and corner. For example, Radley and Summers met with Marz,

Compliance Manager for BP's NAGP unit, to obtain approval to proceed. Marz not only gave his

approval; he also explicitly cautioned Trading Bench personnel to refrain from using certain

words in conjunction with executing the scheme, including the word "squeeze." As detailed

below, personnel from the Trading Bench also had multiple conversations with Byers during the

relevant period about the manipulative scheme and its execution.  Byers was the Chief Operating

Officer for the NAGP unit.

93.     During and after the execution of the manipulation scheme, members of the NGL

Trading Bench provided certain information to various BP executives and the BP Compliance

Manager. Although the conduct violated BP's written policy, the BP Executives and Compliance

Manager failed to report this conduct to authorities, failed to take affirmative steps to ensure such

trading strategies did not recur, and chose not to discipline any of the traders, managers, or the

compliance official involved until the CFTC initiated an investigation. At no time during

February 2004 did anyone at BP bring the scheme to the attention of the legal department.

94.     During the second week of February, BP, by and through its employees following

directions from Radley, continued its aggressive purchase of February 2004 TET "any" propane.

Defendants ended the day on Monday, February 9 having increased their position through TET

purchases of approximately 825,000 additional barrels.

95.     At approximately 4:45 p.m. CST on February 9, 2004, Radley (who was on

vacation, and thus was not in the office that day) called Claborn to get an update on the day's

progress in executing the monopoly and corner. Abbott subsequently joined the conversation. A

transcript of this conversation is attached hereto as Exhibit C. During the conversation, Radley,

Claborn and Abbott remarked that, among other things:

Claborn: How much we got on? I was just looking at that. You want to guess? 3.1.

Radley: You been busy today?

Claborn: Oh, yeah. Did it very quietly, ten lots, five lots, ten lots, fifteen here, five here. The biggest lot I think I bought was 75.

Radley: Off who?

Claborn: Morgan Stanley. We did get - right out of the chute we bought the l50s off Koch at 5/7/8.

Radley: Yeah.

Claborn: So we dropped that. And then it was just a bunch of little ones, the little guys. We did - Nordico (Ph) did, God, 100, probably 150, 175 smoothly. I mean there was no big lots, it's like fifteen here, ten here, then here, fifteen there. I did two Chalkboard deals all day.

Radley: Where was the spread at the end of the day?

Claborn: I would say conservatively probably around 6-1/4.

Abbott: 6-1/2, 6-1/4.

* * *

Abbott: I characterize it as I was kind of surprised we were able to get three hundred from the marketplace basically, maybe three, four hundred from the marketplace without moving it that much. I mean, we definitely were moving it at the end of the day. It was definitely firming up at the end of the day and it feels like it, you know, could - the market could have been anywhere, like sellers were at 65 cents or 62 cents, depending on where the market was, right?

Radley: Yeah.

Abbott: So it's kind of - it seems like something that will just kind of move fairly easily. And then there's one more seller out there that's Dow. I think Dow has one chunk they can do and it's about - maybe that's about it.

Abbott: I mean tomorrow - Tomorrow if we are able to buy another four or five hundred thousand barrels tomorrow from the marketplace, I would be genuinely shocked, I mean really shocked. So, you know, that's it. Then I think we're just kinda - we'll just have to play a waiting game and see, you know, how it's going to shape up.

Radley: Still remains to be seen, isn't it? Still need to see some of these shorts come in.

Abbott: Yeah, I mean I had - I mean, we –

Radley: Were we the only buyer today?

Claborn: Pretty much.

Abbott: Pretty much.

Claborn: There's a few other deals done besides us but nothing - not many at all. Just a few, not - I think you could put them all on one hand. It wasn't us, but-

96.    Defendants recognized that the weather could affect the success of their

manipulative scheme, as cold weather would cause demand to remain high throughout the month

of February. As such, they further noted:

Radley: Well what about the weather outlook?

Claborn: Yeah, It's still good.

Abbott: The weather - yeah, I mean, the weather's still cold in the Northeast, I mean, the parts of the Midwest are now kind of just normal, normal temps is what they're forecasting, but the Northeast is still cold, still below and much belows. I mean, the other thing - I mean, the other thing that's - I mean, when you think about it, you know, we're not - talking with Cody [Claborn] here as we, you know, always talked about every single minute. But, you , know, we're not going to take delivery of the stuff till February 29th, right? 27th, 28th.

Radley: Right.

Abbott: I mean, the shippers who are going to be required to ship, yeah, they're not going to feel, people aren't going to feel concerned until it's time, right?

Radley: Exactly.

Abbott: This could be the last week.

Radley: Sure, sure, that's right. That's absolutely right. There's no doubt about that.

Defendants closely tracked the conduct of shorts for February 2004 TET propane:

Abbott: There's absolutely shorts in the TET market, who will have to cover it. He [Trammogas] goes - so I mean he - he's not extremely bullish, but he just thinks that, you - I mean, hey, I mean it's at, you know, 78 percent of crude. I mean, it's not that cheap. It's not expensive.

Radley: No, no, no. There's a long way to push it without <unintelligible>.

Abbott: Yeah, yeah.

* * *

Radley: This moment don't forget that although we might have three point one million long, we haven't got 3.1 million of physical yet, right?

Abbott: No.

Claborn: No we got 2.4 million right now. It'll go down to 2.1 after it all priced from this point forward.

Abbott: Yeah.

Claborn: Well, it'll be about 2.2, I think.

Abbott: It can get pretty exciting if we continue - if we go off 3 million long. I mean, there will be - there will be - it will be exciting.

97.     Finally, during the same February 9, 2004 telephone call, the traders identify the

true nature of the scheme as one to "squeeze" other market participants:

Radley: Oh, it sounds pretty good, sounds pretty good. Something's got to give, doesn't it.

Claborn: Got to give.

Abbott: It could be very well, yeah, it could be very -

Radley: <unintelligible> very curious. You know, half of me is saying, look. The fact that nothing's really moved in terms of spread yet is good, because people aren't you know, looking for ways out or alternatives or backing out demand or that sort of thing, so that's kind of a good thing. The down side is, of course, it all happens at the last minute, it gets a bit messy, people start cheating, you know.

Claborn: Not delivering.

Radley: Not delivering. You know, it starts to look a little bit funny as well, that the spread, you know, just erupts at the last minute.

Claborn: And we don't get the price out on all this paper.

Abbott: Well, then it's a different thing. If we don't get a price out of this paper and we have-

Radley: The advantage of paper, is that we're selling at an index price, there's no complaints. If we squeeze it in the last four or five days of the month, forgive my French, it's going to be hard to say what's the fair price of the market at the time.

98.     Defendants' described their efforts to deceive market participants into believing

February 2004 TET propane was readily available, belying their active cornering activities. Specifically, Defendants caused offers to sell February TET propane to be presented to the market, but at prices set sufficiently above prevailing market prices so as to be unlikely to result in actual sales. This strategy created the appearance -- through the use of anonymous trading platforms like Chalkboard -- that there were potentially multiple suppliers of February 2004 TET propane willing to sell:

> Abbott: I think as long as we continue to show two ways, I mean we continued to show offers today on the screen and we're showing offers just to get people comfortable with the idea of selling. So we're continually offering it at the same time we're trying to pick up volume today. And I think as long as you continue to show offers, then I think that's fair, you know. We're giving some people an out, okay?
>
> Radley: Yep.
>
> Abbott: It's not - it's not unfair. So we'll see.
>
> Radley: Sounds good, guys.

99.     BP's false and deceptive statements and conduct, such as is described above and herein, prevented market participants, including Plaintiffs, from learning that the market prices were caused by an illegal market manipulation, that they were legally injured, and that BP was responsible for these injuries. Indeed, Plaintiffs did not know and could not reasonably have known of their injuries and obtained the information necessary to bring suit against BP until June 28, 2006, when the CFTC Complaint was filed.

100.     As set forth in the CFTC Complaint, because of his use of the word "squeeze," when he returned from vacation, Radley brought the above conversation to the attention of Summers. Summers testified under oath that he brought the conversation -- and Radley's use of the word "squeeze" -- to the specific attention of Byers and Marz. He further testified that all three individuals then reviewed the audiotape. Byers testified before the CFTC that Tim Bullock,

then President of BP NAGP also became aware of Radley's description of BP's February 2004 TET propane strategy as a "squeeze."

101.    In the above quoted February 9 conversation, Claborn stated that BP owned 2.4 million barrels of TET propane inventory as of that day. Total TEPPCO system propane inventory fell slightly between February 9, 2004 and February 13, 2004, decreasing from just over 3.2 million barrels on February 9, 2004 to just over 3.1 million barrels on February 13, 2004. As of February 9, BP already owned approximately 75% of total February TET propane inventory.

102.    During this same period, Defendants further increased their February position by over 1.4 million barrels. BP's position by the close of business on Friday, February 13, exceeded 3 million barrels. Thus, as of February 13, 2004, BP's position in February 2004 TET propane exceeded the *entire* TEPPCO system propane inventory.

103.    Between February 9 and February 27, 2004, members of the NGL Trading Bench caused bids and offers to be presented to the market via Chalkboard which were designed to falsely reflect that there was more buying or selling interest in the market than actually existed. BP also engaged in conduct to affect the daily and monthly average price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price from being reported. In the context of the market manipulation scheme, this conduct was intended to present false information to the market concerning the actual availability and appropriate pricing of TET propane, was intended to subvert the integrity of the industry benchmark average price, and was intended to defraud certain counterparties.

104.    As reported by OPIS, the average "any" price of February 2004 Mont Belvieu

TET propane rose during the first two weeks of February, from a low of around 61 cpg to 70.125 cpg on Friday, February 13.

105.    As a result of Defendants' manipulative conduct described above, prices paid in over-the-counter transactions for TET propane during this two week period were artificially inflated. Market participants who purchased February 2004 TET propane directly from BP or any other Producer in over-the-counter trading were injured. As detailed above, the OPIS system reported daily average, high, and low prices for Mont Belvieu TET propane over-the-counter transactions. Mont Belvieu OPIS TET pricing was the benchmark or index on which market participants throughout the TEPPCO Pipeline Service Area bought and sold propane, whether delivered through the TEPPCO pipeline, or purchased from a refinery or imported from Canada or overseas. As the result of Defendants' conduct, Mont Belvieu OPIS TET pricing rose to supra-competitive levels. These inflated prices reverberated throughout the TEPPCO Pipeline Service Area, damaging market participants, including Wholesalers and Marketers, who purchased propane directly from BP or any other Producer at prices based on or influened by Mont Belvieu OPIS TET pricing.

### (ii)    Defendants' Propane Trading during the Third Week of February

106.    On Sunday, February 15, 2004, there was a rupture in the TEPPCO pipeline near Coshocton, Ohio. TEPPCO issued a press release that advised that operations of all terminals, including propane terminals, east of Todhunter, Ohio -- with the exception of Eagle, Pennsylvania -- would be suspended until the pipeline could be repaired. The pipeline rupture had the effect of increasing the amount of TET propane remaining in and available at the TET storage caverns. By February 16, 2004, the total TEPPCO system inventory had increased to over 3.3 million barrels.

107.     In testimony before the CFTC, Summers acknowledged that even though, at the time the pipeline ruptured, Defendants' position in February 2004 TET propane was much greater than the demand initially anticipated by the Trading Bench, BP further increased its February 2004 TET propane position because of the rupture. He stated that if:

> [BP] hadn't purchased that volume, then the short positions would be buying that volume from the marketplace, so we wouldn't be in a position to meet that demand . ... If we had chosen not to buy it or in fact sell our position, *then the shorts could have covered a large portion of their positions at that time.*

(Emphasis added).

108.     In a February 16, 2004, taped conversation, Claborn made it clear that Byers was being kept apprised of how the execution of the monopoly and corner was unfolding during the relevant period. Specifically, Claborn said that " ... he talked to Cameron,[6] told him what we were doing, Cameron said just don't try to bring any extra attention ..."

109.     Defendants continued their aggressive purchasing campaign of February 2004 TET propane between Tuesday, February 17 and Friday, February 20. During that week, Defendants -- by and through BP's employees, under Radley's direction -- purchased at least an additional 1.4 million "any" barrels of February 2004 TET propane. By the close of business on February 20, Defendants' position in February 2004 TET propane had increased to just under 4.7 million barrels.

110.     The total TEPPCO system propane inventory steadily increased from just over 3.4 million barrels on February 17 to just over 3.6 million barrels on February 20, 2004. The prices of February TET propane increased over the course of the week. Throughout this week, Defendants' position in February 2004 TET propane continued to exceed the entire TEPPCO

---

[6] The only person with supervisory authority over the NGL Trading Bench that went by the name of "Cameron" at the time was Byers.

system propane inventory, at times by as much as one million barrels.

111.     On February 19, 2004, at approximately 9:30 a.m., Byers, Marz, Summers, and Radley met in Byers's office to discuss the Trading Bench's activities with respect to February 2004 TET propane. In that meeting, Radley informed Marz and Byers that BP's position in February 2004 TET propane "exceeded the availability of barrels in the marketplace at that time." Marz acknowledged that during the meeting they discussed the fact that Defendants' TET position on that date exceeded 4.5 million barrels, and that the total available supply currently in TET storage was around 3.5 million barrels.

112.     Radley informed Byers and Marz that the Trading Bench could unwind the large position it had built in February 2004 TET propane if that were Byers's and Marz's decision. Following the February 19, 2004 meeting, Defendants not only chose not to unwind BP's February 2004 TET position, they continued to *increase* their position in February 2004 TET propane.

113.     At this same meeting, Byers, Marz and Radley also discussed the fact that the Trading Bench had exceeded the BP policy trading limit -- which exposed BP to levels of financial risk that could be maintained only with management approval. As detailed herein, following the February 19 meeting, Defendants continued to exceed this trading limit.

114.     Defendants' conduct artificially inflated the Mont Belvieu OPIS TET pricing, raising the average reported Mont Belvieu OPIS TET "any" price from 67.125 cents on February 17 to 71.125 cents on February 20. As a result, Defendants also increased the spread between the price of February and March TET propane to supra-competitive levels, driving the spread to 9.63 cents on February 17 and to 12.44 cents by February 20.

115.     As described in Section X below, purchasers had little recourse to alternative

supplies in the short run in the face of ever rising prices. Little additional supply could or did come into the market to offset Defendants' monopoly position, leaving daily over-the-counter trading constrained by Defendants' grip on the February TET supply and injured by the resulting artificial and inflated prices. In addition, purchasers of February TET propane, bound by pricing terms in their supply contracts and purchase agreements tied to Mont Belvieu OPIS TET pricing, even if aware of pricing abnormalities, had little option but to pay the artificially inflated prices. Prices in markets beyond the TET propane market and TEPPCO Pipeline Service Area were artificially inflated as a result, as well. Defendants knew that as they drove up the price of Mont Belvieu OPIS TET, market participants throughout the TEPPCO Pipeline Service Area and beyond would be and in fact were damaged as they sought to ensure the propane supplies needed to service heating and commercial demand in the region.

### (iii)   Defendants' Actions during the Final Week of February

116.   On Monday and Tuesday, February 23 and 24, Defendants -- by and through BP employees and following Radley's directions -- further increased their position in February 2004 TET propane. Defendants bought February 2004 TET "any" propane at prices ranging on Monday from 73.5 to 75.125 cpg, and on Tuesday from 74.25 cpg to 78.25 cpg.

117.   The OPIS average price for February 2004 TET propane on February 23, 2004 increased to 74.6875 cpg, an increase of 3.5625 cpg over the OPIS average February 2004 TET propane on February 20, 2004. Some TET propane market participants began to suspect BP might be affecting the price of February TET propane. For example, in an instant message between two market participants, the CFTC reported the following conversation:

> Participant A: is this just an amazing short squeeze for feb TET? last kick at the TET cat combined with shorts . . . . . or is something else miraculous going on?

> Participant B: it bp - trying to squeeze - but the weather is not cooperating - not going to be like last year - and they have a huge position in a market that is .16.17 backward.

> Participant B: tet inventories built almost 500mb from firday [sic] thry [sic] sunday

> Participant A: very nice! thnx

> Participant B: you doing well?

> Participant A: then the rascals use the hi TET numbers to try supporting pricing increases in Michigan and other places!

> Participant B: tell you what . . . . . if they push it up over here, Exxon and Kinetic will jettison (even more) their own product and BP will have lots of product to get next year's prebuy programs off to a start.

> Participant A: a high priced start . . . . . they'll have to pull that old "you should pay a premo price because of BP's exceptional service and reliability" cards [sic].

118.    After 11:00 a.m. on February 24, BP employees, following directions by Radley, sold over 500,000 barrels of February 2004 TET propane at supra-competitive prices of between 79 cpg and 88.25 cpg. Reflecting BP's dominant and controlling position in February 2004 TET propane, on February 24, 2004, between 12:33 and 4:35 p.m., there were *no* offers on Chalkboard to sell February 2004 TET propane in volumes greater than 10,000 barrels *other than* those offers made by Defendants themselves at non-competitively set inflated prices.

119.    On February 24, 2004, Abbott sold 30,000 barrels to a counterparty. They agreed that the contract price for that propane was determined based on the OPIS daily average price for each subsequent trading day in February. The counterparty was not informed that BP was involved in posting "high floor" bids, "stacking" multiple offers and bids, "stepping up the price," posting deceptively low "wet" March offers,[7] or withholding supply from the market during the three-day contract term. BP's conduct had the effect of manipulating the OPIS average price for each pricing day of that contract, and defrauded the counterparty who purchased TET

---

[7] A transaction for "wet" propane requires delivery of the propane on a specified date within the contract month.

propane based on the OPIS benchmark.

120.     On Wednesday, February 25, 2004, BP employees, following Radley's instructions, continued their aggressive purchase of February 2004 TET propane, buying more than 600,000 additional barrels at prices between 85.25 cpg and 91.25 cpg. As the result of their illegal conduct, Defendants were able to force the purchase price for TET propane in the over-the-counter market to a reported OPIS high of 92.75 cpg.

121.     On Thursday, February 26, 2004, Defendants purchased over 250,000 additional barrels of February TET propane at prices between 79.5 cpg and 84 cpg. In furtherance of the corner, they *refused to sell* any February 2004 TET propane to the market.

122.     At certain times during late February, members of the NGL Trading Bench refused to sell TET propane inventory to counterparties as part of their strategy to drive up the price. Acting at the direction of the NGL Bench Leader, the traders at certain times refused to show offers or sell any of BP's TET propane, even though BP held contracts for delivery of millions of barrels, and in at least one instance a counterparty had offered "best bid."

123.     For example, on February 23, 2004, Claborn stated to a counterparty:

Counterparty: Can you use any Dynegy propane?

Claborn: Yea

Counterparty: Do you have any TET you can sell?

Claborn: Thought you were asking me about Dynegy.

Counterparty: Well I am. I got a guy who wants to sell Dynegy and buy TET. Do you have any TET you can sell?

Claborn: Not right now, I don't, but I'll take the Dynegy side.

At the time Claborn refused to sell, BP's position exceeded 4 million barrels.

124.     Similarly, on February 26,2004, BP Trader #2 stated to a counterparty:

Counterparty: I'm looking for 5,000 barrels of TET propane, didn't know if you guys were selling or not.

BP Trader #2: No we're not right now, actually.

* * *

Counterparty: If you guys decided to come back in, I'm the best bid at five.

At the end of this conversation, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane.

125.     The total TEPPCO system inventory for that day increased to just over 4.3 million barrels of propane. As the result of the execution of Defendants' scheme, by the end of the month, BP owned over 88% of all February 2004 propane inventory in the TEPPCO system, and carried a position of over 5.1 million barrels.

126.     At the beginning of February 27, 2004, the last trading day of the month, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane. Early on that date, employees, following Radley's directions, purchased approximately 50,000 additional barrels of February TET propane before 9:00 a.m.

127.     This meant that although BP already owned contracts for more than the deliverable supply of February TET propane on the last trading day of the month, they nonetheless bought more in an effort to ensure that they would be the only company in the market that could sell significant quantities of TET propane.

128.     By 10:00 a.m., BP was the primary seller of February 2004 TET propane for any significant volume. BP employees, including Claborn -- acting at the direction of Radley -- were able to and did dictate the price of this propane as they released it for sale to, *inter alia,* shorts who needed it to cover their contractual obligations.

129.     BP's market dominance was explicitly captured on a recorded conversation between Claborn and a voicebroker:

4953646                                                    38

Voicebroker: Where's your next one?

Claborn: O.K. Confirm, Anadarko buys 25,000 physical TET Feb. at .8850

Voicebroker: Correct. ... that was Paul.

Claborn: Next one is ... uh .... 89, .... 89.

Voicebroker: .89?

Claborn: Yep.

Voicebroker: [Talking on other line] . ... 89. [To Claborn] Just one second. [On other line] You got one shot at it. [To Claborn] I'm telling people they got one shot.

Claborn: That's it.

Voicebroker: How's your day going, man? You're done by the way with SHV.

Claborn: SHV buys 25,000 at .89

Voicebroker: 89. Where's your next? 89 and a half'?

Claborn: 89 and a half.

Voicebroker: All right. [On other line] .89 and a half, next [to Claborn]. ... Are you just walking them up a half step?

Claborn: Now.

Voicebroker: For now, you are .....

Claborn: ... yes.

Voicebroker: [on other line] ... 89 and a half is next, his next offer comes in a penny higher .... Alright, I'll shoot it across to you ... urn ... you're gonna get done.

Claborn: Oh, I know. But were are off that right now.

Voicebroker: Oh, you're off that right now?

Claborn: You want something, you bring it to me.

Voicebroker: Ok.

Claborn: Bring me the bid.

Voicebroker: O.K. Alright, thanks Cody.

*See* copy of transcript of this conversation, attached hereto as Exhibit D.

130.    Later in the morning on February 27,2004, Claborn stated to a voicebroker:

Voicebroker: Hey, urn, do you have an offer? I got .90 bid by [Company C]

Claborn: Uh, .905.

Voicebroker: .905. Can you hang one second? [Talking on another line] .... 905, he's about to hang up.

Claborn: No I'm not. Don't make me feel like the bad guy here.

Voicebroker: Would you do 50 [thousand barrels].

Claborn: 50? I'll do 50.

Voicebroker: He'll do 50. [Company D]'s telling him to buy it because there's nobody else out here that has any but you. F***, what's it gonna go to Cody? A buck?

Claborn: Don't tell him you said that.

Voicebroker: I didn't tell him that.

             * * *

Claborn: Everything you say is recorded on all these lines.

Voicebroker: I hear you.

*See* DPA Statement of Facts, ¶ 55.

131.    In addition to the telephone sales, on certain occasions BP was dictating the price of sales through the use of Chalkboard. During periods when there were relatively few sellers of February 2004 TET propane in the market, members of the NGL Trading Bench posted both bids and offers on Chalkboard. At regular intervals, and usually after a single transaction in the market occurred, the members of the NGL Trading Bench, often working in a coordinated fashion, would withdraw the bids and offers and increase both the bids and the offers, thereby effectively "stepping up the price."

132.    On February 27, 2004, a counterparty located in the Northern District of Illinois holding a short position in February TET propane was forced to buy from BP Products at an

artificial and inflated price:

> Counterparty: We just did a deal on Chalkboard, do you want to do another 5?
>
> Abbott: Another five, hold on ... we're at .925 for 5 [thousand bbls].
>
> Counterparty: Holy smokes! Okay. What's going on? Just people like me out there trying to find this?
>
> Abbott: Yeah.
>
> Counterparty: Well crap, I may have to, I gotta do something here .. 925 is it?
>
> Abbott: Yep
>
> Counterparty: Jesus Christ, I don't have a choice do I? Not really?
>
> Abbott: Not if you need to cover.
>
> Counterparty: I need to cover, why don't we go ahead and do that.

*See* DPA Statement of Facts, ¶ 57.

133.    Defendants were able to drive the reported OPIS high price for TET propane in over-the-counter trading up to 94 cpg.

134.    As the result of Defendants' illegal conduct, the daily reported Mont Belvieu OPIS TET average "any" prices rose substantially in the final week of February, from 74.9375 cents to a high of 89.50 cents. In addition, the February/March spread almost doubled, from 15.8 cents to a high of 29.1 cents. In contrast, the spread between the February price and the March price for propane sold out of the Conway, Kansas hub *fell* during this same period from 5.1 to 4.1 cents.

135.    As the result of Defendants' illegal conduct described above, Mont Belvieu OPIS TET daily reported prices during this week were artificially inflated. Market participants who purchased February 2004 TET propane in over-the-counter trading were injured. In addition, market participants, including Wholesalers and Marketers, who purchased propane based on or

influenced by Mont Belvieu OPIS TET pricing, whether from TEPPCO, local refineries, other sources, as imports, or in other markets, were also injured.

136.    On March 1, 2004, the price of TET propane fell precipitously. The Mont Belvieu OPIS TET average price on Monday, March 1,2004 was 61.75 cpg, almost 25 cpg below the Friday, February 27 average published price. The price for March 2004 TET propane continued to fall for the remainder of that week. By March 10, 2004, the price of March 2004 TET propane had fallen to 56.125 cpg.

137.    Certain counterparties failed to deliver February TET propane to BP by the end of the month in satisfaction of their obligations. BP employees refused to accept late delivery at the lower March 2004 prices, and instead dictated that each counterparty that had failed to deliver February TET propane in a timely manner had to financially settle such contracts by paying the artificial and inflated February 27 OPIS high price - 94 cpg - to satisfy its obligation. BP employees, following Radley's directions, refused to negotiate on this price.

138.    As noted above, multiple supply contracts tied the purchase price to, for example, the average or blended Mont Belvieu OPIS TET prices over a preceding five or ten business day period. Under this pricing formula, Defendants' monopoly and corner continued to inflict financial damage on these parties and entities in their direct purchases of March propane from producers of TET propane up through and including Monday, March 15, 2004.

**F.    Damages in the non-TET Propane Market**

139.    As a result of the above manipulative conduct, additional supplies of propane were directed away from the non-TET caverns at Mont Belvieu and into the TET caverns in order to take advantage of the higher prices Defendants had caused as the result of their corner. This increase in supply of propane to the TET cavern occurred in several ways, including

producers who shipped propane to Mont Belvieu specifically designating that such propane was to be directed to the TET cavern rather than any other cavern, and entities who owned propane already stored in the non-TET caverns at Mont Belvieu physically removing that propane and transporting it, by truck, over to the TET caverns.[8] Because of the sharp run-up in the price of TET propane during this period, there was an active effort to move propane from the non-TET to TET storage caverns. This had the effect of reducing the supply of available non-TET propane and thus artificially increasing prices for that propane, including non-TET OPIS pricing.

140.    As a result, market participants who bought non-TET propane pursuant to supply contracts, purchase agreements or at rack prices, for example off of the Dixie or Enterprise Pipeline Systems, paid inflated prices for that propane, and were damaged.  Market participants who bought propane anywhere at prices tied to, or influenced by, Mount Belvieu OPIS non-TET prices also were forced to pay inflated prices and were damaged.  In addition, market participants who purchased February 2004 non-TET propane or financially settled a purchase or sale obligation for February 2004 non-TET propane in over-the-counter trading were forced to pay inflated prices, and were damaged.

### G.    Three Types of Damages to Direct Purchaser Plaintiffs

141.    In addition to trading damages, as direct purchasers, Plaintiffs suffered damages from three sources:

### (i)    Direct Purchases from BP within the TEPPCO Pipeline Service Area.

142.    During the relevant period, Plaintiffs purchased propane directly from BP within the TEPPCO Pipeline Service Area at prices that were artificially inflated as the result of Defendants' wrongful, deceptive, fraudulent, and illegal conduct, monopoly, and corner detailed

---

[8] There were no pipelines connecting the non-TET and TET caverns at Mont Belvieu; therefore, any movement of propane from one cavern to another had to be done by truck.

herein.

> **(ii)** **Direct Purchases from other producers within the TEPPCO Pipeline Service Area**

143.    During the relevant period, Plaintiffs purchased propane from other producers within the TEPPCO Pipeline Service Area at prices that were artificially inflated as the result of Defendants' wrongful, deceptive, fraudulent, and illegal conduct, monopoly, and corner detailed herein.

> **(iii)** **Direct Purchases from BP or other producers transacted outside the TEPPCO Pipeline Service Area**

144.    During the relevant period, Plaintiffs purchased propane from producers outside the TEPPCO Pipeline Service Area.  Although these purchases were transacted outside the nineteen states that constitute the TEPPCO Pipeline Service Area, Plaintiffs were parties to supply contracts and purchase agreements in which the price of propane was directly tied to Mont Belvieu OPIS TET pricing or OPIS non-TET pricing.  In addition, Plaintiffs purchased propane at prices influenced by OPIS TET pricing or OPIS non-TET pricing.  Defendants' illegal conduct drove up Mont Belvieu OPIS TET pricing and OPIS non-TET pricing, and thus, drove up the prices that Plaintiffs were required to pay for propane outside the TEPPCO Pipeline Service Area.

## VIII.   THE DEFERRED PROSECUTION AGREEMENT

145.    On or about October 25, 2007, BP entered into a Deferred Prosecution Agreement with the U.S. Department of Justice (the "DOJ"). The DPA is binding upon Defendants BP America, BP Corporation, BP International, BP Products, BP Energy and BP International Services, collectively referred to in the DPA as the "BP Entities." Pursuant to the DPA, the Department of Justice filed a criminal Information charging BP America with conspiring to

commit offenses against the United States. In return for the DOJ agreeing to defer prosecution of

these claims, BP America, *inter alia,* agreed to pay a monetary penalty of $100 million and,

separately, agreed to pay a total of $53 million into a fund established for victim restitution.

146.    Pursuant to the DPA, BP America admitted, accepted and acknowledged

responsibility for the acts of its current and former officers and employees of the BP Entities as

set forth in the Statement of Facts attached thereto as "Attachment A." BP America further

agreed that the factual statements set forth in the Statement of Facts were accurate.  A true and

correct copy of the Deferred Prosecution Agreement with attachment A, Statement of Facts, is

filed herewith as Exhibit E.

## IX.    THE ABILITY FOR ALTERNATIVE SOURCES OF PROPANE TO FLOW INTO THE TEPPCO PIPELINE SERVICE AREA TO UNDERMINE THE CORNER WAS EXTREMELY LIMITED

147.    As detailed above, Defendants were able to acquire and control virtually the entire

inventory of April 2003 and February 2004 TET propane.  The size of this available inventory

was limited by the size and storage capacity of the TET caverns.  Defendants demonstrated over

the relevant period that they were willing and able to, and did, buy up available supplies of TET

propane that was delivered to the TEPPCO system, driving up prices for that propane. Market

participants who were required by contract to deliver TET propane in a particular month

therefore had no alternative but to purchase that month's TET propane from Defendants and

others at the supra-competitive prices they imposed as part of their illegal monopoly and corner.

148.    Throughout the TEPPCO Pipeline Service Area, long-term supply contracts and

purchase agreements tied the price of propane to Mont Belvieu OPIS TET pricing. Defendants'

illegal conduct drove up Mont Belvieu OPIS TET pricing, and thus, the prices market

participants were required to pay for propane throughout the TEPPCO Pipeline Service Area.

This was true for any increased propane supplies that might have occurred in the supply of propane into the TEPPCO Pipeline Service Area during the relevant period.

149. There was little ability for alternative sources of propane supply to enter the TEPPCO Pipeline Service Area in a timely manner in reaction to Defendants' monopoly and corner. Other pipeline systems could not have responded by transporting alternative supplies of propane into the TEPPCO Pipeline Service Area because of physical limitations of pipeline system delivery. Refineries contributed only a small percentage of the total propane consumed in the TEPPCO Pipeline Service Area. The bulk of refinery produced propane was sold based on long-term supply contracts or purchase agreements at prices tied to Mont Belvieu OPIS TET pricing. The fact that propane is only a minor by-product of crude oil and natural gas refining imposed a further restriction on the likelihood or ability of refineries to rapidly shift to produce substantially increased amounts of propane in reaction to Defendants' corner.

150. The ability of propane imports from overseas to respond to Defendants' monopoly and corner was also extremely limited. Shipments of propane from Europe, Africa and South America take at least three weeks, making it impossible for importers to have been able to react in a timely manner once talk of the corner began to circulate among market participants. The only geographic location with propane for import into the TEPPCO Pipeline Service Area that might possibly react in a timely enough manner to affect the monthly propane supplies was Sarnia, Canada, and BP controlled virtually all propane out of Sarnia. Beyond these logistical considerations, like refinery propane, the bulk of imported propane during the relevant period was sold at prices tied to Mont Belvieu OPIS TET pricing, including the propane BP sold out of Sarnia into the TEPPCO Pipeline Service Area and the State of Michigan.

151. In summary, Defendants drove up the pricing benchmark in the TEPPCO Pipeline

Service Area as the result of their illegal conduct. The short duration of the corner, directed to the market for propane in a single month, precluded the market from providing any meaningful substitute source of supply.

152.    Over the course of the relevant period, BP owned and/or controlled upwards of ninety percent of all available February 2004 TET propane inventory, and obtained and held positions in February 2004 TET propane that exceeded the entire TEPPCO system propane inventory. As such, BP attempted to attain, did attain, and did exercise monopoly power and control over the supply of February 2004 TET propane in the TEPPCO system. Based on this control, and through the monopolistic and manipulative practices admitted to in the DPA and detailed herein, BP was able to and did inflate the price of over-the-counter transactions for February 2004 TET propane and was able to and did drive up February 2004 Mont Belvieu OPIS TET pricing. Because Mont Belvieu OPIS TET pricing was the benchmark index on which propane in the TEPPCO Pipeline Service Area (the "Relevant Market") and imports from Sarnia into Michigan were priced and sold, as a direct result of BP's manipulative conduct, the price of propane throughout the Relevant Market and beyond was artificially inflated throughout the relevant period.

153.    Defendants have already admitted in the DPA that the price of February TET propane was artificial and inflated by BP's conduct during February and March 2004. *See* DPA, Statement of Facts, ¶ 33.

**COUNT I**
**Against All Defendants**
**(Monopolization - § 2 of the Sherman Act)**

154.    Plaintiffs incorporate by reference each of paragraphs 1 through 153 above as if fully set forth herein.

155.     This claim is brought pursuant to § 2 of the Sherman Act, 15 U.S.C. §§ 2 and 3.

156.     BP willfully acquired, maintained, and exercised monopoly power over the market for February 2004 TET propane. As alleged herein, it did so by executing an unlawful "market squeeze" or corner in the February 2004 TET propane market, thereby controlling and manipulating the available supply of February 2004 TET propane, and artificially inflating the price of propane sold in the Relevant Market and imported into the State of Michigan.

157.     BP had multiple purposes for adopting its unlawful scheme.  It sought to reap monopoly profits in the sale of TET propane in the February 2004 TET propane market (which it accomplished through the "market squeeze" or corner that was intended to and did eliminate competing sellers of this propane), and in the sale of propane from Sarnia, Canada that was sold at prices based on the index OPIS TET pricing. Defendants also sought to perfect the ability to control the TET propane market "at will," allowing them to employ monopoly and corner strategies at opportune future times to obtain monopoly profits on a recurring basis.

158.     BP's actions to acquire, maintain and exercise monopoly power, were not a consequence of superior product, business acumen, or historic accident. Its actions were the consequence of its consciously unlawful plan and practices.

159.     Defendants' actions are in violation of 15 U.S.C. § 2, *et seq.,* in that they helped BP to monopolize the market for February 2004 TET propane by foreclosing competition, which in turn allowed BP to artificially inflate the price of propane sold during the relevant period at a level that would not be obtainable in a competitive market.

160.     There is no pro-competitive justification for Defendants' actions.

161.     Defendants acted with an anti-competitive purpose, and its actions had anti-competitive effects.

162.     The foregoing acts and conduct by Defendants have restrained or prevented competition and threaten to continue to restrain or prevent competition.

163.     The business of Defendants, their actions in pursuance thereof, and their unlawful scheme are within, and directly affect, trade and commerce among the several states.

164.     Plaintiffs have been injured in their business or property by reason of Defendants' antitrust violations. Their injury consists of paying higher prices for propane than would otherwise have prevailed in a truly competitive market. Such injury is of the type the antitrust laws were designed to prevent. The antitrust injury to Plaintiffs was the direct and foreseeable result of Defendants' multiple actions, as alleged herein.

165.     As a consequence, Plaintiffs are entitled to a permanent injunction, restraining BP from engaging in additional anti-competitive conduct, to judgment pursuant to 15 U.S.C. § 15 awarding Plaintiffs three-fold the damages sustained to their business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

## COUNT II
### Against All Defendants
### <u>(Attempted Monopolization - § 2 of the Sherman Act)</u>

166.     Plaintiffs incorporate by reference each of paragraphs 1 through 165 above as if fully set forth herein.

167.     This claim is brought pursuant to § 2 of the Sherman Act, 15 U.S.C. §§ 2 and 3.

168.     Defendants acted with specific intent to achieve (and did achieve in 2004) for BP monopoly power over the markets for April 2003 and February 2004 TET propane.

169.     Defendants engaged in manipulative and anti-competitive acts directed to accomplishing this unlawful purpose. As alleged herein, BP tested and attempted to manipulate the market in April 2003 and then actually executed an unlawful "market squeeze" or corner in

the February 2004 TET propane market, which enabled them to control and manipulate the available supply of February 2004 TET propane, and artificially inflate the price of propane.

170.     BP had multiple purposes for attempting to achieve this monopoly power. It sought to reap monopoly profits in the sale of TET propane in the April 2003 and February 2004 TET propane markets (which it would have (and did in 2004) accomplish through the "market squeeze" or corner that was intended to (and did in 2004) eliminate competing sellers from the monthly propane market), and in the sale of propane imported from Sarnia, Canada that was sold at prices based on the index OPIS TET pricing. Defendants also sought to perfect the ability to control the TET propane market "at will," allowing them to employ monopoly and corner strategies at opportune future times to obtain monopoly profits on a recurrent basis.

171.     There was a dangerous probability that Defendants would succeed in achieving monopoly power in the markets for April 2003 and February 2004 TET propane through the unlawful acts alleged herein.

172.     Defendants knew or should have known that achieving monopoly power in the markets for April 2003 and February 2004 TET propane and artificially inflating the OPIS TET price of propane would affect supply contracts, purchase agreements, and propane sales inside and outside the TEPPCO Pipeline Service Area.

173.     The business of Defendants and their actions in pursuance thereof and of the unlawful scheme described herein are within, and directly affect, trade and commerce among the several states.

174.     Plaintiffs have been injured in their business or property by reason of Defendants' antitrust violations. Their injury consists of paying higher prices for propane than would otherwise have prevailed in a truly competitive market. Such injury is of the type the antitrust

laws were designed to prevent, and flows from Defendants' unlawful conduct in attempting to monopolize and corner the market. Such injury was the direct, intended, and/or foreseeable result of Defendants' conduct, as alleged herein.

175.     By reason of the foregoing, Plaintiffs are entitled to a permanent injunction, restraining BP from engaging in additional anticompetitive conduct, to judgment pursuant to 15 U.S.C. § 15 awarding to Plaintiffs three-fold the damages sustained to their business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

**COUNT III**
**Against All Defendants**
**(Restitution/Disgorgement/Unjust Enrichment)**

176.     Plaintiffs incorporate by reference each of paragraphs 1 through 175 above as if fully set forth herein.

177.     Defendants benefited from their unlawful acts through, *inter alia,* the receipt of overpayments by Plaintiffs. It would be inequitable and unjust for Defendants to retain the benefit of these overpayments that were conferred by Plaintiffs on BP, or paid to Defendants pursuant to or as the result of the unlawful conduct described herein.

178.     Plaintiffs are entitled to the establishment of a constructive trust consisting of the overpayments and/or other benefits to BP.  Defendants should contribute sums equal to the amount of all such overpayments and/or benefits received, from which Plaintiffs may make claims on a pro-rata basis for restitution.

**COUNT IV**
**Against All Defendants**
**(Commodity Exchange Act)**

179.     Plaintiffs incorporate by reference each of paragraphs 1 through 178 as if fully set forth herein.

180.    This claim is brought pursuant to 7 U.S.C. § 25(a)(I)(D) and 7 U.S.C. § 13(b), for damages caused by Defendants' manipulation of the price of NYMEX future contracts for April 2003 and/or February 2004 propane and of the propane underlying such contracts.

181.    Plaintiffs purchased and/or sold contracts for future delivery of propane in April 2003 and/or February 2004.

182.    As alleged herein, Defendants had the ability to influence market prices for (a) NYMEX futures contracts for April 2003 and/or February 2004 propane; and (b) propane within the Relevant Market and within the markets for April 2003 and/or February 2004 propane; and (c) propane sold outside the TEPCO Pipeline Service Area pursuant to contracts that tied pricing to the OPIS TET pricing benchmarks. This ability was demonstrated by BP's acquisition of control over the supply of April 2003 and/or February 2004 TET propane, and the resulting effect on the prices of NYMEX futures trading for April 2003 and/or February 2004 propane and the price of April 2003 and/or February 2004 TET propane.

183.    In executing their "market squeeze" or corner strategy with respect to the market for April 2003 and/or February 2004 TET propane, Defendants intended to influence market prices for (a) NYMEX futures contracts for April 2003 and/or February 2004 propane; (b) propane within the Relevant Market and within the markets for April 2003 and/or February 2004 TET propane; and (c) propane sold outside the TEPPCO Pipeline Service Area pursuant to contracts that tied pricing to the OPIS TET pricing benchmark.

184.    During the relevant period, artificially inflated prices existed for (a) NYMEX futures contracts for April 2003 and/or February 2004 propane; (b) propane within the Relevant Market and within the markets for April 2003 and/or February 2004 TET propane; and (c) propane sold outside the TEPPCO Pipeline Service Area pursuant to contracts that tied pricing to

the OPIS TET pricing benchmark.

185.     Defendants caused these artificial prices by executing their monopoly and corner strategies with respect to the markets for April 2003 and/or February 2004 TET propane, as alleged herein.

186.     Plaintiffs who purchased February 2004 NYMEX futures contracts in January 2004, or who sold February 2004 NYMEX futures contracts prior to January 2004 and were obligated to buy them back to close their futures positions, paid prices higher than would have existed in a normal competitive market as a direct and proximate result of Defendants' unlawful manipulation, and are entitled to recover such damages pursuant to 7 U.S.C. § 25(a)(I)(D).

187.     Likewise, Plaintiffs who purchased April 2003 propane futures contracts, or who sold April 2003 futures contracts and had to close out their obligations at artificially inflated prices, paid prices higher than would have existed in a normal competitive market as a direct and proximate result of Defendants' unlawful manipulation, and are entitled to recover such damages pursuant to 7 U.S.C. § 25(a)(I)(D).

## COUNT V
## Against All Defendants
## (Common Law Fraud)

188.     Plaintiffs incorporate by reference each of paragraphs 1 through 187 as if fully set forth herein.

189.     This claim is brought pursuant to Illinois common law.

190.     In 2003 and 2004, Defendants engaged in an extensive fraudulent and deceptive scheme to monopolize the propane market and manipulate the price of propane.  Defendants' scheme included an attempt to unlawfully "squeeze" the market in April 2003 and an actual "market squeeze" or corner in the February 2004 TET propane market, which enabled them to

control and manipulate the available supply of propane, and thereby artificially inflate the price of propane bought and sold both within and without the TEPPCO Pipeline Service Area.

191.    In order to inflate propane prices, Defendants made repeated false statements of material fact, which Defendants knew to be false when made.  Defendants presented false information to the markets, falsely represented that actual transactions had not occurred by preventing transactions from being reported, and actively misled and provided false signals and information to the markets about actual availability and appropriate pricing of TET propane.  As BP has admitted, and as reflected in tape recorded phone conversations, BP knew these statements and representations were false when they were made.

192.    Defendants intended for participants in the propane markets, such as Plaintiffs, to rely on this false information.  Indeed, the market manipulation could only succeed if the markets believed BP's false information.  As Plaintiffs allege herein and Defendants have admitted in the DPA, BP traders explicitly worked to keep their true conduct a secret, even, *inter alia*, instructing brokers not to tell counterparties that BP controlled available propane supplies and was intentionally and single-handedly "stepping up" propane prices, as well as reminding brokers to censor their speech on recorded telephone lines, lest someone discover BP's misconduct.  BP intended for Plaintiffs and other market participants to respond to these artificial market conditions and buy propane at inflated prices.

193.    As Defendants intended, Plaintiffs and others reasonably relied on the false information and purchased propane at inflated prices to their detriment.  As a result, Plaintiffs suffered damages as they overpaid for their propane purchases due to BP's manipulation, fraud, and deception.

## COUNT VI
### Against All Defendants
### (Consumer Fraud and Deceptive Business Practices Act)

194.     Plaintiffs incorporate by reference each of paragraphs 1 through 193 as if fully set forth herein.

195.     This claim is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq*.

196.     In 2003 and 2004, Defendants engaged in an extensive deceptive scheme to monopolize the propane market and manipulate the price of propane.  Defendants' scheme included an unlawful attempt to "squeeze" the market in April 2003 and an unlawful "market squeeze" or corner in the February 2004 TET propane market, which enabled them to control and manipulate the available supply of propane, and thereby artificially inflate the price of propane.

197.     Defendants' market manipulation depended upon deception.  As described herein, Defendants presented false information to the markets, prevented transactions from being reported, and acted to deceive the markets about actual availability and appropriate pricing of TET propane.

198.     Defendants' intended for participants in the propane markets to rely on these deceptive acts and information.  Indeed, the market manipulation could only succeed if the markets believed the deceptive information.  As Plaintiffs allege herein and Defendants have admitted in the DPA, BP traders explicitly worked to keep their true conduct a secret, even, *inter alia*, instructing brokers not to tell counterparties that BP was intentionally and single-handedly "stepping up" propane prices and reminding brokers to censor their speech on recorded telephone lines, lest someone discover BP's misconduct.

199.     BP's deception occurred as an integral part and in the course of its conduct of

propane trading and commerce.

200. Plaintiffs suffered actual damages when they purchased propane directly from producers at prices that were artificially inflated and higher than Plaintiffs otherwise would have paid, as the result of Defendants' deceptive conduct. BP's deception proximately caused these damages. Without BP's deception, market participants, including Plaintiffs, would not have paid inflated prices and sustained these damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request judgment as follows:

A. Declaring that Defendants violated and are in violation of Section 2 of the Sherman Act, the Commodity Exchange Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and common law alleged herein;

B. Awarding three-fold damages sustained by Plaintiffs as a result of the anti-competitive conduct alleged herein under applicable federal or common law;

C. Awarding Plaintiffs punitive damages as a result of the fraudulent and deceptive conduct alleged herein under applicable statutory and common law;

D. Ordering injunctive relief, preventing and restraining Defendant BP and all persons acting on its behalf from further engaging in the unlawful acts alleged herein;

E. Awarding Plaintiffs costs, interest, expenses, and reasonable attorneys' fees and experts' fees incurred in connection with this action; and

F. Awarding such further relief as the Court may find necessary and appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

Date: February 2, 2009

Respectfully submitted,

s/ Peter G. Skiko

Peter G. Skiko
Daniel G. Wills
**SWANSON, MARTIN & BELL, LLP**
330 North Wabash
Suite 3300
Chicago, IL  60611
Telephone: 312-321-9100
Fax: 312-576-0016
pskiko@smbtrials.com

Henry Chajet
Christina Sarchio
John W. Schryber
DeMaurice F. Smith
John D. Austin, Jr.
Avi Meyerstein
Ahmad Nassar

**PATTON BOGGS LLP**
2550 M Street NW
Washington D.C. 20037
Telephone: 202-457-6000
Fax: 202-457-6315
hchajet@pattonboggs.com

***Counsel for Plaintiffs***

4953646