**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AMERIGAS PROPANE, L.P.,
FERRELLGAS L.P., TITAN ENERGY
PARTNERS, HERITAGE OPERATING,
LP, and INERGY PROPANE, LLC,

      Plaintiffs,

        v.

BP AMERICA, INC., BP CORPORATION
NORTH AMERICA INC., BP
INTERNATIONAL SERVICES
COMPANY, BP PRODUCTS NORTH
AMERICA INC., BP ENERGY, and BP
AMERICA PRODUCTION COMPANY,

      Defendants.

No. 08 CV 981
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

## I. BACKGROUND

There is little dispute regarding the facts in this case. As part of its Deferred Prosecution

Agreement with the government,[1] Defendants BP America Inc. and BP Products North America,

Inc. ("BP Defendants" or "Defendants") admitted that in February 2004, some of its traders

manipulated the February 2004 TET propane market, propane stored in and shipped via the

---

[1] On June 28, 2006, the U.S. Commodity Futures Trading Commission ("CFTC") filed a
Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties under the
Commodity Exchange Act against BP Products North America, Inc. On October 24, 2007, the
BP Defendants and the Department of Justice entered into a Deferred Prosecution Agreement, an
alternative to adjudication in which Defendants made certain admissions and agreed to cooperate
with the government.

Texas Eastern Products Pipeline Company, LLC ("TEPPCO") pipeline system.[2]  In order to artificially create a lack of supply and raise TET propane prices, BP traders, who trade in gas and power products including propane, purchased more TET propane for February 2004 delivery than BP needed.  By doing so, BP traders believed they could force counterparties with short positions[3] to pay inflated prices to cover their delivery obligations at month's end.  As part of the 36-day manipulation scheme, whatever remained would be sold at a small loss in March.[4]  BP succeeded in inflating propane prices for 19 days, driving the cost per gallon up to 94 cents from an earlier February low of 61 cents; however, the scheme eventually failed, as many counterparties declined to purchase as anticipated.

Beginning February 26, prices began to drop.  As a result of Defendants' conduct, "additional supplies of propane were directed away from the non-TET caverns," increasing supply to the TET cavern, and on March 1, the price plummeted to 61.75 cents per gallon, nearly 25 cents below the February 27 price.  BP took a $10 million loss on the propane it sold in March.  Plaintiffs, parties who purchased propane directly from producers, allege that as a result of this scheme, they suffered damages by paying artificially inflated prices.  They seek restitution as well as damages under the Sherman Act, the Commodity Exchange Act ("CEA"), and

---

[2] The TEPPCO system is the primary delivery system of propane to the Northeastern and Midwestern regions of the United States.

[3] An investor "goes short" or takes a short position when he or she borrows assets, usually in the form of securities, from a third party and sells them, with the intention of later buying the assets back and returning them to the lender.  A short seller makes a profit when, after the initial sale, the security falls in price, and the seller buys it back for less than he sold it.

[4] Plaintiffs allege that this scheme was hatched with the benefit of knowledge gained during a similar attempt in April 2003.

common law and statutory fraud.[5]  BP Defendants move to dismiss the Sherman Act and fraud

counts, and the parties filed cross motions for summary judgment on the CEA claim.  For the

following reasons, Defendants' motion to dismiss is granted in part and denied in part, and the

motions for summary judgment are denied.

## II.  MOTION TO DISMISS

### Standard of Review

A Motion to Dismiss under Rule 12(b)(6) requires that I analyze the legal sufficiency of

the complaint, and not the factual merits of the case.  *Autry v. Northwest Premium Servs., Inc.*,

144 F.3d 1037, 1039 (7th Cir.1998).  I must take all facts alleged in Plaintiffs' complaint as true

and draw all reasonable inferences from those facts in favor of Plaintiffs.  *Caldwell v. City of*

*Elwood*, 959 F.2d 670, 671 (7th Cir.1992).  Plaintiffs, for their part, must do more than solely

recite the elements for a violation; they must plead with sufficient particularity so that their right

to relief is more than a mere conjecture.  *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiffs must plead their facts so that, when accepted as true, they show the plausibility of their

claim for relief.  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Plaintiffs must do more than

plead facts that are "consistent with Defendants' liability" because that only shows the possibility,

not the plausibility, of their entitlement to relief. *Id.* (internal quotations omitted).

---

[5] A substantially similar complaint was filed against the same defendants in *Thompson's Gas & Electric Services, et al. v. BP Products North America Inc., et al.*, No. 08 CV 2693.

**Discussion**

**Monopolization Claim Under § 2 of the Sherman Act**

Section 2 of the Sherman Act imposes a penalty on persons who monopolize, attempt to monopolize or conspire to monopolize any part of interstate commerce. 15 U.S.C. § 2 (2004). "The offense of monopoly under [§] 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). "Monopoly power has long been defined in the courts as the power to exclude competition or to control price[.]" *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989). Plaintiffs may prove market power either (1) "through direct evidence of anticompetitve effects," or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). "The existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571.

In their Third Amended Complaint, Plaintiffs allege that as a result of its unlawful scheme, BP acquired and exercised monopoly power over the February 2004 TET propane market. The BP Defendants maintain that this claim should be dismissed because Plaintiffs fail to allege that (1) Defendants structurally altered the TET propane market; (2) Defendants possessed durable market power; and (3) the existence of significant barriers to entry. I have addressed this precise issue in *Thompson's Gas & Electric Services, et al. v. BP Products North America Inc., et al.*, No. 08 CV 2693. For the reasons set forth in my memorandum opinion and

order in that case, I find that Plaintiffs have adequately alleged a monopoly claim under section 2 of the Sherman Act, and Defendants' motion to dismiss this claim is denied.

**Attempted Monopolization Claim Under § 2 of the Sherman Act**

"To prove attempted monopolization under section 2 of the Sherman Act, a plaintiff must show (1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose, and most important for purposes of this case, (3) a dangerous probability that the attempt to monopolize will be successful." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989). In evaluating "dangerous probability," courts must consider the firm's "capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981) (citation omitted).

Plaintiffs allege that Defendants acted with specific intent to achieve monopoly power over the markets for April 2003, when it tested its manipulation, and for February 2004 TET propane, when it actually achieved monopoly power. According to Plaintiffs, Defendants "engaged in manipulative and anti-competitive acts directed to accomplishing this unlawful purpose," and there was a dangerous probability that Defendants would succeed in achieving monopoly power in the markets for April 2003 and February 2004 TET propane where Defendants maintained 88% market share.

Defendants argue that the structure of the TET propane market prevented dangerous probability of any monopolization. Defendants maintain that they did not control the available

supply to the market, and Plaintiffs, in their complaint, note that there were at least eight major producers of propane during the relevant period.

I have addressed this precise issue in *Thompson's Gas & Electric Services, et al. v. BP Products North America Inc., et al.*, No. 08 CV 2693. For the reasons set forth in my memorandum opinion and order in that case, I find that Plaintiffs have adequately alleged an attempted monopolization claim under section 2 of the Sherman Act, and Defendants' motion to dismiss this claim is denied.

**Illinois Consumer Fraud Act**

To adequately plead a claim under the Illinois Consumer Fraud Act ("ICFA"), a plaintiff must allege: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002).

Defendants make two arguments in an attempt to defeat Plaintiffs' ICFA claims: (1) Plaintiffs' allegations negate the element of causation necessary to state claim; and (2) Plaintiffs fail to allege sufficient conduct occurring within Illinois. As to causation, Defendants claim that because Plaintiffs essentially posit a fraud-on-the-market theory of causation, they cannot survive a motion to dismiss this claim.

Plaintiffs counter that they need not rely on the presumption of reliance created by the market theory since they received and relied on direct misrepresentations from BP representatives, as well as indirect deceptive statements. First, Plaintiffs maintain that on two occasions, BP representatives made certain statements to "a counterparty like Plaintiffs."

However, Plaintiffs do not allege that Defendants made any false, deceptive or misleading statements by Defendants *directly to them*.[6]  Second, Plaintiffs contend that they received BP's misrepresentations through "third parties" like Chalkboard and OPIS price reports.[7]  They claim that these indirect misrepresentations constitute fraud under the ICFA.  In support of their position, Plaintiffs rely on *De Bouse v. Bayer Ag*, 896 N.E.2d 882 (Ill. App. Ct. 2008).  In that case, the court of appeals held that a plaintiff patient with no independent knowledge of any

---

[6] It should be noted that Plaintiffs have also failed to identify any specific BP Defendant who made any specific misrepresentation at any specific time to any specific Plaintiff representative, which fails to satisfy pleading requirements of Federal Rule of Civil Procedure 9(b).  Plaintiffs maintain that Rule 9(b) requirements are relaxed when pleading "an extended fraudulent scheme, such as BP's," and where the facts of fraud are held exclusively by Defendants.  *See Hagstrom v. Breutman*  572 F. Supp. 692, 697 -698 (N.D. Ill. 1983) ("the sufficiency of a pleading of fraud varies with the complexity of the transaction; when transactions are numerous and take place over an extended period of time, as here, less specificity is required.");  *U.S. S.E.C. v. Santos*, 355 F. Supp. 2d 917, 921 (N.D. Ill. 2003) ("when information giving rise to securities fraud is exclusively held by defendants, the particularity requirement of Rule 9(b) is relaxed.").

Because BP has admitted the facts of its market manipulation, Plaintiffs assert that the purpose of Rule 9(b) - to minimize "fishing expeditions," and "the extortionate impact that a baseless claim of fraud can have on a firm or an individual" - is irrelevant.  *Vicom, Inc. v. Harbridge Merchant Svcs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *Fidelity Nat. Title Ins. Co. Of N.Y. v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 748-50 (7th Cir. 2005).  However, which particular misrepresentations were made, to whom, and how, would certainly be within Plaintiffs' knowledge and are not facts exclusively held by Defendants.  And where claims for fraud in Illinois require personal reliance on the alleged misrepresentation, such information is crucial to determining whether this element is adequately pled.

It is worth noting that Plaintiffs also claim in their response that when they "spoke directly with BP to conduct trades, BP fraudulently misrepresented the price and supply of propane, as well as omitted to report its illegal manipulations."  However, Plaintiffs provide no citation for this assertion, and I have been unable to locate any such allegation in the Third Amended Complaint.

[7] Chalkboard is a propane trading platform where bids are offered anonymously and party identities are revealed at the time of negotiation.  OPIS is a benchmarking service which compiles and reports propane prices from both suppliers and customers.  See http://opisnet.com.

misrepresentations by the defendant drug manufacturer could still maintain her claim against it. But in *De Bouse v. Bayer Ag*, No. 107528, 2009 WL 4843362, at *5 (Ill. Dec. 17, 2009), the Illinois Supreme Court reversed the appellate court decision, holding that "[i]f there has been no communication with the plaintiff, there have been no statements and no omissions[,]" and the plaintiff has not properly alleged proximate cause. Furthermore, "the deception of unspecified persons having no connection" to a plaintiff amounts to nothing more than a market theory, upon which an ICFA claim cannot rest. *Id.* at *8.

All of the allegations cited by Plaintiffs in reference to their reliance upon the alleged indirect misrepresentations discuss Plaintiffs' purchase of propane, the price of which was tied to the inflated OPIS TET pricing. Plaintiffs allege no reliance upon any specific statement or omission transmitted through these third-party sources. Without any direct statements to Plaintiffs, or any specific indirect statements to them via Chalkboard or OPIS, Plaintiffs are left with a fraud on the market theory in which Plaintiffs paid the inflated OPIS TET price for propane, a price which reflected BP's misconduct. As to whether or not such a theory can support an ICFA claim, I have addressed this precise issue in *Thompson's Gas & Electric Services, et al. v. BP Products North America Inc., et al.*, No. 08 CV 2693. For the reasons set forth in my memorandum opinion and order in that case, I find that Plaintiffs have failed to adequately plead reliance. Without such reliance and subsequent deception, there can be no proximate cause, and Plaintiffs' ICFA claims cannot survive Defendants' motion to dismiss.

**Fraud**

Under Illinois law, the elements of common law fraud are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that

the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 591 (Ill. 1996). Because Plaintiffs fail to allege false statements by Defendants, and put forth what is essentially a fraud-on-the-market theory of fraud, Plaintiffs' claims cannot survive a motion to dismiss.

Plaintiffs do maintain that on two occasions, BP representatives made certain statements to "a counterparty like Plaintiffs." However, Plaintiffs do not allege that Defendants made any false, deceptive or misleading statements by Defendants directly to them.[8] Instead they allege that Defendants "engaged in conduct to affect the daily and monthly average price published by OPIS," and that "this conduct was intended to present false information to the market concerning the actual availability and appropriate pricing of TET propane," and "to subvert the integrity of the industry benchmark average price[.]" Plaintiffs also allege that Defendants communicated "false" bids and offers to propane purchasers and traders, including Plaintiffs, through the Chalkboard trading platform to create the appearance that there were potentially multiple suppliers of February 2004 TET propane willing to sell. Plaintiffs claim that these offers were set sufficiently above prevailing market price so as not to result in actual sales. According to Plaintiffs, these "false" statements and deceptive conduct "prevented market participants, including Plaintiffs, from learning that the market prices were caused by an illegal market manipulation." However, it is difficult to see how these statements were "false," since they were offers that could have been and were at times accepted by buyers. Moreover, Plaintiffs do not allege any direct harm from these offers, only that they influenced the market in such a way that

---

[8] The same Rule 9(b) issue raised supra, n.6 applies here as well.

the truth was obscured. Plaintiffs are alleging a fraud on the market claim, rather than a traditional common law fraud claim.

Plaintiffs contend that these are indirect representations that constitute common law fraud. In support of this proposition, Plaintiffs rely on *St. Joseph Hosp. v. Corbetta Const. Co., Inc.*, 316 N.E.2d 51, 72 (Ill. App. Ct. 1974), where the court noted that under Illinois law, privity is not a prerequisite to recovery under a fraud theory. "It is enough that the statement by the defendant be made with the intention that it reach the plaintiff and influence his action and that it does reach him and that he does rely upon it, to his damage." *Id.* The court held that a hospital could sue a laminate panel manufacturer for fraud where the false statement about the panels' flammable nature was made to the construction company that built the building and not to the hospital itself.

It is true that under Illinois law, false representations need not be made directly to the party claiming to have relied on them, but may instead be indirect, "where a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving him." *Id.* (citation omitted). However, this requires reliance on the particular statement at issue, even though it is not made directly to the complaining party. In this case, Plaintiffs are not alleging that they accepted any of Defendants' offers or were recipients of any false statements, nor do they claim to have relied on specific statements made to them via a third party. They instead allege that they relied on market information in making decisions. This fraud-on-the-market theory cannot support a claim for common law fraud.

**Unjust Enrichment**

"To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc*., 545 N.E.2d 672, 678-679 (Ill. 1989) (citations omitted). Defendants first argue that they received no benefit as a result of this scheme, and that in fact, they sustained substantial losses. As a result, they claim, Plaintiffs cannot allege that they have "unjustly retained a benefit" to Plaintiffs' detriment. *Id.* at 679. Second, Defendants argue that the constructive trust remedy[9] sought by Plaintiffs is "unavailable" here because Plaintiffs cannot identify a res. I have addressed these precise issues in *Thompson's Gas & Electric Services, et al. v. BP Products North America Inc., et al.*, No. 08 CV 2693. For the reasons set forth in my memorandum opinion and order in that case, these grounds for dismissal are inappropriate.

Defendants make a third argument, claiming that Plaintiffs cannot sustain an unjust enrichment claim where they have an adequate remedy at law. Plaintiffs counter that Defendant's equitable defense of "adequate legal remedy," fails because Plaintiffs' unjust enrichment claim, rooted in restitution, is an action at law, to which equitable defenses do not apply. In support of their contention that unjust enrichment is a legal action, Plaintiffs cite *Scott v. GlaxoSmithKline Consumer Healthcare, L.P.*, No. 05 C 3004, 2006 WL 952032, at *4, (Apr. 12, 2006) and *Partipilo v. Hallman*, 510 N.E.2d 8, 10-11 (Ill. App. Ct. 1987). In *Scott*, 2006 WL

---

[9] "A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct." *Eychaner v. Gross*, 779 N.E.2d 1115, 1143, (Ill. 2002).

952032, at *4, I ruled that where a plaintiff was using the principles of unjust enrichment to only

seek restitution for the amounts she and prospective class members overpaid for a drug, she was

actually bringing an action at law. I noted, however, that were the plaintiff seeking a constructive

trust, her claim would be an equitable one, subject to the adequate legal remedy defense. *Id.* at

n.2. In *Partipilo*, the court held that where a plaintiff seeks money damages, "unjust enrichment,

sometimes referred to as restitution, a contract implied in law, quasi-contract, or an action in

assumpsit . . . is an action at law." 510 N.E.2d at 10-11. Defendants maintain that it is only when

an unjust enrichment or restitution claim is quasi-contractual that it is an action at law. *HPI*, 545

N.E.2d at 678 ("The doctrine of unjust enrichment underlies a number of legal and equitable

actions and remedies, including the equitable remedy of constructive trust and the legal actions of

assumpsit and restitution or quasi-contract."). And in *Independent Voters of Illinois v. Illinois

Commerce Com'n*, 510 N.E.2d 850, 854 (Ill. 1987) (citations omitted), a case that followed

*Partipilo*, the Illinois Supreme Court noted that "[r]estitution is an equitable remedy that is

sought before a court, and the basis of such liability is unjust enrichment to the defendant.

Restitution is compelled against one who has obtained money or property without authority and

usually where an adequate legal remedy does not exist for the aggrieved party."[10] Here,

Plaintiffs are seeking a constructive trust, an equitable remedy, and they base their

restitution/unjust enrichment claim, a claim characterized by the Illinois Supreme Court as an

equitable remedy, on Defendants' "inequitable" conduct. Such a remedy is available to a

---

[10] *But see Burns Philp Food, Inc. v. Cavalea Continental Freight, Inc.*, 135 F.3d 526,
528 (7th Cir. 1998) ("we do not find persuasive indications that the Supreme Court of Illinois
thinks of restitution as an action in equity rather than at law.").

plaintiff where he has no adequate remedy at law. *Id.*; *Season Comfort Corp. v. Ben A. Borenstein Co.*, 655 N.E.2d 1065, 1071 (Ill. Ct. App. 1995).

Defendants contend that Plaintiffs have an adequate remedy at law pursuant to the CEA, 7 U.S.C. § 25(a)(1)(A)-(D), which provides a private remedy for plaintiffs who traded futures that were affected by a manipulation of the market. But in their response to Plaintiffs' motion for summary judgment on their CEA claim, discussed *infra*, Defendants argue that Plaintiffs do not have standing to bring such a claim. If it is true that Plaintiffs lack standing to bring a CEA claim, then they would not have access to an adequate legal remedy. Because I find, as discussed *infra*, that Plaintiffs' standing under the CEA is a live question of material fact that cannot be decided at this stage, I cannot determine whether or not Plaintiffs have an adequate remedy pursuant to the CEA. For this reason, Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is denied.[11]

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted as to Plaintiffs' fraud and ICFA claims, and denied as to Plaintiffs' claims of monopolization, attempted monopolization and unjust enrichment.

## III. MOTION FOR SUMMARY JUDGMENT

## Standard of Review

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[11] At the October 7 hearing, Plaintiffs confirmed that the unjust enrichment claim and the CEA claim were pled in the alternative. Further discovery will uncover which of the two claims, if any, Plaintiffs may pursue.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). I consider the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the nonmovant's favor. *Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 471 (7th Cir. 2002). I will accept the nonmoving party's version of any disputed fact only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers*, *Inc.,* 92 F.3d 560, 562 (7th Cir. 1996).

**Preliminary Issues**

Defendants generally object to Plaintiffs' statement of facts as immaterial, on the basis that it discusses the manipulation of the February 2004 TET propane market, which is a market for physical propane. Defendants claim that such allegations are irrelevant because the CEA "creates the exclusive remedies available to those injured by violations of the CEA, and makes

those remedies available only to persons injured in the course of trading on a contract market."

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1153 (7th Cir. 1992)

(emphasis added; abrogated on other grounds). Defendants argue that the relief Plaintiffs are

seeking pursuant to the CEA is not available to them in light of the facts asserted in their Local

Rule 56.1(a)(3) statement of facts.

Part and parcel of this argument is Defendants' challenge to Plaintiffs' standing in their

response to Plaintiffs' motion for summary judgment. There, Defendants point out that Plaintiffs

have offered no evidence that they meet the standing requirements by having traded propane

futures in a contract market. In connection with the standing issue, Defendants filed a Rule 56(f)

declaration requesting discovery.

In response to Defendants' argument challenging Plaintiffs' standing to bring a CEA

claim, Plaintiffs included in their Local Rule 56.1(b)(3)(c) Statement of Additional Facts nine

new fact statements on the issue of standing. They also included four new fact affidavits and a

new "expert" report focused on standing issues. Defendants now move to strike these nine

factual assertions, arguing that they were inappropriately submitted in reply to Defendants'

response.

Plaintiffs maintain that where Defendants filed a "Combined Response to Plaintiffs'

Motion for Partial Summary Judgment" these assertions are permitted under Local Rule

56.1(b)(3)(c). Alternatively, Plaintiffs maintain that it is within my discretion to consider the

issue of standing and the facts put forth by Plaintiffs on the topic. However, neither of Plaintiffs'

arguments succeeds. "Local Rule 56.1 does not contemplate a statement of additional facts from

the movant."[12] *Blackhawk Molding Co., Inc. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948, 952 (N.D. Ill. 2006). Here, Plaintiffs submitted their factual assertions on standing in response to Defendants' opposition, not in opposition to Defendants' own motion for summary judgment. While it may be within my discretion to consider them, such an exercise would be unjust where Defendants have had no opportunity to dispute these facts, nor have they had any opportunity to take discovery on the issue. For these reasons, Defendants' motion to strike paragraphs 20 through 28 of Plaintiffs' Local Rule 56.1 Statement of Additional Facts is granted.

In their response to Defendants' Local 56.1 Statement of Facts, Plaintiffs object to several of Defendants' factual assertions as immaterial, but I need not address each individual objection. I regard Defendants' Statement of Facts to be based on an incomplete record in light of the fact that at the time the briefs were filed no discovery had taken place with regard to either Plaintiffs' standing or Defendants' statute of limitation defense. Similarly, because I find both motions for summary judgment to be premature, I need not address each of Defendants' individual objections to Plaintiffs' assertions of fact.

## Discussion

Nearly two weeks after filing their Third Amended Complaint, Plaintiffs filed a motion for partial summary judgment on their CEA claim. Section 22(a)(1)(D) of the CEA), codified at 7 U.S.C. § 25(a)(1)(D) (2008), creates a private right of action solely for plaintiffs injured from a manipulation of a futures market or organized exchange. 7 U.S.C. § 25(a)(1)(D) (2008); *Three*

---

[12] Local Rule 56.1(a) makes clear that any statement of facts submitted by the moving party in reply to the opposing party's statement of additional facts should consist not of new facts but of pointed responses to each of the opposing party's individual statements. In this case, Defendants did not include any factual assertions regarding Plaintiffs' standing, so the new facts submitted by Plaintiffs cannot appropriately be considered a reply under the rule.

*Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033 (S.D.N.Y. 1993). The statute "creates the exclusive remedies available to those injured by violations of the CEA, and makes those remedies available only to persons injured in the course of trading on a contract market." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1153 (7th Cir. 1992) (emphasis added; abrogated on other grounds). Section 22 specifies that only those persons trading in a "contract of sale of any commodity for future delivery" may bring suit, and it is well established that this language refers to a futures contract, rather than a cash-forward contract for sale of a physical commodity. *See* 7 U.S.C. § 25(a)(1)(B)&(D); *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 865-66 (7th Cir. 2004); *Nagel v. ADM Inv. Svcs., Inc.*, 65 F. Supp. 2d 740, 751 (N.D. Ill. 1999), aff'd, 217 F.3d 436 (7th Cir. 2000).

Plaintiffs' motion for summary judgment is based largely on the fact that in their Deferred Prosecution Agreement, Defendants admitted to conspiring to "corner the market and manipulate the price of February 2004 TET propane contrary to [the] Commodity Exchange Act." Plaintiffs maintain that in light of these admissions, there is no genuine issue of fact as to whether Defendants violated the CEA, and Plaintiffs are entitled to summary judgment on their claim.

Defendants respond that Plaintiffs' motion should be denied because (1) their claim is barred by the statute of limitations; (2) they have failed to offer any evidence that they have standing under the CEA; and (3) their motion does not support the liability ruling they seek. Defendants also move for summary judgment on the CEA claim on the ground that the statute of limitations bars the claim. Because there exists genuine issues of material fact as to whether Plaintiffs' CEA claims were timely filed and whether they have the standing to file them, the motions for summary judgment are denied.

Any cause of action brought pursuant to section 25 of the CEA "shall be brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). "[T]he statute commences to run when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge of the conduct in question." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991) (citations omitted). The limitations period begins "when the plaintiff knew or in the exercise of reasonable diligence should have known of defendant's alleged misconduct." *Id.* (citation omitted).

Defendants argue that Plaintiffs should have known about BP's market squeeze no later than February 27, 2004, rendering the February 15, 2008 complaint two years too late. Plaintiffs themselves point to OPIS newsletters dated February 23 and 24, 2004, and another February 24 industry report described the "short squeeze" on the market. They admit that the February 2004 TET propane market was "tight," and that three of the four plaintiffs "were aware that BP was acquiring a long position." Additionally, Plaintiffs in their Third Amended Complaint allege that by February 23, 2004, some market participants began to suspect BP of price manipulation. According to Defendants, the self-described "nation's largest propane company" was surely as sophisticated if not more so than an ordinary market participant, and should have known about the reasons behind the February 2004 price spike. At the very least, such sophisticated parties could have done a simple comparison of TET prices against other benchmarks to determine the artificiality of TET propane prices. Defendants maintain that these facts support summary judgment in their favor, or at a minimum, denial of Plaintiffs' summary judgment motion.

Plaintiffs counter that the doctrines of inquiry notice, equitable estoppel, and class action tolling preclude Defendants from claiming a statute of limitations defense. First, Plaintiffs argue that the statute of limitations does not begin to run until a plaintiff is on inquiry notice, where he

is "on notice of the need to conduct further inquiry," and should be able, with the exercise of reasonable diligence, "to learn the facts underlying the claim" such that a suit could be filed. Plaintiffs maintain that the few news reports of a "squeeze" were merely relaying rumor, and that there were many reports of possible legitimate reasons for the February price swing. Investigation of the circulating gossip would not have revealed the facts necessary for Plaintiffs to file a complaint. It was not until the CFTC complaint was filed in June of 2006 that Plaintiffs claim they were on inquiry notice. Plaintiffs maintain that Defendant "bears the burden of showing what a reasonably diligent investor could have done to obtain the necessary information," and that they have failed to do so.

The doctrine of inquiry notice does not preclude Defendants from raising a statute of limitations defense in this case. In support of their contention that inquiry notice marking the commencement of the limitations period requires the ability to ascertain facts underlying the claim, Plaintiffs cite *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367-8 (7th Cir. 1997), *In re Motorola Securities Litigation*, 505 F. Supp. 2d 501, 526 (N.D. Ill. 2007), and *Morton's Market Inc. v. Gustafson's Dairy Inc.*, 198 F.3d 823, 832 (11th Cir. 1999), none of which involves CEA claims. Rather *Marks* and *Motorola* address the one-year statute of limitations for actions for securities fraud arising under Rule 10b-5 promulgated pursuant to the Securities Exchange Act. 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78j(b) (2000); *see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991) ("Litigation instituted pursuant to § 10(b) and Rule 10b-5 therefore must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation."). *Morton's Market* involves the statute of limitations under the Clayton Act. 15 U.S.C. § 15b. Defendants maintain that as such, the "inquiry notice" described by Plaintiffs is not applicable here, and that it is the

"reasonable diligence" standard articulated in *Dyer*, which applies. However, it is difficult to see how this difference is dispositive here.

To begin, the "reasonable diligence" standard is based on the Seventh Circuit's finding in *Hupp v. Gray*, 500 F.2d 993, 996-97 (7th Cir. 1974) that the plaintiff in a securities fraud suit brought pursuant to § 10(b) "has the burden of showing that he 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" It is not entirely clear that *Marks* and *Motorola* do not apply here. Moreover, it is difficult to see how the standards are all that different from one another. In *Dyer*, 928 F.2d at 240, the Court explained that the limitations period begins "when the plaintiff knew or in the exercise of reasonable diligence should have known of defendant's alleged misconduct." In *Motorola*, 505 F. Supp. 2d at 526 the Court set forth the applicable standard this way:

> The test is an objective one. Inquiry notice occurs when the plaintiff becomes aware of facts that would have led a reasonable person to investigate whether he might have a claim. In other words, a plaintiff is put on inquiry notice when the plaintiff has learned or should have learned the facts that he must know to know that he has a claim. Inquiry notice does not, however, require that the plaintiff have in hand all the facts he needs in order to bring suit immediately. Rather, the statute of limitations is triggered when the plaintiff learns or should have learned through the exercise of ordinary diligence ... enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year. Such facts must be sufficiently probative of fraud to be advanced beyond the stage of mere suspicion, but can fall short of actual proof of fraud.

In both standards, the plaintiff is required to exercise "ordinary diligence" to discover the defendant's alleged misconduct, and the statute is triggered at the point where the plaintiff should have been able to do so. In a securities fraud case such as *Motorola*, a plaintiff would need to be in a position to discover more facts than he normally would to state a claim, since such fraud claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). But in either instance, awareness of the defendant's alleged misconduct would most likely

mean awareness of the who, the what, the when and perhaps even the how of the misconduct - presumably enough to file a claim.

At this time, no discovery has been taken on the statute of limitations issue, and it is clear that several key facts are in dispute. One example is a February 2004 conversation between plaintiff Inergy's affiant, trader Bill Gautreaux, and BP trader Cody Claborn, in which Gautreaux allegedly asked Claborn about the circulating rumor of a BP squeeze. The parties dispute the content of the conversation, as well as whether the alleged inquiry amount to Gautreaux's "best efforts to determine if [the market manipulation] was true." Other facts in dispute include assertions made by individual employees of Plaintiffs that there was "no reason to believe that the tight market was the result of an intentional market manipulation." The BP defendants have had no opportunity to depose Plaintiffs' affiants, or collect documents and other evidence of what Plaintiffs might have known, when they knew it, and their efforts involved in discovering it. Where Defendants have the burden to prove the affirmative statute of limitations defense, it is difficult to see how summary judgment for either side is appropriate before any discovery takes place. *Motorola*, 505 F. Supp. 2d at 526. Although Defendants do raise several "red flags" that might be considered sufficient to have put Plaintiffs on "inquiry notice," "[t]he commencement of the statute of limitations is a question of fact."[13] *Morton's Market*, 198 F.3d at 828.

---

[13] The Court in *Morton's Market*, 198 F.3d at 832-833 noted:

[I]t is not enough for summary judgment to point to facts which might have caused a plaintiff to inquire, or could have led to evidence supporting his claim. A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment. To award summary judgment on such a showing is error.

.

"[R]easonable diligence may become an issue for the court if the relevant facts are undisputed and only one conclusion may be drawn from them." *Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir. 1994). Such is not the case here.

Plaintiffs also contend that Defendants are equitably estopped from a limitations defense because Defendants fraudulently concealed their misconduct. However, Plaintiffs describe acts of concealment by BP that were part and parcel of the manipulation scheme. The Seventh Circuit has cautioned that:

> [e]quitable estoppel in the limitations setting is sometimes called fraudulent concealment, but must not be confused with efforts by a defendant in a fraud case to conceal the fraud. To the extent that such efforts succeed, they postpone the date of accrual by preventing the plaintiff from discovering that he is a victim of a fraud. They are thus within the domain of the discovery rule. Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant-above and beyond the wrongdoing upon which the plaintiff's claim is founded-to prevent the plaintiff from suing in time.

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) (citation omitted); *Chapple v. National Starch and Chemical Co. and Oil*, 178 F.3d 501, 506 (7th Cir. 1999) ("The defendant's misconduct must be distinct from that which forms the basis of the plaintiff's claim[.]"). The fraudulent concealment alleged here is not "above and beyond" the scheme that forms the basis of Plaintiffs' claims. It is rather an integral part of that scheme, which could not have been executed without it. As such, equitable estoppel is inappropriate on the facts presented. Because there exists a genuine issue of material fact as to whether Plaintiffs' claims were timely filed, summary judgment is inappropriate at this time.

In addition to the statute of limitations, there also exists a question of fact as to the Plaintiffs' standing to bring a CEA claim. In their motion for summary judgment, Plaintiffs offer

no evidence of their standing under the CEA.  Although they attempt to do so in their Statement of Additional Facts, the assertions and evidence that address the issue of standing were inappropriately filed under the local rules and have been deemed stricken.  Without this evidence there is nothing in the record that supports Plaintiffs' claims of standing.

For these reasons, I find that there is a genuine issue of material fact as to when the CEA claims accrued and whether the Plaintiffs have standing to bring them.  As such, Plaintiffs' and Defendants' motions for summary judgment on Plaintiffs' CEA claim are denied.

ENTER:

James B. Zagel
United States District Judge

DATE:  February 25, 2010